**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE NEW YORK TIMES COMPANY FOR ACCESS TO CERTAIN SEALED COURT RECORDS | Miscellaneous Action No. _____ <br><br> ORAL HEARING REQUESTED |

## <u>MOTION FOR PUBLIC ACCESS TO CERTAIN SEALED COURT RECORDS</u>

The New York Times Company (the "Times"), by and through its undersigned

counsel, respectfully moves the Court, pursuant to Local Rule of Criminal Procedure 57.6,

for an Order unsealing certain sealed court records relating to the now-concluded criminal

investigation into anthrax mailings of 2001 (the "Amerithrax investigation"). Specifically, the

Times seeks access to: search warrants, warrant applications, supporting affidavits, Court

Orders, and returns (collectively, the "Warrant Materials") for all warrants requested by the

government, whether executed or not, relating to searches of property owned or used by

Dr. Bruce E. Ivins, Dr. Steven J. Hatfill and/or Ms. Peck Chegne. While the fact of these

searches is publicly known, most of the court records relating to them are sealed in their entirety,

including even the docket numbers of the proceedings through which warrants were issued.

In support of this Motion, the Times avers as follows:

**BRIEF FACTUAL BACKGROUND**

1.      The court records sought by the Times relate to the government's criminal

investigation into the deaths of five persons, and the injury of dozens of others, resulting from

the mailing of several anonymous letters to members of Congress and members of the media in

September and October 2001.  The letters contained *Bacillus anthracis,* commonly referred to as anthrax.

2.     The government has described the Amerithrax investigation as one of the most complex and far-reaching criminal investigations ever conducted by the federal government.

3.     On information and belief under Federal Rule of Criminal Procedure 41(b)(3), this Court previously has granted applications by the government in connection with the Amerithrax investigation for a number of warrants relating to the search of property owned or used by Dr. Bruce E. Ivins, Dr. Steven J. Hatfill and Ms. Peck Chegne.  On information and further belief, this Court also previously granted the government's requests to seal the search warrants and related materials in their entirety, although information about items seized by the FBI in searches of the property of Dr. Hatfill and Ms. Chegne have been made public in civil lawsuits filed by Dr. Hatfill.

4.     In 2002 Dr. Hatfill was publicly described by the Attorney General as a "person of interest" in the Amerithrax investigation, and the government just recently settled a lawsuit brought by Dr. Hatfill in which he had alleged that the government unlawfully released information about its investigation of him.  Shortly thereafter, the government asserted that Dr. Ivins, who had just died of an apparent drug overdose, was solely responsible for the anthrax mailings.  These developments have generated significant public and media attention to the Amerithrax investigation and the government's conduct over the past seven years.

**RELIEF REQUESTED**

5.     By this Motion, the Times seeks access to any (a) search warrants, (b) warrant applications, (c) affidavits in support of warrant applications, (d) Court Orders, and (e) returns

filed with the Court (collectively, the "Warrant Materials") for any warrant requested by the

government in connection with the Amerithrax investigation to search property owned or used

by Dr. Ivins, Dr. Hatfill and/or Ms. Chegne, whether or not the warrant was issued, and whether

or not it was executed.

6.      Upon information and belief, each search warrant application subject to the

Times' Motion was assigned a unique docket number, but no listing of these docket numbers is

publicly available on the Court's website or otherwise. The Times therefore also requests that

the United States Attorney be directed to provide a list of the specific docket numbers associated

with the Warrant Materials that fall within the scope of this application to unseal.

7.      As set forth more fully in the accompanying memorandum of points and

authorities, the public has a qualified right of access to the these court records, and no proper

basis exists for continuing to keep the Warrant Materials under seal, particularly given the

public's knowledge that these three individuals were subject to scrutiny by the Amerithrax

investigators.

8.      The public is intensely interested in understanding and evaluating the

government's conduct of the now-completed Amerithrax investigation. The public has a

legitimate interest in knowing the bases upon which warrants were sought, the grounds deemed

sufficient by the Court to allow searches of private homes to be conducted, and the results of

those searches. All of the reasons cited by the Department of Justice to justify the recent

unsealing of limited information concerning searches conducted in the investigation of Dr. Ivins

support the public release of the additional information sought by the Times. The Court should

lift the sealing orders that currently block public access to these Warrant Materials.

WHEREFORE, for the reasons stated herein and in the accompanying declarations and memorandum of points and authorities in support hereof, the Times respectfully requests that the Court enter an Order unsealing the requested Warrant Materials.

Dated: September 4, 2008

REQUEST FOR ORAL HEARING

The Times respectfully requests an oral hearing on this Motion.

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

By: _____
David A. Schulz, DC Bar No. 459197
Jeanette M. Bead, DC Bar No. 480539

1050 Seventeenth Street, NW
Suite 800
Washington, DC 20036-5514
Phone (202) 508-1100
Fax (202) 861-9888

*Of Counsel:*

David E. McCraw
The New York Times Company
620 Eighth Avenue
18th Floor
New York, NY 10018

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of September 2008, I caused a true and correct copy

of the foregoing Motion for Public Access to Certain Sealed Court Records, as well as true and

correct copies of the memorandum of points and authorities in support thereof, the Declaration of

Scott Shane, Declaration of Jeanette Melendez Bead, and a proposed Order, to be served by hand

delivery upon the following:

Rachel Carlson Lieber
Assistant United States Attorney
United States Attorney's Office
for the District of Columbia
National Security Section
555 Fourth St., NW, Room 11-909
Washington, DC 20530
(202) 353-8055

Jeanette Melendez Bead

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE APPLICATION
OF THE NEW YORK TIMES COMPANY
FOR ACCESS TO CERTAIN SEALED
COURT RECORDS

Miscellaneous Action No. _____

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## MOTION FOR PUBLIC ACCESS TO CERTAIN SEALED COURT RECORDS

Through this application, The New York Times Company (the "Times"), seeks access to

court records concerning specific search warrants issued in connection with the FBI's massive

criminal investigation into the anthrax mailings that caused five deaths in 2001 (the "Amerithrax

investigation"). Specifically, the Times seeks access to the search warrants, applications,

supporting affidavits, Orders, and returns (collectively, the "Warrant Materials") relating to three

individuals known to have been targeted in the Amerithrax investigation: Dr. Bruce E. Ivins, Dr.

Steven J. Hatfill and/or Ms. Peck Chegne. Each was publicly identified during the investigation

as a subject of FBI searches, and the government itself recently requested unsealing of some

warrant materials concerning Dr. Ivins due to the "extraordinary and justified public interest in

this investigation."[1] The remaining court records, however, are entirely under seal, with even the

relevant docket numbers unavailable.

As set forth below, court records reflecting the adjudication of an application for a search

warrant are not like other grand jury materials. Both the common law and the First Amendment

---

[1] *See* Declaration of Scott Shane ("Shane Decl.") ¶ 9.

extend a qualified public right of access to these court records, and the reasons for this right apply with particular force to the requested Warrant Materials.  The public has a vital, ongoing interest in understanding how the government carried out its now-completed Amerithrax investigation.  Questions continue to be raised about how the investigation became misdirected in focusing on Dr. Hatfill (at huge expense to the American taxpayer), why it took seven years to complete the investigation, and whether the government's conclusion that Dr. Ivins was solely responsible for the anthrax mailings is sound.

No proper basis exists for continuing to impose secrecy over the requested court records. The Court should lift the sealing orders that continue to block public access to the Warrant Materials, and make them fully available for public inspection.

## BACKGROUND

**A.      Public Interest in the Completed Criminal Investigation**

The court records sought by the Times arise out of the massive federal investigation into the deaths of five persons, and the injury of dozens of others, that resulted from several anthrax-laced letters mailed to members of Congress and the news media in late 2001.  This investigation was among the highest priorities of the Department of Justice for the past seven years, and solving the anthrax crime was widely viewed as a matter of vital interest to our national security. Shane Decl. ¶ 6.

In the course of this investigation, the government in 2002 declared Dr. Steven J. Hatfill a "person of interest" and placed him under intense scrutiny.  *See* Shane Decl. ¶ 3.  The government is known to have conducted several searches of property owned or used by Dr. Hatfill, including the apartment in D.C. of his girlfriend, Peck Chegne.  *See* Declaration of Jeanette Melendez Bead ("Bead Decl.") ¶ 8.  Indeed, information about the fruits of these FBI

searches has been made public in civil litigation pursued by Dr. Hatfill. *See* Bead Decl. ¶ 8. No applications for warrants that may have been issued in connection with these searches appear on the Court's docket, but on information and belief, this Court previously granted such applications under Federal Rule of Criminal Procedure 41 (b)(3) and they are currently under seal. As set forth in the accompanying declaration of Times reporter Scott Shane, there is substantial public interest in access to these sealed court records. *See* Shane Decl. ¶¶ 2, 6, 11.

Just three months ago, the government reached a multimillion dollar settlement with Dr. Hatfill to resolve a Privacy Act lawsuit he had filed in 2002 asserting, among other things, a pattern of government misconduct in connection with the investigation of him. Shane Decl. ¶ 3. The settlement has renewed the public's interest in understanding the evidence the government possessed when it publicly named Dr. Hatfill a person of interest, and the reasons why the government misdirected its investigative efforts at Dr. Hatfill at such a substantial cost in time and resources. Shane Decl. ¶¶ 5-6.

Just six weeks after its settlement with Dr. Hatfill, which itself sparked significant public debate and attention, the government announced that the anthrax case is solved and that it is closing the investigation. At a press conference on August 6, the Justice Department named Dr. Ivins, a researcher who had died from an apparent drug overdose one week earlier, the "sole suspect in the case." Shane Decl. ¶ 4. It asserted, "based on the evidence we had collected," that Dr. Ivins' guilt could be established "beyond a reasonable doubt." *Id.* During the press conference, the Justice Department discussed in detail previously sealed search warrant materials relating to searches of property owned or used by Dr. Ivins. *Id.* ¶ 9. The Justice Department stated that it was compelled to both seek the unsealing of some search warrant materials and explain their significance to the American public "because of the extraordinary and justified

3

public interest in this investigation, as well as the significant public attention resulting from" Dr. Ivins' death. *Id.*

The government's recent actions have generated significant public interest in understanding and evaluating the manner in which the investigation was carried out, including the basis for the government's decisions to target Dr. Hatfill and Dr. Ivins; the reasons that countless hours and resources were spent investigating a man who the government now acknowledges had no involvement; and, the strength of the government's case against the man it now says was solely responsible and acted alone.  These are all matters of legitimate public concern that will be illuminated by release of the Warrant Materials.

**B.     The Warrant Materials Sought by the Times**

The Times is seeking the Warrant Materials relating to three individuals who have each been publicly identified as critically connected to the Amerithrax investigation.

1. <u>Dr. Hatfill</u>.  In August 2002, the Justice Department described Dr. Hatfill as a "person of interest" in the Amerithrax investigation.  *See* Am. Compl. ¶ 51 in *Hatfill v. Mukasey*, No. 1:03-cv-01793 (RBW) (D.D.C.) (Bead Decl. Ex. 5 ).  The Times is aware of at least three searches of Dr. Hatfill's apartment in connection with the Amerithrax investigation, two of which were witnessed by the media, and at least one of which was broadcast on national television— a consensual search on June 25, 2002, a search pursuant to a warrant on August 1, 2002 and a further search on September 11, 2002.  Bead Decl. ¶ 8 & Exs. 5-7.  In addition, on June 26, 2002, the government searched a storage shed in Ocala, Florida that Dr. Hatfill had leased.  *Id.*, Ex. 5.  Although the returns for the searches conducted on June 25, 2002 and August 1, 2002 are publicly available, *see id.*, Ex. 7, the warrant applications, supporting affidavits or order for the August 1, 2002 search are not publicly available, *see* Shane Decl. ¶ 10, nor are the

Warrant Materials for any other searches of property owned or used by Dr. Hatfill available to the public. These materials presumably remain under seal in this Court.[2]

    2. <u>Peck Chegne</u>. Ms. Chegne was Dr. Hatfill's girlfriend when he was under investigation, and the apartment she shared with Dr. Hatfill in Washington D.C. was also subjected to at least one search, believed to have occurred on August 1, 2002. *See* Bead Decl. Ex. 5. The Times seeks access to the Warrant Materials relating to any search warrants issued or applied for relating to the government's investigation of both Ms. Chegne as well as Dr. Hatfill.

    3. <u>Dr. Ivins</u>. The government has identified Dr. Ivins as the person responsible for the anthrax mailings. Shane Decl. Ex. B. Although the government itself moved this Court to unseal certain Warrant Materials relating to its investigation of Dr. Ivins, it appears that additional Warrant Materials relating to the government's investigation of Dr. Ivins remain under seal.[3] The government has described the previously sealed Warrant Materials relating to Dr. Ivins as providing details about the government's evidence against Dr. Ivins, but has not indicated that warrants relating to all searches of Dr. Ivins' property are now public. *See id.*; *see also* Bead Decl. Ex. 2. By this Motion, the Times seeks any additional Warrant Materials relating to Dr. Ivins that remain under seal.

---

    [2] Upon information and belief, the June 26, 2002 search of the storage shed in Ocala, Florida was conducted with Dr. Hatfill's consent. Bead Decl. ¶ 8.

    [3] It appears at a minimum that the following Search Warrant Materials are not publicly available: (a) the Return in Mag. No. 08-496-m; (b) the Return in Mag. No. 08-497-m; and (c) the Application for a Search Warrant in Mag. No. 08-430-m. Bead Decl. ¶ 7.

# ARGUMENT

## I. THE PUBLIC HAS A QUALIFIED RIGHT TO INSPECT THE SEALED WARRANT MATERIALS

Both the common law and the First Amendment afford the press and public a qualified

right of access to inspect the Warrant Materials.[4]

### A. Common Law Right

The public's right to inspect court documents is enshrined in the common law. *Nixon v.

Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) ("the courts of this country recognize a

general right to inspect and copy . . . judicial records and documents"); *In re NBC*, 653 F.2d 609,

612 (D.C. Cir. 1981) ("existence of the common law right to inspect and copy judicial records is

indisputable"); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006) (same).

The common law access right "is not some arcane relic of ancient English law," but rather "is

fundamental to a democratic state." *United States v. Mitchell*, 551 F.2d 1252, 1258 (D.C. Cir.

1976), *rev'd on other grounds sub nom. Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589 (1978).

The right of access to judicial records exists to ensure that courts "have a measure of

accountability" and to promote "confidence in the administration of justice"—a goal that cannot

be accomplished "without access to testimony and documents that are used in the performance of

---

[4] The United States Supreme Court has repeatedly held that "representatives of the press and general public must be given an opportunity to be heard on the question of their exclusion" from judicial proceedings and records. *See, e.g., Globe Newspapers Co. v. Superior Court*, 457 U.S. 596, 609 n. 25 (1982) (internal quotations and citations omitted). An application to unseal is an appropriate procedural device for protecting the public's right of access to judicial records, including search warrant materials. *See, e.g., In re Application of Newsday*, 895 F.2d 74, 75, 79 (2d Cir. 1990) (press application to unseal search warrant application; "an opportunity must be afforded to voice objections to the denial of access") (internal quotations and citations omitted).

Article III functions." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995); *accord United States v. Hubbard*, 650 F.2d 293, 314-15 (D.C. Cir. 1981). The right also protects more generally "the citizen's desire to keep a watchful eye on the workings of public agencies." *Nixon*, 435 U.S. at 597-598. It promotes "'an informed and enlightened public opinion,'" *Mitchell*, 551 F.2d at 1258 (citation omitted), which is "the most potent of all restraints upon misgovernment," *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936).

While not every document filed with a court falls within the right of access, search warrant applications and related materials plainly do. *See, e.g., In re Search Warrant*, No. 00-138M-01 (JMF), 2000 WL 1196327, at *1 (D.D.C. July 24, 2000) (recognizing common law right of access to affidavit filed in support of a search warrant); *In re Search Warrants Issued on May 21, 1987*, Misc. No. 87-186 (JHG), 1990 WL 113874, at *3 (D.D.C. July 26, 1990) (same); *Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 65 (4th Cir. 1989) (common law right of inspection attaches once a search warrant affidavit is filed with the clerk); *In re Eye Care Physicians of Am.*, 100 F.3d 514, 517 (7th Cir. 1996) (same); *In re Search of 1638 E. 2d Street*, 993 F.2d 773, 775 (10th Cir. 1993) (same); *In re Search Warrant for Secretarial Area*, 855 F.2d 569, 573 (8th Cir. 1988) ("*Gunn I*") (same).

Indeed, Rule 41(i) of the Federal Rules of Criminal Procedure requires that all papers prepared in connection with a search warrant shall be filed with the clerk of the district court in the district in which the subject property was seized. Fed. R. Crim. P. 41(i). These records typically are then available for public inspection. As this Court has explained: "It is the practice of the Clerk of this Court to create a separate court file for each search warrant, with accompanying affidavit, and to make these files available to the public, just like any other court file." *In re Search Warrant*, 2000 WL 1196327, at *1. The sealing of search Warrant Materials

7

has been described as "an extraordinary action," one which "should be done only if the government shows a real possibility of harm." 3A Charles Alan Wright, Nancy J. King, Susan R. Klein & Sarah N. Welling, FEDERAL PRACTICE & PROCEDURE, CRIMINAL § 672 (3d ed. 1999).

The presumption favoring access to judicial records is at its apex for search Warrant Materials because those documents "adjudicate[] the right of individuals under the Fourth Amendment not to be subjected to government intrusion into areas in which they might reasonably have expected privacy absent a judicial determination of sufficient cause." *In Re Sealed Search Warrant*, Nos. 04-M-370 & 04-M-388, 2006 WL 3690639 * 3 (N.D.N.Y. Dec. 11, 2006). Because "[t]he judicial determination whether to permit the government to enter and search a person's private property and possessions" is an exercise of power "at the heart of the performance of judicial functions," the common law presumption of access to search Warrant Materials also "carries the maximum possible weight." *Id.*

Even where Warrant Materials are filed under seal, their status as public documents to which there is a presumption of access remains unchanged. *In re Application of Newsday*, 895 F.2d 74, 79 (2d Cir. 1990).[5] The common law right thus applies fully to the Warrant Materials now being sought. The warrants have either long since been executed or the searches will never be conducted, the public knows that the targeted individuals were under investigation, and the government has now declared the investigation completed and the case solved. No compelling reason exists for keeping these court records under seal.

_____

[5] In this respect, search Warrant Materials are in a different class of documents and distinguishable from grand jury records, "to which no general right of access has ever been recognized." *Newsday*, 895 F.2d at 79.

8

**B.    First Amendment Right**

As the Court of Appeals for the District of Columbia Circuit observed in *Washington Post Company v. Robinson*, 935 F.2d 282 (D.C. Cir. 1991) ("*Robinson*"), "[t]he first amendment guarantees the press and the public a general right of access to court proceedings and court documents unless there are compelling reasons demonstrating why it cannot be observed." *Id.* at 287.  This First Amendment right of access to judicial records also encompasses access to search warrant materials filed with a court, once the warrant has been executed and an investigation completed.

*Richmond Newspapers, Inc.  v. Virginia*, 448 U.S. 555 (1980), and its progeny hold that the First Amendment right extends to government proceedings and information that historically have been available to the public, and where public access plays a "significant positive role" in the functioning of government. *E.g., Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 605-07 (1982); *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8-9 (1986) ("*Press-Enterprise II*"); *ABC v. Stewart*, 360 F.3d 90, 98 (2d Cir. 2004).  Under this "experience" and "logic" analysis, the right of access "has special force" when it carries the "favorable judgment of experience," but what is "crucial" in deciding where an access right exists "is whether access to a particular government process is important in terms of that very process." *Richmond Newspapers*, 448 U.S. at 589 (Brennan & Marshall, J.J., concurring).

Under the same experience and logic analysis, the First Amendment right attaches to court-filed search warrant affidavits and related materials.  The "experience" prong of the analysis is satisfied by the previously-recognized existence of the common law right to inspect search warrant affidavits. *See Hartford Courant v. Pellegrino*, 380 F.3d 83, 92 (2d Cir. 2004) (existence of common law right is generally sufficient evidence of "a history of openness").  The

9

"favorable judgment of experience" is further confirmed by the obligation imposed by Rule 41 of the Federal Rules of Criminal Procedure to file search warrant affidavits with the court, and the fact that such documents "are routinely filed with the clerk of court without seal." *Gunn I*, 855 F.2d at 573.[6]

The "logic" or "policy" prong is equally satisfied. The focus of this analysis is whether public access to search warrant affidavits contributes to the functioning of the judicial process of which they are a part. Plainly it does. In *Richmond Newspapers*, the Supreme Court identified at least five distinct interests advanced by open proceedings, each of which equally applies to unsealed search warrant materials: (1) ensuring that proper procedures are being followed; (2) discouraging perjury, misconduct of participants, and biased decisions; (3) providing an outlet for community hostility and emotion; (4) ensuring public confidence through the appearance of fairness; and (5) inspiring confidence in government through public education regarding the methods followed and remedies granted by government. *See Richmond Newspapers*, 448 U.S. at 569-71.

The disclosure of the specific Warrant Materials at issue here likewise advances these interests. The disclosure of the Warrant Materials will materially assist the public in understanding the nature of the evidence the government possessed regarding Dr. Hatfill, who maintained throughout the course of the Amerithrax investigation that he was being unfairly

---

[6] While history and policy are interrelated in the Supreme Court's definition of the right of access, the absence of historical evidence of access to search warrant affidavits would not defeat the right. In *Press Enterprise Co. v. Superior Court*, the Court noted that the First Amendment right attached to pretrial proceedings even when they had "no historical counterpart," but the "importance of the . . . proceeding" was clear. 478 U.S. 1, 10 n.3 (1986). *See also United States v. Chagra*, 701 F.2d 354, 363 (5th Cir. 1983) (lack of historic record of access to bail proceedings does not bar recognition of a First Amendment right of access).

10

targeted by the government, and will help the public assess whether the government followed

proper procedures in the course of its prolonged investigation of an innocent man, and whether

the government was even warranted in targeting him in the first instance. Similarly, disclosure

of the Warrant Materials will allow the public to assess the strength of the government's case

against Dr. Ivins and perhaps instill the public with confidence that the government has

identified the person responsible for the anthrax mailings and that its decision to declare him the

sole perpetrator of the anthrax attacks was warranted and fair.

The public interest in evaluating the government's conduct of this investigation is

particularly significant in light of the important national security interests underlying its effort to

solve the crime, and the massive costs to taxpayers of this unprecedented undertaking, involving

"hundreds of thousands of agent-hours" and "many hours of prosecution time." Shane Decl. Ex.

B. The government itself was motivated by these same interests when it sought to unseal the

Warrant Materials relating to Dr. Ivins and discussed them in detail at the August 6 press

conference. *Id.* ("[B]ecause of the extraordinary and justified public interest in this investigation,

as well as the significant public attention resulting from the death of Dr. Bruce Edwards Ivins

last week, today we are compelled to take the extraordinary step of providing . . . the American

public with an overview of some recent developments as well as some of our conclusions.").

The "logic" of public access to search warrant affidavits is also implicit in the past

recognition of the common law right. As the Supreme Court explained in *Nixon v. Warner*

*Communications, Inc.*, 435 U.S. 589, 598 (1978), the common law right of access exists because

it is essential to "the citizen's desire to keep a watchful eye on the workings of public agencies."

Such oversight is particularly important when it comes to the Fourth Amendment and the use of

government power to invade a private home. *See, Gunn I*, 855 F.2d at 573 (access to search

11

warrant material an effective restraint on prosecutorial or judicial misconduct). *See also*,

*Lugosch*, 435 F.3d at 119 (monitoring "deters arbitrary judicial behavior" and gives public

confidence in the "conscientiousness, reasonableness, [and] honesty of judicial proceedings").

While application of the First Amendment right of access to such Warrant Materials has

not widely been litigated in the Courts of Appeals, the Eighth Circuit has concluded that the

constitutional access right does indeed apply to search warrant affidavits. *Gunn I*, 855 F.2d at

572-74. No other Circuit has disagreed in the circumstances presented here.[7]

Indeed, because Warrant Materials themselves adjudicate important constitutional rights,

application of the public's constitutional right of access is particularly appropriate. Warrant

Materials adjudicate the right of individuals under the Fourth Amendment to be free from

government intrusion into their homes and other private property, among this country's highest

values. *See generally Stanford v. Texas*, 379 U.S. 476, 481-484 (1965) (describing the history of

the Fourth Amendment and noting that its represented a "culmination . . . of a struggle against

oppression which had endured for centuries."). The judicial determination whether to permit the

government to enter and search a person's private property is a determination of an individual's

substantive legal rights. *See generally United States v. Leon*, 468 U.S. 897, 913-14 (1984)

(court's exercise of duties under Fourth Amendment warrant requirement mandates a "detached

---

[7] Rulings by the Fourth and Ninth Circuits declined to apply a constitutional right of access to search warrants, but did so at the pre-indictment stage of on-going investigations, a distinctly different factual context with a different tradition of access and different policy implications. *See Baltimore Sun Co. v. Goetz.*, 886 F.2d 60, 62-65 (4th Cir. 1989); *Times Mirror Co. v. United States*, 873 F.2d 1210, 1221 (9th Cir. 1989). Practical and policy concerns regarding how the release of pre-indictment warrant materials will interfere with an ongoing criminal investigation simply are not present where the government investigation has ended. *See In re Sealing and Non-Disclosure of Pen/Tap/2703(d) Orders*, Mag. Nos. H-08-218M & H-08-219M, 2008 WL 2315862, at *12 (S.D. Tex. May 30, 2008) ("[N]o court has ruled that search warrant applications may be sealed indefinitely after the investigation comes to a close.").

and neutral" judge who will "'not serve merely as a rubber stamp for the police'") (citation

omitted); *Johnson v. United States*, 333 U.S. 10, 14 (1948) ("The right of officers to thrust

themselves into a home is also a grave concern, not only to the individual but to a society which

chooses to dwell in reasonable security and freedom from surveillance.").

Proceedings that set limits on individual liberty, such as those represented by the Warrant

Materials, demand openness. There is a both a history and logic to public access where citizens'

constitutional rights are so directly at stake, and a necessity for it to ensure public understanding

and confidence in our judicial system. As another district court noted in ordering search Warrant

Materials released to the public, "'[p]eople in an open society do not demand infallibility from

their institutions, but it is difficult for them to accept what they are prohibited from observing.'"

*United States v. Kott*, 380 F. Supp. 2d 1122, 1124-25 (C.D. Cal. 2004) (quoting *Press-Enterprise*

*II*, 478 U.S. at 13), *aff'd*, 33 Media L. Rep. 1954 (9th Cir. 2005) (also at 2005 WL 1400288).

In short, there exists both a common law and constitutional right of public access to the

Warrant Materials that the Times has standing to enforce.

## II.     NO PROPER BASIS EXISTS FOR THE CONTINUED SEALING OF THE REQUESTED WARRANT MATERIALS

·A party seeking to restrict access rights bears the burden of justifying any limitation.

Where, as here,

> the State attempts to deny the right of access in order to inhibit the
> disclosure of sensitive information, it must be shown that the
> denial is necessitated by a compelling governmental interest, and is
> narrowly tailored to serve that interest.

*Robinson*, 935 F.2d at 287 (citation omitted); *see Johnson v. Greater Southeast Community*

*Hospital Corp.*, 951 F.2d 1268, 1277-78 (D.C. Cir. 1991); *Lugosch*, 435 F.3d at 123-24 (same).

Because a restriction on access must be "no broader than is necessary to protect those specific

13

interests identified as in need of protection," *Johnson*, 951 F.2d at 1278, any order limiting

access must also be effective in actually protecting the interest for which sealing is ordered. *See*

*Press-Enterprise II*, 478 U.S. at 14 (party seeking secrecy must demonstrate "that closure would

prevent" harm sought to be avoided); *In re The Herald Co.*, 734 F.2d 93, 101 (2d Cir. 1984)

(closure impermissible if information "has already been given sufficient public exposure").

 This Court has previously articulated six factors to assist in the judicial sealing

determination:

> (1) the need for public access to the documents at issue; (2) the
> extent to which the public had access to the documents prior to the
> sealing order; (3) the fact that a party has objected to disclosure
> and the identity of that party; (4) the strength of the property and
> privacy interests involved; (5) the possibility of prejudice to those
> opposing disclosure; and (6) the purposes for which the documents
> were introduced.

*Johnson*, 951 F.2d at 1277 n.14 (citing *Hubbard*, 650 F.2d at 317-22).[8]

 As discussed *supra* at 2-4, the need for public access to the Warrant Materials cannot

seriously be disputed. The government has conceded that they are unquestionably relevant to the

American public's understanding of the Amerithrax investigation and the conclusions the

government has made in connection with its decision to close the investigation. *See* Shane Decl.

¶ 9. The government spent countless investigative hours trying to uncover the perpetrator of the

anthrax mailings and has been charged by some as wasting many of those hours focusing on Dr.

Hatfill, a man the government has cleared from any involvement in the anthrax mailings.

 Moreover, privacy interests that might normally support sealing are not implicated by the

disclosure of the Warrant Materials sought by the Times. This case does not present the usual

---

[8] These factors were developed in considering the scope of the common law right of
access. Some courts have held that a higher standard is required where the First Amendment
right also applies. *See generally, Lugosch*, 435 F.3d at 121-125 (and cases cited therein).

privacy concerns arising from the fact that "the issuance of a warrant . . . may indicate to the public that government officials have reason to believe that persons named in the search warrant have engaged in criminal activity," even though "[p]ersons who prove to be innocent are frequently the subjects of government investigations." *Times-Mirror Co.*, 873 F.2d at 1216. With respect to Dr. Hatfill, the government itself identified him as a "person of interest" in the Amerithrax investigation, Dr. Hatfill himself brought a lawsuit against the government seeking, among other things, vindication for the government's unwarranted investigation of him, and various aspects of the investigation of Dr. Hatfill, including the searches of his apartments, were the subject of widespread public and media attention. With regard to Dr. Ivins, the government has declared that he was the sole individual responsible for the anthrax mailings and has contended that it would have been able to prove this fact beyond a reasonable doubt had Dr. Ivins been put to trial. The government has already released numerous warrant materials purporting to show Dr. Ivin's guilt. Thus, the public right of access should trump the minimal privacy interests at stake here. *See In re Search Warrants Issued June 13, 1988 for the Office and Home of William M. Galvin*, Misc. Nos. 87-218 & 88-216, 1989 U.S. Dist. LEXIS 5240, at *4-5 (D.D.C. May 12, 1989) (recognizing diminished expectations of privacy where subject of search warrants already subjected to media attention as a result of government investigation).

While some information contained in the requested search warrants materials may need to remain sealed under Federal Rules of Criminal Procedure 6(e) and 49.1, much of the information need no longer be sealed or otherwise protected, and should be disclosed at this time given the intense public interest in understanding what the government did to investigate the anthrax mailings and the basis for its belief that the crime was carried out by a single individual who has since died.

15

**CONCLUSION**

For all of the foregoing reasons, the Times respectfully requests that the Court enter an

Order unsealing the Warrant Materials relating to the government's investigation of Dr. Ivins,

Dr. Hatfill and/or Peck Chegne, in connection with the Amerithrax investigation.

Dated: September 4, 2008

                                Respectfully submitted,

                                LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

                                By:                                
                                      David A. Schulz, DC Bar No. 459197
                                    Jeanette M. Bead, DC Bar No. 480539

                                1050 Seventeenth Street, NW
                                Suite 800
                                Washington, DC 20036-5514
                                Phone (202) 508-1100
                                Fax (202) 861-9888

*Of Counsel:*

    David E. McCraw
    The New York Times Company
    620 Eighth Avenue
    18th Floor
    New York, NY 10018

16

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

IN THE MATTER OF THE APPLICATION
OF THE NEW YORK TIMES COMPANY
FOR ACCESS TO CERTAIN SEALED
COURT RECORDS

Miscellaneous Action No. _____

## DECLARATION OF SCOTT SHANE

I, Scott Shane, pursuant to 28 U.S.C. § 1746, do hereby declare:

      1.      I am a reporter for *The New York Times* (the "Times") in its Washington, D.C. bureau, and am currently reporting for the Times on the FBI's investigation into the anthrax mailings of 2001. I submit this declaration in support of the Times' Motion to Unseal Certain Sealed Documents relating to that investigation. I make this declaration based on my personal knowledge.

      2.      I have been a reporter for over twenty-five years. I reported for *The Baltimore Sun* from 1983 to 2004 and have reported for the Times since 2004. Both as a reporter for *The Baltimore Sun* and for the Times, I have regularly reported over the past seven years on the FBI's investigation into the 2001 anthrax mailings, which government investigators named "Amerithrax." The Amerithrax investigation has generated widespread public interest and has been reported about extensively in the press both nationally and internationally. In the wake of recent announcements by the Department of Justice that it considers the case solved and will soon close the Amerithrax investigation, my colleagues at the Times and I have published news articles about the investigation on an almost daily basis.

3.      In June 2008, the government reached a settlement with Dr. Steven J. Hatfill, a former government researcher who had been described by Justice Department officials as a "person of interest" in the Amerithrax investigation.  The settlement, which provides that Dr. Hatfill will receive an initial payment of $2.825 million dollars and an annual annuity of $150,000 for twenty years, resolved a lawsuit that Dr. Hatfill had initiated against the government in which he alleged, among other things, that the government unlawfully released information to the media about the government's case against him.  Annexed as Exhibit A is a true copy of the June 27, 2008 statement by the Department of Justice concerning the settlement, which is available at http://www.usdoj.gov/opa/pr/2008/June/08-opa-576.html.

4.      A little over a month later, on August 6, 2008, Jeffrey Taylor, the United States Attorney for the District of Columbia, named Dr. Bruce E. Ivins  "the sole suspect in the case," at a Justice Department press conference held just a few days after Dr. Ivins died from an apparent drug overdose.  Annexed as Exhibit B is a true copy of the transcript of the August 6, 2008 conference, which is available on the Department of Justice website at http://www.usdoj.gov/opa/pr/2008/August/08-opa-697.html.  Mr. Taylor further stated that Dr. Ivins "was the only person responsible for these attacks" and that "based on the evidence we had collected, we could prove his guilt beyond a reasonable doubt."

5.      The government has concluded that Dr. Hatfill was not involved in the anthrax mailings.  Annexed as Exhibit C is a true copy of a letter from United States Attorney Jeffrey Taylor to Thomas Connolly, Dr. Hatfill's attorney, stating that the Department of Justice has concluded that Dr. Hatfill "was not involved in the anthrax mailings."  Now that Dr. Hatfill has been cleared of any wrongdoing, the press and the public are seeking information concerning, among other things, how the government came to invest countless investigative hours focusing

on Dr. Hatfill.  Legitimate issues have been raised about why Dr. Hatfill was targeted and the propriety of the government's extremely aggressive investigative techniques, which included 24-hour surveillance, sniffing dogs, draining a pond near Dr. Hatfill's residence, and a number of other extraordinary measures.

6.      The Amerithrax investigation was among the Justice Department's highest law enforcement priorities for nearly seven years, and the government committed significant resources to uncovering the identity of the perpetrator of the 2001 anthrax mailings.  The government's recent settlement of the case brought by Dr. Hatfill and its announcement that Dr. Ivins was the sole person responsible for the anthrax mailings has generated significant public debate about the propriety of various aspects of the Amerithrax investigation, including the government's decision to target Dr. Hatfill in the first instance and the strength of the government's case against Dr. Ivins.

7.      Dr. Ivins's friends and scientific colleagues have publicly expressed their doubts about Dr. Ivins's responsibility for the anthrax mailings, and the government itself has acknowledged these doubts.  Dr. Vaid Majidi, the Assistant Director responsible for the FBI's Weapons of Mass Destruction Directorate, told reporters at an August 18, 2008 science briefing on the Amerithrax investigation: "I don't think, number one, we were ever going to put the suspicions to bed.  There is always going to be a spore on the grassy knoll."  Annexed as Exhibit D is a true copy of the Opening Statement of the August 18, 2008 science briefing, which is available at http://www.fbi.gov/page2/august 08/anthraxscience_081808.html.

8.      The government has acknowledged that federal law enforcement officials conducted more than 70 searches as part of its Amerithrax investigation.  On information and

3

belief, the warrant applications and returns were all sealed at the time they were filed with the Court, and many remain sealed at this time.

9.      The search warrants and related documents that were issued in connection with this investigation contain important information about the government's basis for targeting particular individuals and the strength of its case against Dr. Ivins.  When the Justice Department briefed the public and the press on the status of the Ameritrax investigation and discussed previously sealed search warrants and related documents that had been unsealed at the Department's request, the Department explained that it was compelled to disclose this information "because of the extraordinary and justified public interest in this investigation, as well as the significant public attention resulting from the death of Dr. Bruce Edwards Ivins . . . ." (Exhibit B).

10.      Although certain search warrants and related documents have been unsealed, many documents remain under seal.  Specifically, the applications for and affidavits supporting search warrants of Dr. Hatfill's property and the property of his girlfriend, Peck Chegne, are not publicly available.  These materials remain under seal even though the fact that these searches occurred and the fruits of the searches are largely known to the public through disclosures made in various lawsuits filed by Dr. Hatfill.  It is also unclear whether all of the search warrants, affidavits and related materials concerning the investigation of Dr. Ivins have been removed from the Court's sealing orders, even though the government has selectively disclosed some of this information.

11.      The public and the press are intensely interested in the information contained in the search warrants and related court filings concerning these three individuals.  Access to these court records will assist the public in assessing the propriety of the government's actions in

4

connection with the Amerithrax investigation, examining the information the government possessed with respect to Dr. Hatfill's involvement in the anthrax mailings, understanding how the investigation got misdirected at Dr. Hatfill at such a substantial cost in time and resources, and evaluating the evidence the government has collected to support its contention that Dr. Ivins was in fact responsible for the anthrax mailings. There is a significant and legitimate public interest in the disclosure of this newsworthy information at this time.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 3, 2008

_____

SCOTT SHANE

5

# EXHIBIT A

# Department of Justice

**FOR IMMEDIATE RELEASE**
**Friday, June 27, 2008**
**WWW.USDOJ.GOV**

**OPA**
**(202) 514-2007**
**TDD (202) 514-1888**

## Statement of Brian Roehrkasse, Director of Public Affairs, on Department's Settlement with Steven Hatfill in Hatfill v. Ashcroft

"The United States has reached a settlement with Steven Hatfill to resolve pending civil litigation about the disclosures of information related to the investigation of the anthrax mailings in the fall of 2001. The government has determined that settlement is in the best interests of the United States and has agreed to pay Dr. Hatfill and his attorneys $2.825 million dollars and purchase for Dr. Hatfill an annual annuity of $150,000. By entering into this agreement, the United States does not admit to any violation of the Privacy Act and continues to deny all liability in connection with Dr. Hatfill's claims.

"The government remains resolute in its investigation into the anthrax attacks, which killed five individuals and sickened others after lethal anthrax powder was sent through the United States mail. We commend the agents and law enforcement personnel who have devoted countless hours to the pursuit of the perpetrator of this horrible crime, and we reassure the public and the victims that this investigation remains among the Department's highest law enforcement priorities."

###

08-576

# EXHIBIT B

# Department of Justice

**FOR IMMEDIATE RELEASE**
**Wednesday, August 6, 2008**
**WWW.USDOJ.GOV**

**OPA**
**(202) 514-2007**
**TDD (202) 514-1888**

## Transcript of Amerithrax Investigation Press Conference

### *WASHINGTON, D.C.*

**3:40 P.M. EDT**

**MR. TAYLOR:** Good afternoon. I'm Jeff Taylor, the United States Attorney for the District of Columbia. I am joined here today by Joseph Persichini; Assistant Director in Charge of the FBI's Washington Field Office; Chief Postal Inspector Alexander Lazaroff; and Assistant U.S. Attorney Ken Kohl.As the Department indicated last week and has been widely reported, substantial progress has been made in the Amerithrax investigation in recent years. As you know, this investigation into the worst act of bioterrorism in U.S. history has been one of the largest and most complex ever conducted by the FBI. The U.S. Postal Inspection Service has also made an extraordinary contribution to this investigation. Over the past seven years, hundreds of thousands of agent-hours have been dedicated to solving this crime as well as I may add, many hours of prosecution time.

Ordinarily, we do not publicly disclose evidence against a suspect who has not been charged, in part because of the presumption of innocence. But because of the extraordinary and justified public interest in this investigation, as well as the significant public attention resulting from the death of Dr. Bruce Edwards Ivins last week, today we are compelled to take the extraordinary step of providing first, the victims and their families, as well as Congress, and the American public with an overview of some recent developments as well as some of our conclusions.

Earlier today, several search warrant affidavits were unsealed in federal court in the District of Columbia. Among other things, these search warrants confirm that the government was investigating Dr. Ivins in connection with the attacks, which killed five individuals and injured 17 others in 2001. Dr. Ivins was a resident of Frederick, Maryland, and a long-time anthrax researcher who worked at the U.S. Army Medical Research Institute for Infectious Diseases, known as USAMRIID.

Dr. Ivins died of an overdose on July 29, 2008, and, at the time of his death, was the sole suspect in the case. Our investigation had begun to shift to a particular laboratory at USAMRIID in 2005 and began to focus on Dr. Ivins as a suspect in 2007. In the weeks prior to his death, we had been in conversations with his attorneys regarding the direction of the investigation because we believed that based on the evidence we had collected, we could prove his guilt to a jury beyond a reasonable doubt. Based upon the totality of the evidence we had gathered against him, we are confident that Dr. Ivins was the only person responsible for these attacks.

We are now beginning the process of concluding this investigation. Once this process is complete, we will formally close the case. Had Dr. Ivins been indicted, he would have been presumed innocent until proven guilty as is the case of any other criminal defendant. We regret that we will not have the opportunity to present the evidence to a jury to determine whether the evidence establishes Dr. Ivins' guilt beyond a reasonable doubt.

We have provided you copies of the court documents, which give details about our evidence. I encourage you to read through them carefully.

I will summarize from these documents and then I'll turn the podium over to the FBI to go into greater detail. I will also note that, for a variety of reasons, there may be some questions and details we simply may not be able to discuss publicly today. I hope you respect these boundaries, given the extraordinary steps we're taking with this disclosure today.

Now, turning to the evidence.

First, we were able to identify the genetically-unique properties of the anthrax spores used in the mailings. As the court documents allege, the parent material of the anthrax spores used in the attacks was a single flask of spores, known as "RMR-1029," that was created and solely maintained by Dr. Ivins at USAMRIID. This means that the spores used in the attacks were taken from that specific flask, regrown, purified, dried and loaded into the letters. No one received material from that flask without going through Dr. Ivins. We thoroughly investigated every other person who could have had access to the flask and we were able to rule out all but Dr. Ivins.

Second, as a renowned expert in the production and purification of anthrax spores, Dr. Ivins was one of a handful of scientists with the capability to create spores of the concentration and purity used in the attacks. The affidavits allege that, not only did Dr. Ivins create and maintain the spore batch used in the mailings, but he also had access to and experience using a lyophilizer. A lyophilizer is a sophisticated machine that is used to dry pathogens, and can be used to dry anthrax. We know others in Dr. Ivins' lab consulted him when they needed to use this machine.

Third, in the days leading up to each of the mailings, the documents make clear that Dr. Ivins was working inordinate hours alone at night and on the weekend in the lab where the flask of spores and production equipment were stored. A review of his access records revealed that Dr. Ivins had not spent this many "off hours" in the lab at any time before or after this period. When questioned about why he was in the lab during those off hours prior to each of the mailings, Dr. Ivins was unable to offer any satisfactory explanation.

Fourth, the affidavits indicate Dr. Ivins had engaged in behavior and made a number of statements that suggest consciousness of guilt. For example, one night shortly after a search warrant was executed on his house, Dr. Ivins took highly unusual steps to discard a book and article on DNA coding while under 24/7 surveillance. In addition, he had submitted a questionable sample of anthrax from his flask of parent spores to the FBI, presumably to mislead investigators. He had also made far-reaching efforts to blame others and divert attention away from himself, and had made threatening e-mail statements to a friend regarding the case. Recently, he had detailed threats in his group therapy session to kill people who had wronged him, after learning he might be indicted.

Fifth, as reflected in the court documents, Dr. Ivins had a history of mental health problems and was facing a difficult time professionally in the summer and fall of 2001 because an anthrax vaccine he was working on was failing. The affidavits describe one e-mail to a co-worker in which Dr. Ivins stated that he had "incredible paranoid, delusional thoughts at times," and feared that he might not be able to control his behavior.

Sixth, throughout his adult life Dr. Ivins had frequently driven to other locations to send packages in the mail under assumed names to disguise his identity as the sender. He had also admitted to using false names and aliases in writings. In addition, he was a prolific writer to Congress and the media, the targeted victims in the anthrax attacks. Law enforcement recovered 68 letters to such entities from his house in a November 1, 2007 search.

I'll conclude with one more point. The envelopes used in the attacks were all pre-franked envelopes, sold only at U.S. Post Offices during a nine-month window in 2001. An analysis of the envelopes revealed several print defects in the ink on the pre-printed portions of the envelopes. Based on the analysis, we were able to conclude that the envelopes used in the mailings were very likely sold at a post office in Frederick, Maryland area in 2001. Dr. Ivins maintained a post office box at the Post Office in Frederick, from which these pre-franked envelopes with print defects were sold.

During the course of the seven-year investigation, Dr. Ivins was interviewed by federal authorities several times -- three times in 2008 alone. His statements were inconsistent over time and failed to explain the evidence against him.

The points I have just gone over are only a summary of the court documents we have provided you. There are additional details in the documents, which again, we encourage you to read thoroughly. All the information contained in this statement is now public information. We are able to give you this information because the United States followed proper procedures and formally requested that a federal court unseal several search warrants in this investigation, and that court approved the request. In addition, we consulted and received express permission of the Justice Department to do so.

I'd now like to introduce Mr. Persichini to provide you with some greater detail on the evidence and how the investigation was conducted. Thank you.

As Assistant Director in charge of the Washington Field Office of the FBI, I was able to be with Director Mueller this morning as he met with the families of those who died, and many of the surviving victims of these attacks. I was able to once again offer my sincere and heartfelt condolences, and provide them some of the answers they have waited for with such patience and understanding for seven years.

As U.S. Attorney Taylor pointed out, over the past seven years, the members of the Amerithrax Task Force, comprised of FBI Agents and U.S. Postal Service Inspectors, put forth a herculean effort to identify the origin of the anthrax spores contained in the mailings. And, together with career prosecutors from the Department of Justice, prepared to bring the person responsible for these crimes to justice.

The Amerithrax Task Force members worked tirelessly on a case that quickly became a global investigation spanning six continents, and required that new scientific techniques be created. Postal inspectors, FBI agents, analysts and scientists worked this investigation 24/7, with unwavering dedication and perseverance.

For example, at the time of the anthrax attacks, the protocols for genetic tests to determine the DNA fingerprint of individual batches of anthrax had not been developed. The FBI sought out the best experts in the scientific community and, over time, four highly sensitive and specific tests were developed that were capable of detecting the unique qualities of the anthrax used in the 2001 attacks.

That is to say, this investigation took our agents and scientists to new territory. An extraordinary amount of research and testing needed to achieve these groundbreaking accomplishments required months and years of trial and error analysis and review.

We were then able to trace that to an individual lab, a single flask, and one individual who controlled it. Further, painstaking investigation lead us to the conclusion that Dr. Bruce E. Ivins was responsible for the death, sickness and fear brought to our country by the 2001 anthrax mailing, and that it appears, based on the evidence, that he was acting alone.

In closing, I sincerely hope that the documents we have released today provide an overview of our investigation of the 2001 anthrax mailings, our scientific accomplishments and the conclusion made regarding Dr. Ivins.

Thank you.

**MR. TAYLOR:** We're happy to take some questions.

**QUESTION:** Can you explain, please, why you would tell a target or someone that you believed that he -- that there was a killer who had a weapon of mass destruction, and then allow that person continued access to a lab working with -- still having access to some of those substances?

**MR. TAYLOR:** With respect to the access he actually had, I'll refer to the Department of Defense. However, when the investigation began to focus on Dr. Ivins, the lab was notified of our concerns about him. With respect to what was done after that, I'll refer you to the Department of Defense.

Jim.

**QUESTION:** A question for Mr. Persichini. You build -- this is obviously, at this point, a circumstantial case. You build a strong circumstantial case. What direct evidence do you have? For instance, do you have any tape that was used on the envelope that was recovered from his home? Do you have any other -- any other evidence that clearly would link him? For instance, in the affidavit, it mentions that people of this sort often keep souvenirs. Did you find anything like that at his home?

**MR. PERSICHINI:** Well first, I would refer back to the documents, because that's the purpose of our press conference today, to provide you the documents and the information pertained in the documents. As it relates to admitting evidence into it, I'm going to refer back to Jeff. But again, we're looking at the document itself and the purpose of our release and providing this information to the families. That's first and foremost for us. So I won't discuss the actuality of evidence, then.MR. TAYLOR: Let me talk for a minute about the circumstantial evidence notion directives. As I've just laid out, there's plenty of evidence in this case of all types. We have a flask that's

effectively those spores were taken by anyone controlled by Dr. Ivins. The anthrax in that flask was created by Dr. Ivins. We have the suspicious behavior that he had undertaken over the years. We have, in addition, the mail envelopes with the tool stamp defects I had mentioned.

But again, back to circumstantial evidence -- thousands of prosecutors in thousands of courthouses prove cases beyond a reasonable doubt using circumstantial evidence. In fact, the standard jury instruction given by judges across the country is that a jury can consider circumstantial evidence and direct evidence, and they both can be given equal weight depending on the jury's view. So, again, circumstantial evidence? Sure, some of it is. But it's compelling evidence and our view is we are confident it would have helped us prove this case against Dr. Ivins beyond a reasonable doubt.

Yes.

QUESTION: When did you guys get back around to him? Reading the documents, it said June 17, 2004, the FBI discovered that the strains matched the flask. And then they got back to him about nine months later and told him that, and he lied and said than an FBI agent had told him that later. So clearly, by then, it sounds like he was actually trying to lead to guys astray. He had already given you false specimens, those kinds of things. When did you get back around to him from March 31 of 2005, as a suspect?

MR. TAYLOR: You've got to remember how complex, complicated this investigation was. At the onset, we had identified the universe of the persons and labs that might have access to this type of anthrax, once we identified what type of anthrax it was. And then over the years, there were efforts to shrink the size of that pool. One of the key steps was the science that the FBI was able to develop that, over time, allowed them to show that that flask, RMR 1029, was the parent flask for the spores used in those envelopes. That further shrunk the pool, if you will, and created additional interest in Dr. Ivins. But even at that point, the investigation still had a long way to go, because there's still a universe of people who might have access to that flask, or people with whom Dr. Ivins may have shared some portion of that anthrax.

The initial science breakthrough, if you will, came in early 2005, in terms of having validated science that could be used to show the flask was the parent; science that could be used at trial, that could lead to admissible evidence. Then in 2007, as we conducted additional investigative steps, we were able to narrow the focus even further, exclude individuals, and that left us looking at Dr. Ivins.

QUESTION: So there was at least a two-year delay between the forensic evidence leading to Fort Dietrich, and really focusing on Dr. Ivins. How big a factor was Dr. Hatfield in that, and how did the FBI get so off-track in focusing on him, apparently as the sole and primary suspect?

MR. TAYLOR: Let me refer back to what I said: It was an extensive investigation. In an investigation of this scope and complexity, the task is to follow the evidence where it leads. The science breakthrough in '05 leads you to flask RMR1029. At that point, as I said, there is a tremendous amount of additional investigation that needs to take place to identify the universe of individuals who had access to that flask, what they did with it, checking lab books, doing interviews, things of that nature. And only through taking those extensive, time-consuming steps, involving a lot of agents, were they able to exclude individuals and include others; in particular, Dr. Ivins.

QUESTION: Was Dr. Hatfield under investigation at this time? MR. TAYLOR: Again, the evidence -- the followed where it lead. That's all I'm prepared to say at this point.

QUESTION: Dr. Hatfield was never established to have access in the Detrick division or possession, obviously, of anthrax. Yet his residence was searched in June of 2002. Further searches of his property were conducted throughout that year and beyond. Yet it took until, if I'm reading your documents correctly, late 2007 before you ever sought to search Bruce Ivins' vehicles or his residence. Can you just speak to that gap? And did you determine whether Dr. Ivins ever had his vehicle cleaned or bleached in the intervening six years?

MR. PERSICHINI: I've talked already about the extensive investigation that took place from 2005 to 2007. Again, we're talking about a large number of individuals, over 100, who potentially had access to this substance. We had to go through this laborious process to ferret out or exclude those who were not involved. With respect to the other individual you mentioned, we were able to determine that at no time could that individual be put in the presence of that flask from which these spores came.

QUESTION: Jeff, did you find any handwriting samples or hair samples that would have matched Dr. Ivins to

**MR. TAYLOR:** We did not find any handwriting analysis or hair samples in the mailbox. So there were no facts and circumstances of that part.

**QUESTION:** You didn't take handwriting samples from Dr. Ivins? MR. TAYLOR: We examined handwriting samples but then there was no comparison made or a specific identification of the handwriting. It appears that when the analysts would look at it, that there was an attempt to disguise the handwriting. So it was unable to make a comparison.

With respect to handwriting samples, we did have indications from individuals with whom we spoke that there appeared to be some similarities in handwriting that were apparent. That said, we did not have a scientifically valid conclusion that we thought would lead us to be able to admit that in evidence.

**QUESTION:** Could you speak a little bit about what he said in an e-mail a couple of days before the letters went out regarding al-Qaeda having some kind of biological weapons or sarin gas or anthrax to this quality? There was some mention in the affidavits about it, and then it's compared to the letters.

**MR. TAYLOR:** That's correct. There was an e-mail at the time that mentioned that factor, and we put it in to suggest, among other things, some possible connection between what he was describing about death to Israel, death to America, and what was found in the letters that had been mailed in the attacks. QUESTION: Is that a strong connection, do you think? MR. TAYLOR: It's circumstantial evidence.

Yes?

**QUESTION:** Do you think there's a connection between Ivins and what was known at the time of the Quantico letter? There was a letter sent in September of 2001 identifying an Arab-American scientist at Fort Detrick as a bioterrorist. The letter also threatened a bioterror attack and also death to Israel. Were you ever satisfied that you were able to run down that letter and the author of that letter?

**MR. TAYLOR:** I'm not aware of any connection. To my knowledge, there's no evidence linking the two.

Joe?

**QUESTION:** In your affidavits, there's a footnote that indicates you searched -- you had probable cause to search other "individuals," more than one. Can you talk about the scope or the number of people you searched that you believe you had probable cause on?

**MR. TAYLOR:** I'm not going to get into the details of other investigative techniques that were handled that we used in this case for the other individuals. I'm here today based on all that investigation, we stand here today firmly convinced that we have the person who committed those attacks, and we are confident that had this gone to trial, we would have proved him guilty beyond a reasonable doubt.

Mark?

**QUESTION:** Can you elaborate a little bit on what you think is the motive behind this? Because of him being -- in terms of like other than mental deficiency or imbalance. And also, the evidence in the document seems to suggest that maybe he was already in a frame of mind to do this and was acting strangely before 9/11. So is there a connection with 9/11? Did 9/11 accelerate this somewhat? And finally, you'd mentioned in your statements earlier something about contacting his lawyers recently and talking with them, proving reasonable doubt. Have you got a target letter that -- had you informed him that he was being investigated?

**MR. TAYLOR:** I'm going to take those in reverse order and hope I can remember all three. There had been scheduled last week a meeting with his lawyer, what we call a reverse proffer, where we were going to sit down with him and lay our cards on the table: Here's what we have. Here's where this investigation is going. Based on the evidence that's in the affidavits and other investigation, it seems clear that Dr. Ivins was aware that the government was proceeding in that direction toward bringing charges.

Help me with number two, Mark.

**MR. TAYLOR:** The other question you have, Dr. Ivins is a troubled individual, particularly so at that time. He's very concerned, according to the evidence, that this vaccination program he's been working on may come to an end. He's also very concerned that some have been criticizing and blaming that vaccination program in connection with illnesses suffered by soldiers from, I think, the first Gulf War. So that was going on, according to the evidence, in his mind at that particular time.

With respect to motive, I'll point again to -- with respect to the motive, the troubled nature of Dr. Ivins. And a possible motive is his concern about the end of the vaccination program. And the concerns had been raised, and one theory is that by launching these attacks, he creates a situation, a scenario, where people all of a sudden realize the need to have this vaccine.

**QUESTION:** In the context of 9/11? In other words, do you think 9/11 precipitated this?

**MR. TAYLOR:** I don't want to speculate on that. I don't know.

In the back.

**QUESTION:** Just to follow, any thoughts as to why Senator Leahy, Senator Daschle, and the publication in Florida and the publication in New York?

**MR. TAYLOR:** Well, I refer you to the documents. In the affidavits, there's some speculation concerning -- or some indications, some evidence, ideas, concerning Senator Leahy and Senator Daschle. Also there's an e-mail in one of the documents talking about the National Enquirer, and the site in Florida was the publication of the National Enquirer.

**QUESTION:** Could you address the reports today that the family had been confronted at a mall in Frederick, Maryland at one point by investigators?

**MR. TAYLOR:** That's categorically false. The notion that somehow these people were coerced or abused by the agents or the lawyers is categorically false. These agents handled themselves professionally, responsibly, and with great respect for Mr. Ivins and for his family. And I'd say the same thing about the prosecutors in this case. They are pros, and they handled themselves the right way.

Joe, do you want to say anything about that?

**QUESTION:** Can you tell us Dr. Ivins was able to get the anthrax out of the lab and how he did not get sick himself? Also, were you able to place him at the mailboxes in Princeton?

**MR. TAYLOR:** With respect to your first question about getting the anthrax out of the site, Dr. Ivins -- and correct me if I'm wrong, Ken -- had vaccinated himself against anthrax.

With respect to the mailbox, as I laid out before, there is ample evidence in this case pointing to Dr. Ivins as the individual who drove to Princeton to mail those letters. He had the hours in the hot seat during the relevant times. We looked at the records when he was at work and when he would have had time to drive to Princeton, New Jersey. And it's clear from those records that he had time on the relevant occasions to drive to Princeton, mail the envelopes, and come back. There's also evidence I'll refer you to in the affidavits concerning where that mailbox was located in Princeton, New Jersey in relation to some obsessive conduct on his part with regard to a sorority. Again, it's a chain. It's a chain of evidentiary items that, assembled together, leads to one reasonable conclusion, and that is Dr. Ivins mailed that anthrax in those envelopes from that mailbox in Princeton.

Yes?

**QUESTION:** Is there evidence like a gas receipt that shows that he was there, I mean, that actually proves that he was in that area?

**MR. TAYLOR:** We don't have that piece of direct evidence you mentioned.

**QUESTION:** Sir, two questions. Is there any evidence at all that Dr. Ivins, based on his knowledge of his coworker, somehow framed or set up Dr. Hatfield? And secondly, given the fact that this guy had mental problems going back to 2000, you allege, how is it possible that a guy of his state of mind could have tricked the FBI for so long into thinking it was somebody else, or at least not him? The first question is about Dr. --

**MR. TAYLOR:** There's no evidence to indicate anything like that. With respect to the second question, no. As I said, the evidence was followed by the FBI. They conducted an exhaustive investigation, narrowing the universe. Eventually, as I said, the key breakthrough was the science that then focused their attention laser-like onto that flask and the person who had control of that flask and the person who made the spores in that flask. And then furthermore, as the investigation continues, we learn -- we can exclude others. We learn about the lyophilizer and his expertise in using that and how that could have been used to dry those spores.

**QUESTION:** You make the case that he was coming unhinged. How could a guy in his fragile state, as you describe it in these papers, for years -- you know, alcoholism, mental problems, paranoid, delusional, things you described -- how could he get away with this for so long? MR. TAYLOR: Well, I'm not going to speculate on how. I can't get into his mind. I think what you're asking, sir, answers the question itself. He had been this way for a number of years, going back for quite a number of years, and still able to carry on his professional life at USAMRIID.

Yes?

**QUESTION:** Sir, Mickey McCarter from Homeland Security Today. The scientific breakthroughs that we're discussing here, what would they need for future investigations into a sort of similar situation with anthrax or bioterrorism?

**MR. TAYLOR:** Joe?

**MR. PERSICHINI:** Well, I think first as we displayed in this case, the ability to use DNA to track this spore or the anthrax that was used is significant. Now, we do have yet -- the FBI lab has to come out with publications. We were prepared to use this analysis if we went to trial. So this is a major development. It's a significant development, and we talk about the timeframe that has taken to develop that DNA. But when you think about the universe of samples and the testing and the procedures and the verification that was done, this is -- this is a huge development not just for the FBI but all of us in law enforcement. Again, we faced a weapon which we had never, ever faced before in our life, an inability to trace that evidence such we do with either DNA or firearms or fingerprints. This is a, I think, a significant development and kudos to the lab folks that have helped.

**QUESTION:** When will your research be published?

**MR. PERSICHINI:** I'm not going to comment on -- on when the publications and the process will come out, but the FBI lab will do that accordingly.

**QUESTION:** Mr. Secretary, could you talk a little more about the meeting with the families today, just a little more about the meeting with the families?MR. TAYLOR: Let me add something on the science. It's important that the science was developed, but also that it's been validated, that it's something that's scientifically approved that can be used going forward in investigations to bring cases. And while the breakthrough came in 2005, there was an additional piece of validation regarding another assay that didn't take place until 2007.

Now, yes, sir?

**QUESTION:** Yeah, if you could just talk a little more about the meeting with the families. I think this was the first time that they all came from across the country and was invited by the FBI. Could you just talk a little bit more about that the meeting went over two hours. Did they seem satisfied with the explanation and what's the follow-up because some of them are saying they still have more questions and they're not quite knowing that this one person could do all these things and all these mailings? So what assurance did you have for some of the families who could not come to Washington today?

**MR. PERSICHINI:** Well, I think as we -- we started this conference today, the primary mission for us was to sit with the families, and FBI Director Mueller personally provided them the briefing, was there for about two hours. I think it was an outstanding opportunity for us to put forth the documents, to have the ability to show them what we

believe to be the evidence. And as I said earlier, it has been Failed 08/04/09 Page 37 of 101 ause of our rules, because of the investigative steps, we could not disclose them that evidence.

So I'm not going to characterize how it was received or -- or the mood of -- of these individuals. I think it was important for all of us, and the investigative team was all there present. I think I'd clarify it as a moving day for all of us, very important in this investigation to bring closure.

**QUESTION:** Yes, I have a two-part question.

**MR. TAYLOR:** Yes, in the back.

**QUESTION:** One, with the issue with us not knowing if that was his handwriting and also not knowing that he put these letters in the mailbox. How -- how are you so sure that there wasn't another person involved?

**MR. TAYLOR:** The evidence I described in my statement and that I've described throughout this question-and-answer period, as I said, led us to conclude that Dr. Ivins is the person who committed this crime. We are confident based on the evidence we have that we could prove this case beyond a reasonable doubt.

**QUESTION:** Also, I'd like to ask the Postal Inspector -- I don't know which one. When are you -- are you planning to brief or speak with the postal workers who were affected or is that the end of it?

**MR. LAZAROFF:** We, today, this morning sent out a letter from the Postmaster General to all of our postal employees to talk a little bit about the investigation. And the answer to your question is yes. We are planning to -- to speak with our employees further and we do have our employee support folks onsite in the -- in the facilities that were impacted to provide further assistance to any employee that's in need.

**QUESTION:** You're speaking about EAT. I'm speaking about having a briefing with the employees because I am also one of the affected employees. So I would like to know are you-all planning to do anything to meet with us so that we can get a briefing and also ask our questions.

**MR. LAZAROFF:** Yeah, I think that -- I think, as I said, we sent general information out today, and I think we had folks onsite in some of the critical facilities. And the plans are to provide briefings to the employees in the -- in the facilities that were impacted. And, of course, we'll answer the questions as the questions come into the postal service. But remember, we have 700,000 employees across the country, and we're focusing on the employees that -- that are in those critical facilities and we're going to provide general information but very specific information to the folks closest to where the incidents took place.

**QUESTION:** Mr. Persichini, when did you find out that Dr. Ivins might be suicidal and if you found that out, I guess the answer is yes, did it occur to you to take some kind of measures to keep from him the fact that you were about to close in on him so that you were able to keep him alive, try to arrest him all at once?

**MR. TAYLOR:** Our job in law enforcement is to pursue our criminal investigation. With respect to what was troubling Dr. Ivins, the agents involved in the case had been keeping tabs on Dr. Ivins for quite some time as part of the investigation. We came -- became aware through law enforcement authorities in Frederick, Maryland some new, more serious concerns and that he had been picked up by those authorities and taken to a facility in Maryland. We also learned when he was released, and from that time just a few days before he took his life, FBI agents were conducting 24/7 surveillance. We were able to prevent him from harming anyone else. Unfortunately, we were unable to prevent him from harming himself.

**QUESTION:** Did you ever feel that he was going to commit another act like this one? Was that a possibility?

**MR. TAYLOR:** I don't want to speculate about possibilities. What we know is that the attacks took place when they did and there have been nothing similar since then.

**QUESTION:** Can you speak a little broadly about some of the skepticism that people have?

Amerithrax Court Documents

###

**EXHIBIT C**



U.S. Department of Justice

Jeffrey A. Taylor
United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St., N.W.*
*Washington, D.C. 20530*

August 8, 2008

Thomas Connolly, Esq.
Harris, Wiltshire & Grannis LLP
1200 Eighteenth Street, NW
Washington, DC 20036

Dear Mr. Connolly:

This letter reiterates the Department's position concerning your client, Dr. Steven Hatfill, which we had sought to make clear at our August 6, 2008, press conference.

Over the course of the FBI's seven-year investigation into the anthrax mailings of 2001, the FBI scrutinized hundreds of potential suspects in the United States and abroad, and always endeavored to follow the evidence wherever it led. That evidence led to one man, Dr. Bruce Ivins, and excluded your client as a subject or target of the investigation. As the Department stated publicly on August 6, 2008, we believe that Dr. Ivins, acting alone, committed the anthrax mailings.

The scientific breakthroughs that allowed investigators to trace the source of the anthrax used in the 2001 attacks to the flask of anthrax stored in Dr. Ivins's laboratory at USAMRIID took several years to develop and validate. These forensic techniques did not exist in the summer of 2002, when the FBI conducted a search at the home of your client. We have concluded, based on lab access records, witness accounts, and other information, that Dr. Hatfill did not have access to the particular anthrax used in the attacks, and that he was not involved in the anthrax mailings.

Sincerely yours,

JEFFREY A. TAYLOR
United States Attorney

**EXHIBIT D**



# FEDERAL BUREAU OF INVESTIGATION

*Celebrating a Century 1908-2008*

SEARCH

**Contact Us**
- Your Local FBI Office
- Overseas Offices
- Submit a Crime Tip
- Report Internet Crime
- More Contacts

**Learn About Us**
- Quick Facts
- What We Investigate
- Natl. Security Branch
- Information Technology
- Fingerprints & Training
- Laboratory Services
- Reports & Publications
- History
- More About Us

**Get Our News**
- Press Room
- E-mail Updates
- News Feeds

**Be Crime Smart**
- Wanted by the FBI
- More Protections

**Use Our Resources**
- For Law Enforcement
- For Communities
- For Researchers
- More Services

**Visit Our Kids' Page**

**Apply for a Job**

## Headline Archives

### SCIENCE BRIEFING ON THE ANTHRAX INVESTIGATION
### Opening Statement by Dr. Vahid Majidi

08/18/08

Good afternoon ladies and gentlemen. I am Vahid Majidi, the Assistant Director responsible for the FBI's Weapons of Mass Destruction Directorate. I would like to start today's session with a brief opening statement and define the scope of our roundtable discussion.

After nearly seven years of investigation we have developed a body of powerful evidence that allows us to conclude that we have identified the origin and the perpetrator of the 2001 bacillus anthracis mailings.

The attribution process and identification of a specific perpetrator relies on the confluence of intelligence, investigative, and forensic information. It is the forensic information that determined the source of the 2001 bacillus anthracis mailings to be derived from a unique pool of spore preparations known as RMR-1029 that was maintained at U.S. Army Medical Research Institute for Infectious Diseases, Fort Detrick, Maryland (USAMRIID). While there were countless investigative hours spent narrowing the field of suspects, we are here today to focus on the scientific aspects of this case.

First of all, let me dispel some frequently repeated erroneous information. For example:

- There were no intentional additives combined with the bacillus anthracis spores to make them any more dispersible.

- The purity of samples obtained from the four letters (Hart and Russell Senate office, and NBC and New York post offices in New York) were sufficiently different, which allowed us to conclude that at least two different bacillus anthracis batches were prepared from the original RMR-1029. This indicates that aliquots of the RMR-1029 were removed and cultured in at least two separate batches to produce the materials used in the mailings.

The FBI began this complex investigation by coordinating analyses of the spore powders contained in the 2001 bacillus anthracis mailings. We enlisted the help of many biodefense experts to assist our examinations, including those who had previously developed tests to differentiate strains of bacillus anthracis and identify the spores in the letters as the "Ames strain."

Other analytical strategies were employed to target the chemical and elemental profiles of the spore powders. Specific techniques included scanning and transmission electron microscopy, energy dispersive X-ray analysis, carbon-dating by accelerator mass spectrometry, and inductively coupled plasma-optical emission and mass spectrometry.

Additional scientists from the Department of Defense and the Centers for Disease Control examined the spore materials and it was determined that there were many phenotypic variants within the samples.

With generous support by both the National Institutes of Health, the National Science Foundation and other government agencies, FBI scientists worked with The Institute for Genomic Research to determine if genetic mutations were responsible for the altered appearance of the variants found in the bacillus anthracis letters. Several genetic mutants were discovered in these studies.

FBI microbiologists contracted the assistance of several laboratories to develop highly specific assays to detect four specific genetic mutations found in the bacillus anthracis letters.

The mutation detection assays were validated and used by the FBI Laboratory to examine the repository of bacillus anthracis Ames that was collected through the course of the investigation.

This unprecedented scientific approach allowed the FBI to identify potential sources of the bacillus anthracis used to produce the 2001 spore powders.

Through a comprehensive analytical approach, the investigators were provided with validated scientific data which linked the material used in the 2001 attacks to material from USAMRIID identified as RMR-1029.

It is important to emphasize that the science used in this case is highly validated and well accepted throughout the scientific community. The novelty is in the application of these techniques for forensic microbiology.

Today, I am very confident that the significant lessons learned from the 2001 bacillus anthracis case have been rigorously evaluated by the FBI and appropriate actions have been taken to safeguard the American public. The FBI Laboratory has revolutionized the approach to nontraditional forensic samples and has developed robust capabilities to collect and examine evidence containing biological, chemical, radiological or nuclear materials. We have developed a strong partnership with the U.S. government laboratory complex, public health system, private industry and academia to significantly enhance our capabilities dealing with future investigations. The creation of the Weapons of Mass Destruction Directorate is another example of the FBI's progressive approach focusing on prevention as well as investigation of all issues involving chemical, biological, radiological and nuclear materials.

Please note that there were many dedicated individuals, including prosecutors, scientists, investigators, analysts, and support personnel that worked on this case.

Finally, I am asking you to understand that this is the first step toward broader dissemination of the scientific information surrounding this case. Additional information will be available through peer reviewed publications and I ask you to please respect the integrity of this process. In fact, several research projects related to the FBI's investigation have already resulted in peer reviewed publications and we will provide you with that list. Additional publications will be available for peer review as more information from the investigation is released.

Before we open the floor for questions and answers session, we would like to introduce you to our distinguished panel. Today, we have with us a small group of individuals representing the large cadre of non-Bureau scientists that helped us chart and navigate our scientific path through this unprecedented case. In the near future, after we work through each non-disclosure agreement and privacy issues, we will release the names of those key individuals who tirelessly worked with us on the 2001 bacillus anthracis mailings.

To my left is the current FBI Laboratory Director, Dr. Chris Hassell. Dr. Hassell will introduce our panel members.

**Professor Paul Keim**
Professor Paul Keim is Regents Professor of Biology and holds the Cowden Endowed Chair in Microbiology at Northern Arizona University. He is also Director of the Pathogen Genomics Division at the Translational Genomics Research Institute. His research focuses on molecular genetics for a wide variety of organisms, including bacteria, fungi, plants and animals. His work in support of the FBI included identification of the spore powders as the Ames strain of the anthrax bacillus.

**Dr. James Burans**
Dr. James Burans is currently the Associate Laboratory Director of National BioForensic Analysis Center (NBFAC). He has been in the forefront of development of diagnostic assay techniques to identify and characterize biological threat agents. He led several of the Scientific Working Groups that were assembled from the National Academy of Sciences, National Laboratories and other Federal R&D facilities.

**Dr. Rita Colwell**
Dr. Rita Colwell is currently Distinguished Professor both at the University of Maryland, College Park, as well as at the Johns Hopkins University Bloomberg School of Public Health, and she is also Senior Advisor to Canon U.S. Life Science Inc. From 1998 to 2004, she served as Director of the National Science Foundation, which provided funding for much of the genetic sequencing efforts in support of the FBI investigation. She has served as president of the American Association for the Advancement of Science, the American Society for Microbiology, and she is a member of the National Academy of Sciences. In July 2007, she received the National Medal of Science.

**Professor Claire Fraser-Liggett**
Professor Claire Fraser-Liggett is a Professor of Medicine and Director of the newly created Institute for Genome Sciences at the School of Medicine, University of Maryland in Baltimore, Maryland. She was previously the President and Director of The Institute for Genomic Research (TIGR), where she led teams that sequenced the genomes of several microbial organisms, including important human and animal pathogens. TIGR performed genetic sequence analysis in support of the anthrax investigation.

**Dr. Jacques Ravel**
Dr. Jacques Ravel is an associate professor of microbiology and a member of the Institute for Genome Sciences at the University of Maryland School of Medicine, and also was formerly with The Institute for Genomic Research. His research focuses on the application of microbial genomics to several key areas, including microbial genome sequence comparative analyses, with a special emphasis on human microbial pathogens, including Bacillus anthracis. His work included genetic sequence analysis and characterization of genetic mutants in support of the FBI investigation.

**Dr. Joseph Michael**
Dr. Michael is a Distinguished Member of the Technical Staff at Sandia National Laboratories in Albuquerque, New Mexico. He currently works in the Materials Characterization Department of the Materials Science Center where he develops and applies electron and ion microscopy to the characterization of materials. Dr. Michael is a coauthor of the leading textbook on Scanning Electron Microscopy. He assisted with elemental analysis, electron microscopy of the samples, and with development of strategies for analysis of chemical/physical characteristics of the spore powders.

**Resources:**
- FBI and Department of Justice Detail Amerithrax Case (August 6, 2008)
- Amerithrax Investigation
- Linguistic and Behavioral Analysis (2001)
- The Search for Anthrax
- Details and Images of Letter to Sen. Patrick Leahy

Headline Archives home

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE APPLICATION
OF THE NEW YORK TIMES COMPANY
FOR ACCESS TO CERTAIN SEALED
COURT RECORDS

Miscellaneous Action No. _____

## DECLARATION OF JEANETTE MELENDEZ BEAD

Jeanette Melendez Bead, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am a member of Levine Sullivan Koch & Schulz, L.L.P., counsel to The New York Times Company (the "Times"), and a member in good standing of the Bar of the District of Columbia.  I make this declaration to place before the Court public records and facts relevant to the Times' motion for public access to certain sealed court records.  I am familiar with the facts and circumstances set forth herein, and to the best of my knowledge, information and belief, the exhibits annexed hereto are true and correct copies of the documents cited herein.

2.      The Times is the publisher of *The New York Times*, a national, daily newspaper of general circulation.  It has reported extensively on the federal government's investigation of the anthrax mailings of 2001, an investigation which the government has named "Amerithrax."  The Times has published hundreds of articles concerning the investigation since 2001.  The Times continued to report on the investigation after the government announced on August 6, 2008 that the case is solved, publishing articles concerning the Amerithrax investigation on almost a daily basis following the announcement.

3.      Annexed hereto as Exhibit 1 is a copy of a Statement by the Department of Justice

on the Anthrax Investigation (08-680), which is available on the Department of Justice website at

http://www.usdoj.gov/opa/pr/2008/August/08-opa-680.html.  The statement notes that the

Amerithrax investigation "is one of the most complex and comprehensive ever conducted by law

enforcement," and that "[o]ver the past seven years, the Amerithrax Task Force, which is

comprised of 17 FBI Special Agents and 10 U.S Postal Inspectors, has executed approximately

75 searches and conducted more than 9,100 interviews in the relentless pursuit of the perpetrator

of these attacks."

4.      Annexed hereto as Exhibit 2 is a copy of the Government's Omnibus Motion to

Unseal Search Warrants and Accompanying Documents, and Memorandum of Law in Support

Thereof (the "Government's Unsealing Motion").  On information and belief, the Government's

Unsealing Motion, which is undated, was filed with the Court on or before August 6, 2008.  The

search warrants and accompanying documents that are the subject of the Government's

Unsealing Motion relate to the government's investigation of Dr. Bruce E. Ivins, who the

government now contends was the sole perpetrator of the deadly anthrax mailings of 2001.

5.      Annexed hereto as Exhibit 3 is a copy of the Court's August 6, 2008 Order

granting the Government's Unsealing Motion.

6.      Copies of certain of the search warrants and accompanying documents that were

the subject of the Government's Unsealing Motion are publicly available on the Court's website

at http://www.dcd.uscourts.gov/Anthrax-Case-Info.html and on the Department of Justice

website at http://www.usdoj.gov/amerithrax.  Annexed hereto as Exhibit 4 are copies of the

webpages listing the documents available on these websites.

7.     Based on our firm's review of the documents available on these websites, it appears that the following documents are not publicly available: (a) the Return in Mag. No. 08-496-m; (b) the Return in Mag. No. 08-497-m; and (c) the Application for a Search Warrant in Mag. No. 08-430-m.  By this Motion, the Times seeks access to these documents, which appear to have been previously unsealed as a result of the Court's August 6 Order.

8.     Annexed hereto as Exhibit 5 are relevant excerpts from the Amended Complaint, dated November 11, 2008, in *Hatfill v. Mukasey*, No. 1:03-cv-01793 (RBW) (D.D.C.).  This document reflects that Dr. Steven J. Hatfill was identified by the government as a person of interest in the Amerithrax investigation, Am. Compl. ¶ 51; that the government conducted a consensual search of Dr. Hatfill's apartment on June 25, 2002, *id.* ¶¶ 31-32; that the government searched a storage shed in Ocala, Florida that had been rented by Dr. Hatfill (which, upon information and belief, was conducted pursuant to a search warrant), *see id.* ¶57; that the government searched Dr. Hatfill's apartment pursuant to a search warrant on August 1, 2002, *id.* ¶ 42; that the searches of Dr. Hatfill's apartment were either witnessed by the media or broadcast live on national television, *id.* ¶¶ 34, 42; and that the home of Ms. Chegne was also searched on August 1, 2002, *id.* ¶ 80.

9.     Annexed hereto as Exhibit 6 is a copy of a news article published in *The New York Times* on September 12, 2002 which reports that on September 11, 2002, the government searched Dr. Hatfill's Maryland home for a third time.

10.     Annexed hereto as Exhibit 7 is a copy of correspondence from the Department of Justice to A.J. Kramer, dated October 16, 2003, along with documents listing the property seized from Dr. Hatfill and Ms. Chegne during searches conducted on June 25, 2002 and August 1, 2002.  These documents were publicly filed in the parties' Joint Appendix in *Hatfill v. The New*

*York Times Company*, No. 07-1162 (4th Cir.), a libel case brought by Dr. Hatfill against the Times. Exhibit 6 reflects that as of October 16, 2003, the government had seized a total of 223 items from Dr. Hatfill and Peck Chegne, who, upon information and belief, was Dr. Hatfill's girlfriend at the time.

11.     As the facts and documents set forth above demonstrate, Drs. Hatfill and Ivins were the subject of considerable inquiry during the Amerithrax investigation, including multiple searches of their properties. By this Motion, the Times seeks access to any sealed search warrants, warrant applications, affidavits submitted in support of the warrants, Court Orders, and returns for all searches, whether conducted or not, relating to the government's investigation of Dr. Ivins, Dr. Hatfill and/or Peck Chegne, in connection with the Amerithrax investigation.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 4, 2008

JEANETTE MELENDEZ BEAD

4

**EXHIBIT 1**

# Department of Justice

**FOR IMMEDIATE RELEASE**
**Friday, August 1, 2008**
**WWW.USDOJ.GOV**

**OPA**
**(202) 514-2007**
**TDD (202) 514-1888**

## Statement by the Department of Justice on the Anthrax Investigation

The Justice Department, the FBI, and the U.S. Postal Inspection Service (USPIS) today announced that there have been significant developments in the investigation into the 2001 anthrax mailings, which killed five individuals and injured 17 others. In particular, we are able to confirm that substantial progress has been made in the investigation by bringing to bear new and sophisticated scientific tools.

We are unable to provide additional information at this time. The Department, the FBI, and the USPIS have significant obligations to the victims of these attacks and their families that must be fulfilled before any additional information on the investigation can be made public. In addition, investigative documents remain under court seal.

We anticipate being able to provide additional details in the near future.

### ADDITIONAL INFORMATION ON THE INVESTIGATION

The investigation known as "Amerithrax" is one of the most complex and comprehensive ever conducted by law enforcement. Over the past seven years, the Amerithrax Task Force, which is comprised of 17 FBI Special Agents and 10 U.S. Postal Inspectors, has executed approximately 75 searches and conducted more than 9,100 interviews in the relentless pursuit of the perpetrator of these attacks.

###

08-680

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In the Matter of the Search of: | : | |
| Residence at xxxxxxxx Road, Frederick, Maryland, owned by Bruce Edwards Ivins, DOB xx/xx/xxx, SSN xxx-xx-xxxx | : : | Mag. No. 07-524-m |
| 2002 Saturn SL1, blue, 4 door sedan, bearing VIN # xxxxxxxxxxxxxxxxx, registered to Bruce Edwards Ivins, at xxxxxxxx Road, Frederick, MD | : : : | Mag. No. 07-525-m |
| 1993 Honda Civic four door sedan, bearing VIN # xxxxxxxxxxxx, registered to Bruce Edwards Ivins, at xxxxxxxx Road, Frederick, MD | : : : | Mag. No. 07-526-m |
| 1996 Dodge van, red in color, bearing VIN # xxxxxxxxxxxxxxxx, registered to xxxxxxxxxxxx, at xxxxxxxxxx Road, Frederick, MD | : : | Mag. No. 07-527-m |
| Safe Deposit Box #48, located at Farmers & Mechanics Bank, Branch #1 1305 West 7th Street, Frederick, MD rented by Bruce E. Ivins and xxxxx | : : : | Mag. No. 07-528-m |
| Office, Wall Lockers, and Laboratory Space of Bruce Edwards Ivins, inside Buildings 1412 and 1425 of the U.S. Army Medical Research Institute of Infectious Diseases, on Porter Street, Fort Detrick, MD | : : : | Mag. No. 07-529-m |
| Electronic mail stored in account goldenphoenix111[at]hotmail[dot]com, controlled by MSN Hotmail Microsoft Corp., 1065 La Avenida, Building 4, Mountainview, CA 94043 | : : | Mag. No. 08-082-m |
| Electronic mail stored in account kingbadger7 @aol.com, controlled by America Online, Inc. 2200 AOL Way, Dulles, VA 20166 | : | Mag. No. 08-083-m |

| | | |
|---|---|---|
| **Electronic mail stored in accounts** **jimmyflathead[at]yahoo[dot]com and** xxxxxxx@yahoo.com, **controlled by** **Yahoo!, Inc., 701 First Avenue, Building D** **Sunnyvale, CA 94809** | : : : | Mag. No. 08-084-m |
| **Office, Wall Lockers, and Laboratory** **Space of Bruce Edwards Ivins, inside** **Buildings 1412 and 1425 of the U.S. Army** **Medical Research Institute of Infectious** **Diseases, on Porter Street, Fort Detrick, MD** | : : : | Mag. No. 08-429-m |
| **Residence at xxxxxxx** **Frederick, Maryland,** **owned by Bruce Edwards Ivins** **DOB: xx/xx/xx** | : : : | Mag. No. 08-430-m |
| **2002 Saturn SL1, blue, 4 door sedan** **bearing VIN xxxxxxxxxxxx** **registered to Bruce Edwards Ivins,** **at xxxxxxxxxx Road, Frederick, MD** | : : | Mag. No. 08-431-m |
| **1996 Dodge van, red in color,** **bearing VIN xxxxxxxxxx** **registered to xxxxxxxxxxxxxxx** **xxxxxxxxx Road, Frederick, MD** | : : : | Mag. No. 08-432-m |
| **1993 Honda Civic four door sedan** **bearing VIN xxxxxxxxxx** **registered to Bruce Edwards Ivins,** **at xxxxxxxxxx Road, Frederick, MD** | : : | Mag. No. 08-433-m |

2

### GOVERNMENT'S OMNIBUS MOTION TO UNSEAL
### SEARCH WARRANTS AND ACCOMPANYING DOCUMENTS,
### AND MEMORANDUM OF LAW IN SUPPORT THEREOF

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully moves the Court to unseal portions the above-captioned search warrants and accompanying applications and affidavits in support of the search warrants, as well as corresponding Court Orders, and permit redacted affidavits, warrants, applications, and Court Orders to be filed on the public record.

### Introduction

The search warrants captioned above arise out of the government's criminal investigation of the deaths of five persons, and the injury of dozens of others, resulting from the mailing of several anonymous letters to members of Congress and members of the media in September and October 2001, which letters contained *Bacillus anthracis*, commonly referred to as anthrax. The Court granted the government's application for these warrants pursuant to domestic terrorism search warrant provisions of Federal Rule of Criminal Procedure 41(b)(3). The search warrants and supporting affidavits alleged acts constituting threats to witnesses in, and obstruction of, a domestic terrorism investigation then pending in the District of Columbia. In each instance, the reviewing magistrate granted the government's requests and ordered that the search warrants and accompanying affidavits, applications, and court orders, be sealed, and further directed that all records be sealed and entries be delayed on the public docket.

3

**Argument**

As the government previously explained in support of its motions to seal, this Court has the

inherent power to seal affidavits and other documents filed in support of search warrants in order to

protect an ongoing investigation and confidential witnesses. <u>Arizona v. Maypenny</u>, 672 F.2d 761,

765 (9th Cir. 1982); <u>In re Sealed Affidavit(s) to Search Warrants</u>, 600 F.2d 1256 (9th Cir. 1979).

<u>See</u> <u>Washington Post v. Robinson</u>, 935 F.2d 282, 290 (D.C. Cir. 1991); <u>United States v. Hubbard</u>,

650 F.2d 293 (D.C. Cir. 1980); <u>In the Matter of Search Warrants Issued June 13, 1988 for the Office</u>

<u>and Home of William Galvin</u>, Misc. Nos. 87-218, 88-216, reported at 1989 U.S. Dist. LEXIS 5240

(D.D.C. 1989) ("[T]here exists no First Amendment or common law rights of access to search

warrant documents during the pre-indictment stage of a criminal investigation."); <u>Shea v. Gabriel</u>,

520 F.2d 879 (1st Cir. 1975); <u>In re Braughton</u>, 520 F.2d 765, 766 (9th Cir. 1975).

In addition, Federal Rule of Criminal Procedure 6(e) prohibits the disclosure of information

obtained during the course of a grand jury investigation, and Federal Rule of Criminal Procedure

49.1 requires that certain personal identifying information be redacted from public filings.

In this case, some of the information contained in the above-captioned search warrants, and

accompanying affidavits, applications, and Court Orders, must remain sealed under the pertinent case

law and federal rules. However, other information need no longer be sealed or otherwise protected,

and thus appropriately should be disclosed and be made part of the public record. The government

therefore has prepared redacted versions of the warrants and accompanying documents that the

government submits should be made a part of the public record. The government will submit both

unredacted and redacted versions to the Court, *in camera,* for the Court to review before ruling on

the instant motion.

4

Respectfully submitted,

JEFFREY A. TAYLOR
D.C. BAR NUMBER 451-058
UNITED STATES ATTORNEY

BY: _____
RACHEL CARLSON LIEBER
Assistant United States Attorney
DC Bar No. 456-491
555 Fourth Street, NW, Room 11-909
National Security Section
Washington, DC  20530
(202) 353-8055
Rachel.lieber@usdoj.gov


BY: _____
KENNETH C. KOHL
Assistant United States Attorney
DC Bar No. 476-236
555 Fourth Street, NW, Room 11-850
National Security Section
Washington, DC  20530
(202) 616-2139
ken.kohl@usdoj.gov

5

**EXHIBIT 3**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of:                    :

Residence at xxxxxxxx Road,                        :        Mag. No. 07-524-m
Frederick, Maryland,
owned by Bruce Edwards Ivins,                      :
DOB xx/xx/xxx, SSN xxx-xx-xxxx

                                                   :

2002 Saturn SL1, blue, 4 door sedan,               .     Mag. No. 07-525-m
bearing VIN # xxxxxxxxxxxxxxxx,                     :
registered to Bruce Edwards Ivins,
at xxxxxxxxx Road, Frederick, MD                   :

1993 Honda Civic four door sedan,                  :        Mag. No. 07-526-m
bearing VIN # xxxxxxxxxxxx,
registered to Bruce Edwards Ivins,                 :
at xxxxxxxx Road, Frederick, MD
                                                   :

1996 Dodge van, red in color,                              Mag. No. 07-527-m
bearing VIN # xxxxxxxxxxxxxxxxx,                   :
registered to xxxxxxxxxxxx,
at xxxxxxxxxx Road, Frederick, MD                  :

Safe Deposit Box #48, located at                   :        Mag. No. 07-528-m
Farmers & Mechanics Bank, Branch #1
1305 West 7th Street, Frederick, MD                :
rented by Bruce E. Ivins and xxxxx

                                                   :

Office, Wall Lockers, and Laboratory                        Mag. No. 07-529-m
Space of Bruce Edwards Ivins, inside               :
Buildings 1412 and 1425 of the U.S. Army
Medical Research Institute of Infectious           :
Diseases, on Porter Street, Fort Detrick, MD
                                                   :

Electronic mail stored in account                           Mag. No. 08-082-m
goldenphoenix111[at]hotmail[dot]com,               :
controlled by MSN Hotmail Microsoft Corp.,
1065 La Avenida, Building 4,                        :
Mountainview, CA 94043
                                                   :

Electronic mail stored in account kingbadger7               Mag. No. 08-083-m
@aol.com, controlled by America Online, Inc.       :
2200 AOL Way, Dulles, VA 20166

Electronic mail stored in accounts           :        Mag. No. 08-084-m
jimmyflathead[at]yahoo[dot]com and
xxxxxxx@yahoo.com, controlled by             :
Yahoo!, Inc., 701 First Avenue, Building D
Sunnyvale, CA 94809                          :


Office, Wall Lockers, and Laboratory          :        Mag. No. 08-429-m
Space of Bruce Edwards Ivins, inside
Buildings 1412 and 1425 of the U.S. Army     :
Medical Research Institute of Infectious
Diseases, on Porter Street, Fort Detrick, MD :


Residence at xxxxxxx                          :        Mag. No. 08-430-m
Frederick, Maryland,
owned by Bruce Edwards Ivins                  :
DOB: xx/xx/xx
                                             :
2002 Saturn SL1, blue, 4 door sedan                    Mag. No. 08-431-m
bearing VIN xxxxxxxxxxxxx                     :
registered to Bruce Edwards Ivins,
at xxxxxxxxxxx Road, Frederick, MD           :


1996 Dodge van, red in color,                 :        Mag. No. 08-432-m
bearing VIN xxxxxxxxxxx
registered to xxxxxxxxxxxxxxxx                :
xxxxxxxxx Road, Frederick, MD
                                             :
1993 Honda Civic four door sedan                       Mag. No. 08-433-m
bearing VIN xxxxxxxxxxx                       :
registered to Bruce Edwards Ivins,
at xxxxxxxxxx Road, Frederick, MD            :

7

## O R D E R

Upon consideration of the government's Omnibus Motion to Unseal Search Warrants and

Accompanying Documents and Memorandum of Law in Support Thereof, in the above-captioned

matters, and the record herein, it is this ___6th___ day of August, 2008, hereby

ORDERED that the Government's Motion to Unseal Search Warrants and Accompanying

Documents is **GRANTED**, and that the redacted documents presented to the Court be made part of

the public record. It is

FURTHER ORDERED that the unredacted documents presented to the Court shall remain

under seal.


_Royce C. Lamberth_
ROYCE C. LAMBERTH
CHIEF JUDGE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Copies to:

Rachel Carlson Lieber
Assistant United States Attorney
555 Fourth Street, NW, Room 11-909
Washington, DC  20530

Kenneth C. Kohl
Assistant United States Attorney
555 Fourth Street, NW, Room 11-850
Washington, DC  20530

**EXHIBIT 4**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

## ANTHRAX CASE DOCUMENTS:

(unsealed August 6, 2008)

---

- MOTION TO UNSEAL

- ORDER UNSEALING

---

8/7/08    Mag. No. 08-496-m Application

8/7/08    Mag. No. 08-497-m Application

Mag. No. 07-524-m
Application
Search Warrant
Affidavit 1
Affidavit 2
Affidavit 3
Return

Mag. No. 07-525-m
Application
Search Warrant
Affidavit
Return

Mag. No. 07-526-m
Application
Search Warrant
Affidavit
Return

Mag. No. 07-527-m

Application
Search Warrant
Affidavit
Return

Mag. No. 07-528-m

Application
Search Warrant
Affidavit
Return

Mag. No. 07-529-m

Application
Search Warrant
Affidavit
Return

Mag. No. 08-082-m

Application
Search Warrant
Affidavit
Return

Mag. No. 08-083-m

Application
Search Warrant
Affidavit
Return

Mag. No. 08-084-m

Application
Search Warrant
Affidavit

Mag. No. 08-429-m

Application
Search Warrant
Affidavit 1
Affidavit 2
Affidavit 3
Affidavit 4

Mag. No. 08-430-m

Search Warrant
Affidavit 1
Affidavit 2
Affidavit 3
Return

Mag. No. 08-431-m

Application
Search Warrant
Search Warrant
Affidavit 1
Affidavit 2
Affidavit 3
Affidavit 4
Return

Mag. No. 08-432-m

Application
Seach Warrant
Affidavit
Return

Mag. No. 08-433-m

Application
Search Warrant
Affidavit
Return



**SEARCH**

**ABOUT DOJ**

**PRESS ROOM**

**JOBS**

**WORKING WITH DOJ**

**RESOURCES**

**DOJ AGENCIES**

**DOJ HOME**

## Amerithrax Court Documents

- motion to unseal

- order to unseal

- 07-524-M-01 attachment

- 07-524-M-01 search warrant

- 07-524-M-01 search warrant affidavit

- 07-524-M-01 search warrant application

- 07-524-M-01 search warrant return

- 07-524-M-01

- 07-525-M-01 search warrant

- 07-525-M-01 search warrant affidavit

- 07-525-M-01 search warrant application

- 07-525-M-01 search warrant return

- 07-526-M-01 search warrant

- 07-526-M-01 search warrant affidavit

- 07-526-M-01 search warrant application

- 07-526-M-01 search warrant return

- 07-527-M-01 search warrant

- 07-527-M-01 search warrant affidavit

- 07-527-M-01 search warrant application

- 07-527-M-01 search warrant return

- 07-528-M-01 search warrant

- 07-528-M-01 search warrant affidavit

- 07-528-M-01 search warrant application

- 07-528-M-01 search warrant return

- 07-529-M-01 search warrant

- 07-529-M-01 search warrant affidavit

- 07-529-M-01 search warrant application

- 07-529-M-01 search warrant return

- 08-082-M-01 search warrant

- 08-082-M-01 search warrant affidavit

- 08-082-M-01 search warrant application

- 08-082-M-01 search warrant return

- 08-083-M-01 search warrant

- 08-083-M-01 search warrant affidavit

- 08-083-M-01 search warrant application

- 08-083-M-01 search warrant return

- 08-084-M-01 search warrant

- 08-084-M-01 search warrant affidavit

- 08-084-M-01 search warrant application

- 08-429Affidavit

- 08-429AffidavitAttachment

- 08-429Application

- 08-429SearchWarrant

- 08-429SWAffAttach07524

- 08-429SWAttach07524

- 08-430SearchWarrant

- 08-430SWAffidavit

- 08-430SWAffidavit07524

- 08-430SWAttachment07524

- 08-430SWReturn

- 08-431Affidavit07524

- 08-431Application

- 08-431Attachment07525

- 08-431SW

- 08-431SW07525

- 08-431SWAffidavit

- 08-431SWAttachment

- 08-431SWReturn

- 08-432 affidavit

- 08-432 application

- 08-432 return

- 08-432 search warrant

- 08-433 affidavit

- 08-433 application

- 08-433 return

- 08-433 search warrant

- 08-496 affidavit

- 08-497 affidavit

*Disclaimer:*
Due to public interest in this case, the Department of Justice is
releasing the court documents in the format unsealed by the court
today. The Department recognizes that these documents are not in an
accessible format. If you have a disability and the format of any
material on the site interferes with your ability to access some
information, please email the Department of Justice webmaster at
webmaster@usdoj.gov. To enable us to respond in a manner that will
be of most help to you, please indicate the nature of the accessibility
problem, your preferred format (electronic format (ASCII, etc.),
standard print, large print, etc.), the web address of the requested
material, and your full contact information so we can reach you if
questions arise while fulfilling your request.

**EXHIBIT 5**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STEVEN J. HATFILL, M.D., <br><br> *Plaintiff,* <br><br> v. <br><br> JOHN ASHCROFT, in his individual capacity; ATTORNEY GENERAL ALBERTO GONZALES, in his official capacity; U.S. DEPARTMENT OF JUSTICE; FEDERAL BUREAU OF INVESTIGATION; TIMOTHY BERES, in his individual and official capacities; DARRELL DARNELL, in his individual and official capacities; VAN HARP, in his individual capacity; TRACY HENKE, in her individual and official capacities; an unknown number of UNKNOWN EMPLOYEES OR AGENTS OF THE FEDERAL BUREAU OF INVESTIGATION; and an unknown number of UNKNOWN EMPLOYEES OR AGENTS OF THE DEPARTMENT OF JUSTICE, <br><br> *Defendants* | Civ. A. No. 03-1793 (RBW) <br> (Judge Walton) |

## FIRST AMENDED COMPLAINT

### INTRODUCTION

1.      This case involves a sustained course of willful and intentional misconduct by law enforcement officials who placed the public image of their agencies above their duty to respect the privacy and liberty of an innocent U.S. citizen. The context for the defendants' illegal and unconstitutional actions was the government's official investigation into the deadly anthrax mailings of 2001 – an investigation that was code-named "Amerithrax."

2.     With our nation still shaken by the terror attacks of September 11, 2001, the

anthrax mailings created enormous public anxiety, as well as considerable political pressure to

identify and bring the mailers to justice. Unfortunately, the government has failed to make any

substantial progress in solving the case in more than four years. No one could possibly be more

disappointed about that than Dr. Steven Hatfill.

3.     Beginning in the late winter and spring of 2002, the FBI and Department of

Justice became increasingly concerned about the widespread perception that they were incapable

of solving the anthrax attacks. As a consequence, they intentionally and willfully leaked to

innumerable reporters information about the plaintiff, Dr. Steven Hatfill, and about investigative

interest in Dr. Hatfill. These leaks -- which have certainly numbered in the hundreds since 2002

and which have continued even into this year -- were calculated to create in the public mind the

impression that the defendants were making progress in solving the anthrax case. Because these

hundreds of leaks disclosed information that was protected from disclosure under the Privacy

Act of 1974, they were unlawful as well as unjust.

4.     In addition, the defendants conducted a highly visible campaign to curtail Dr.

Hatfill's liberty without due process of law. This they achieved not only by repeatedly leaking

sensitive information about him to the news media, but also by going out of their way to make

their investigation of Dr. Hatfill as conspicuous as possible to the general public. For many

months the defendants subjected Dr. Hatfill to "surveillance" that was so conspicuous as to be

inconsistent with any genuine desire to obtain useful evidence. The defendants also contrived to

have Dr. Hatfill fired from his job training first responders at Louisiana State University

("LSU"); thereafter, Dr. Hatfill's hopes of new employment were dashed when the team

2

"surveilling" him ambushed the potential employer in the hotel where the interview was taking place.

5.     Despite their awareness of these abuses, senior DOJ and FBI officials have consistently failed to prevent, punish, condemn, or even seriously investigate the injustices done to Dr. Hatfill.  Indeed, after the defendants' leaks put Dr. Hatfill at the center of the media's coverage of the investigation, defendant Ashcroft poured gasoline on the fire by going on national television and naming Dr. Hatfill a "person of interest" in the investigation.  This action, by the nation's highest ranking law enforcement officer, was tantamount to an official declaration of open season on Dr. Hatfill.  In the hierarchical culture of the FBI and DOJ, the Attorney General's personal participation was sufficient to eliminate any hesitation that some subordinates might otherwise have felt about discussing Dr. Hatfill's status in the investigation publicly.  Indeed, on the one occasion when an FBI official criticized the public disclosure of "persons of interest," that official was *reprimanded* by FBI Director Mueller for having even implied that Attorney General Ashcroft had acted improperly.  By refusing to implement any remedial measures either to prevent disclosure of Amerithrax information or to mitigate the damage caused by such disclosures, the defendants sustained and encouraged the pattern of abuse and misconduct described herein.

## JURISDICTION AND VENUE

6.     This case arises under the United States Constitution and the laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution, 28 U.S.C. §§ 1331 & 1343(a)(3), and 5 U.S.C. § 552a(g)(1)(C), (g)(1)(D), and (g)(4).  Plaintiff seeks actual damages as well as fees and costs against the DOJ and the FBI for the

Van Harp, then the Assistant Director in Charge of the Washington Field Office out of which the

Amerithrax investigation was based, also attended this meeting – at the insistence of Senate staff.

In this meeting, Professor Rosenberg, who had no official authority, no investigative experience,

and most significantly no access to the forensic tests conducted on the anthrax letters or the

FBI's investigative file, made clear to the Daschle and Leahy staffs that her suspicions rested on

Dr. Hatfill as the person most likely responsible for the mailings.

30.     Assistant Director Harp was openly skeptical of Rosenberg's claims during their

meeting, so much so that a Senate staffer later instructed him to call Professor Rosenberg and

apologize, which he did.  Harp and his superiors were anxious to placate the senators because at

that time many senators had made it publicly known that they were displeased at how the FBI

had handled terrorism investigations generally and the Amerithrax investigation in particular.

Some had remarked that it was time to think about revoking the FBI's responsibility in

investigating domestic terrorism and to consider turning those responsibilities over to another

government agency.

**June 25, 2002:  The First Search of Dr. Hatfill's Apartment**

31.     Within a week of Professor Rosenberg's meetings on Capitol Hill, the FBI

searched Dr. Hatfill's apartment under the white-hot glare of the national press.  On June 25,

2002, the day of the search, Dr. Hatfill had agreed to meet with FBI special agents assigned to

the Washington Field Office.  The meeting was held at an office leased by the FBI in Frederick,

Maryland, approximately 50 miles from Washington, D.C.  At the conclusion of the meeting, Dr.

Hatfill consented to have FBI agents search his Frederick, Maryland apartment.

32.     After Dr. Hatfill consented to the search, he and the FBI special agents drove to

the apartment, a drive of less than ten minutes.  Almost immediately, Dr. Hatfill's apartment

11

complex was surrounded by news helicopters and television vans filming the search. According to one FBI agent on site at the time, the camera crews came from Washington and Baltimore, and arrived so quickly that it was obvious they had been tipped off in advance of the search by someone who knew that the FBI had planned a search for that day.

33.     This was not the way that consensual searches are ordinarily handled by the FBI, and it was not the way Dr. Hatfill had been told the search would be conducted. In fact, it was a remarkable departure from sound investigative practice, which dictates as much secrecy as possible regarding planned searches so as not to alter the behavior of any potential subjects of an investigation, or to alert them to the nature of the evidence investigators may be collecting. In addition, such a public display violates the privacy interests of the person whose premises are being searched, creating a strong possibility for stigmatization, humiliation, and even risk of physical injury.

34.     The search of Dr. Hatfill's apartment was televised live on network and cable news channels. Although the FBI had spoken to hundreds of scientists in the Amerithrax investigation, and had searched many scientists' homes with their consent, this was the first time that the name of any of these scientists had been purposely leaked to the media.

35.     Live television coverage of the June 25, 2002 search generated a huge number of follow-up articles in which Dr. Hatfill's name was consistently and disparagingly linked with the anthrax investigation. These follow-up articles often contained new details about the investigation that were themselves leaked in violation of the Privacy Act. In this way, each leak seemed to lead to additional leaks.

    h.   Dave Altimari and Jack Dolan, *Hartford Courant*, "Hatfill teaching bioterrorism course; Scientist in FBI anthrax probe works for government-funded program," June 28, 2002;

    i.   Nicholas D. Kristof, *New York Times*, "Anthrax?  The F.B.I. Yawns," July 2, 2002;

    j.   Nicholas D. Kristof, *New York Times*, "The Anthrax Files," July 12, 2002; and

    k.   Nicholas D. Kristof, *New York Times*, "Case of the Missing Anthrax," July 19, 2002.

37.    Importantly, the leaked information was frequently wrong by the time it appeared in news stories, though plaintiff is unable to say whether the factual errors arose during the leaking or whether the information is wrong in the government's records.  However, on information and belief plaintiff alleges that DOJ and FBI records contain some version of each of the following facts or purported facts, all of which can be retrieved by the name of Dr. Hatfill or by some identifying particular assigned to Dr. Hatfill, and all of which were disclosed to the press during this period:

    a.   that the FBI searched Dr. Hatfill's apartment on June 25, 2002;

    b.   that Dr. Hatfill consented to the search of his apartment;

    c.   that "evidence" was removed from Dr. Hatfill's apartment;

    d.   the results of the search of Dr. Hatfill's apartment;

    e.   that Dr. Hatfill was a former government scientist who used to work in the biological weapons defense program at Fort Detrick;

    f.   that Dr. Hatfill worked for the National Institutes of Health;

    g.   that Dr. Hatfill was a "person of interest" in the anthrax investigation;

    h.   that the FBI had interviewed Dr. Hatfill as early as December 2001;

    i.   that the FBI had Dr. Hatfill under scrutiny;

    j.   that Dr. Hatfill had or may have had access to anthrax while working at Fort Detrick;

    k.   that Dr. Hatfill attended medical school in Zimbabwe/Rhodesia;

    l.   that Dr. Hatfill may have lived in or near a town, suburb, or school known as "Greendale" while attending medical school;

    m.   that the FBI was looking closely at a 1999 bioweapons report about mailed anthrax that was commissioned by Dr. Hatfill from a leading bioweapons expert;

    n.   that the amount and quality of anthrax used in the Leahy and Daschle letters were similar to what was described in the 1999 report;

    o.   that the FBI searched a storage shed maintained by Dr. Hatfill in Ocala, Florida;

    p.   that the FBI removed boxes from a refrigerated storage facility rented by Dr. Hatfill;

    q.   that Dr. Hatfill's security clearance expired and was never renewed;

    r.   whether Dr. Hatfill is or is not considered a suspect;

    s.   that the FBI searched Dr. Hatfill's car; and

    t.   that Dr. Hatfill possesses the expertise to handle deadly pathogens.

38.    In addition, the leaks seem to have emboldened some armchair detectives who were telling the FBI what to do rather than asking the FBI what it was doing. For example, Nick Kristof wrote three more op-ed pieces about the Amerithrax investigation in July, which contained fresh falsehoods about Dr. Hatfill and which were critical of the FBI – mostly for not investigating Hatfill quickly enough or thoroughly enough.

**August 1, 2002: The Second Search of Dr. Hatfill's Apartment**

39.     In May 2002, Dr. Hatfill had secured a position as associate director of the

National Center for Biomedical Research and Training at Louisiana State University in Baton

Rouge. He was hired to train state and local first responders to identify and react to biological

attacks. His appointment was effective July 1, 2002.

40.     According to press reports, in late July 2002, FBI agents observed Dr. Hatfill

throwing trash into a dumpster outside of his apartment building. This activity was natural

enough for a man who was packing and preparing to move to his new job in Baton Rouge, and as

such should not have aroused any suspicions. Though investigators had found nothing of interest

during the first search, Dr. Hatfill's trip to the trash apparently heightened their interest in him and

motivated them to search his apartment again.

41.     In late July 2002, FBI Supervisory Special Agent Bob Roth phoned Dr. Hatfill

and requested an interview with him. Dr. Hatfill referred the request to his civil attorney, Victor

M. Glasberg. Mr. Glasberg called Special Agent Roth immediately and left a voicemail

indicating that Dr. Hatfill would happily cooperate, as he had previously when the FBI had

requested to interview him, administer a polygraph examination, and search his home and other

property. Mr. Glasberg suggested an interview on August 5, 6, or 7. Though he received the

message, Special Agent Roth never responded to it.

42.     Instead, government agents obtained a search warrant, and on August 1, 2002,

they once again searched Dr. Hatfill's Frederick apartment. Despite the media circus that their

June 25 search had become, and despite the increased interest from news organizations which the

June 25 search had generated, the FBI followed essentially the same game plan for the August 1

search. Once again, the news media were there to cover the search as it happened. Once again,

16

someone who was privy to the FBI's search plan had tipped off major news organizations in advance of the search.

43.     Upon learning from Dr. Hatfill that the search was underway, Mr. Glasberg phoned Special Agent Roth to ask why he had ignored his voicemail message offering to cooperate. Special Agent Roth acknowledged listening to the phone message, but contended he did not understand the offer of cooperation. Mr. Glasberg requested that Special Agent Roth save the voicemail message to settle the issue of its content. Special Agent Roth refused to guarantee the safekeeping of the voicemail. Mr. Glasberg then wrote to Mr. Kenneth Kohl, the Assistant United States Attorney for the District of Columbia assigned to the anthrax investigation, to alert him to the situation and request the voicemail message be secured. Mr. Kohl never responded to Mr. Glasberg's letter. Dr. Hatfill does not know whether the government preserved or destroyed this evidence.

44.     Following the August 1, 2002, it was widely reported that the search had been conducted pursuant to a search warrant, and that agents had sought a search warrant because Dr. Hatfill had refused to consent to a second search. Debra Weierman, media representative in the FBI's Washington Field Office, admits that she revealed this information to the press. According to Weierman, someone in the Washington Field Office specifically authorized her to reveal the existence of the search warrant.

**The Leaks Cost Dr. Hatfill His Job**

45.     On August 1, 2002, defendant Darrell Darnell was sitting in his office in DOJ's Office of Domestic Preparedness, watching television, when he saw the second search of Dr. Hatfill's apartment being broadcast live on cable news channels. Part of Darnell's job was to

17

period Dr. Hatfill was terminated, still without having been officially advised of the basis for this

decision nor provided an opportunity to appeal.

**Life as a Person of Interest**

50.     Although Dr. Hatfill's removal from the federally funded grant at LSU remained

unknown to the press for a few weeks, almost every other facet of Dr. Hatfill's life was laid bare

during the weeks following the August 1, 2002 search of his apartment. This new and more

damaging wave of coverage followed essentially the same pattern as its predecessor: a big leak

generated a plethora of follow-up stories, and many of the follow-ups contained brand new leaks.

51.     In the wake of the media circus *redux* that followed the August 1 apartment

search, defendant Ashcroft personally joined the ranks of those who publicly stigmatized Dr.

Hatfill by illegally disclosing sensitive information about Hatfill's status in the investigation. On

August 6, 2002, Mr. Ashcroft appeared on some morning television shows. On CBS's "The

Early Show," Mr. Ashcroft identified Dr. Hatfill as "a person of interest" in the Amerithrax

investigation. On NBC's "Today Show," Mr. Ashcroft stated that Dr. Hatfill was "a person that

– that the FBI's been interested in" in its investigation.

52.     At the time he made these disclosures, defendant Ashcroft knew that the term

"person of interest" was a term of art in the Amerithrax investigation because he had been

briefed about the "persons of interest" list. He also knew that whether someone was a "person of

interest" was not a subjective judgment but rather an official status that was based on specified

guidelines and was duly recorded in records that are maintained in the FBI's Automated Case

Support system of records. Attorney General Ashcroft's willful and intentional disclosure of the

e. Frank D. Roylance, *Baltimore Sun*, "Scientist's rooms searched again; Anthrax investigators focus on researcher who worked at Fort Detrick," August 2, 2002;

f. Josh Meyer and Megan Garvey, *Los Angeles Times*, "FBI returns to Md. Home in Anthrax Probe; Inquiry: Agents spend several hours in a second search of a former Army scientist's apartment," August 2, 2002;

g. Eric Rosenberg, *The Times Union* (Albany, N.Y.), "Apartment a focus in anthrax inquiry," August 2, 2002;

h. Pete Williams (reporting), CNBC, *The News with Brian Williams*, "FBI re--searches Dr. Steven Hatfill's apartment," August 5, 2002 broadcast; and

i. Dan Abrams, MSNBC, *The Abrams Report*, "FBI Goes to Israel to Investigate Terror Attack; Man Convinces Judge to Stop His Ex--Girlfriend From Having an Abortion; Interview With Tamara Brooks, Jackie Marris," August 5, 2002 broadcast.

57.     On information and belief, plaintiff alleges that DOJ and FBI records contain some version of each of the following facts or purported facts, all of which can be retrieved by the name of Dr. Hatfill or by some identifying particular assigned to Dr. Hatfill, and all of which were disclosed to the press during this period:

a. that the FBI searched Dr. Hatfill's apartment on August 1, 2002;

b. that the June 25, 2002 search was consensual but the August 1, 2002 search was conducted pursuant to warrant;

c. that the search warrant was based on new information in the case;

d. that Dr. Hatfill refused to consent to the August 1, 2002 search;

e. that the FBI also searched the residence of a friend of Dr. Hatfill;

f.   that Dr. Hatfill was a person of interest;

g.   that Dr. Hatfill was a potential suspect;

h.   that the FBI interviewed and polygraphed Dr. Hatfill;

i.   that Dr. Hatfill worked at Fort Detrick until 1999;

j.   that Dr. Hatfill had access to the Ames strain of anthrax at Fort Detrick;

k.   that Dr. Hatfill worked with a Pentagon contractor;

l.   that Dr. Hatfill lost his security clearance;

m.   that Dr. Hatfill's polygraph results were inconclusive;

n.   that the FBI was searching for traces of anthrax on June 25, but was searching for
     something else on August 1;

o.   that the FBI searched trash bins outside Dr. Hatfill's apartment;

p.   that some sources were calling Dr. Hatfill a potential suspect but he was not an
     official suspect;

q.   that Dr. Hatfill was fired from his job at S.A.I.C. in March 2002;

r.   that SAIC colleagues claimed to have seen him remove biological material carriers
     from the facility;

s.   that investigators armed with a search warrant also returned to Dr. Hatfill's rented
     storage facility in Ocala, Florida;

t.   that Dr. Hatfill fit the FBI's profile of the anthrax mailer in some respects but not in
     others;

u.   that the FBI had become far more suspicious of Dr. Hatfill;

v.   that the FBI used bloodhounds to investigate Dr. Hatfill;

w.  that specially trained bloodhounds showed reactions to scents at Dr. Hatfill's apartment and the apartment of his girlfriend;

x.  that the bloodhounds did not show any reaction at places associated with dozens of other people the FBI was investigating;

y.  that one of the bloodhounds ran over to Dr. Hatfill and was practically sitting in his lap; and

z.  that the dogs' reactions were used as the basis for the warrant to search Dr. Hatfill's apartment.

**Dr. Hatfill Tries to Salvage His Name and Reputation**

58.     On Sunday, August 11, 2002, Dr. Hatfill made his first public statement.  He did so reluctantly, and only because the unrelenting media fire storm fueled by government leaks was destroying his life.  Dr. Hatfill declared publicly what he had told investigators repeatedly – that he had nothing to do with the anthrax attacks.

59.     Dr. Hatfill tried to set the record straight and correct the misinformation being disseminated by the defendants.  He explained that he had cooperated all along with investigators.  He had sat for several interviews and a polygraph test, which he had been told he passed.  Afterward, FBI officials informed Dr. Hatfill that he was not a suspect.  Dr. Hatfill explained the renewed interest in him after the Rosenberg meeting on Capitol Hill; and he explained that he had consented to FBI requests to search his apartment, car, and other belongings.

60.     Dr. Hatfill described his shock and dismay at discovering the media events at the searches of his apartment.  He explained that he had never worked with anthrax, that he did not have a current inoculation against anthrax, and that his expertise was not bacteriology (which

25

They also misled an anxious public into thinking that the Attorney General and his subordinates were making progress in the investigation of the anthrax mailings. The truth is that there has never been any credible evidence linking Dr. Hatfill to the anthrax mailings and investigators have made little or no progress toward identifying and apprehending the mailer(s).

**The Buck Never Stops**

80.       On August 13, 2002, Dr. Hatfill's attorney, Victor Glasberg, filed a formal complaint on Dr. Hatfill's behalf with the FBI Office of Professional Responsibility and the DOJ Office of Professional Responsibility. The complaint focused on several issues: (1) improper government leaks to the media of details regarding the searches of Dr. Hatfill's apartment (noting that Dr. Hatfill's father had received a telephone call from a reporter the day before the second search informing him that the FBI intended to conduct another search); (2) an improper government leak of evidence from the search of Dr. Hatfill's apartment to ABC News, one hour prior to Dr. Hatfill's August 11, 2002 public statement; (3) the violent, destructive, and threatening manner in which federal agents conducted the search of the home of Dr. Hatfill's girlfriend on August 1, 2002; (4) Special Agent Roth's misrepresentation to superiors regarding Dr. Hatfill's willingness to cooperate in the investigation (along with another request to secure the voicemail message in which Mr. Glasberg offered Dr. Hatfill's continued cooperation); and (5) improper and highly prejudicial government leaks appearing in the August 12, 2002 issue of *Newsweek* concerning investigative procedures and their results, government officials' bases for focusing on Dr. Hatfill, statements concerning evidence, and witness statements. On August 16, 2002, Mr. Glasberg supplemented his formal complaint, adding a request that the professional responsibility officers at the FBI and DOJ look into still more improper government leaks about investigative procedures and results.

37

**EXHIBIT 6**

Westlaw.

9/12/02 NYT A16

The New York Times

Page 1

9/12/02 N.Y. Times A16
2002 WLNR 4009167

New York Times (NY)
Copyright (c) 2002 The New York Times. All rights reserved.

September 12, 2002

Section: A

F.B.I. Searches Home Of Researcher Again

The New York Times

FBI agents search Maryland home of Dr Steven Hatfill for third time in connection
with hunt for anthrax killer (S)

WASHINGTON, Sept. 11 Agents from the Federal Bureau of Investigation searched the
Maryland home of Dr. Steven Hatfill today for a third time in connection with the
hunt for the anthrax killer, the authorities said.

F.B.I. officials declined to say what they were seeking except to say it was part
of a continuing investigation. They said that it was not a prelude to filing
charges against Dr. Hatfill, 48, who worked until 1999 at an Army research
institute in Fort Detrick, Md. The institute is the main repository of the Ames
strain of anthrax that was sent through the mail last year, eventually killing five
people.

Dr. Hatfill, who says he is the victim of overzealous investigators, moved out of
his apartment in Frederick, Md., last month. After he was fired on Sept. 3 from a
research job at Louisiana State University, he said his life had been "utterly
destroyed" because of the federal investigation.

---- INDEX REFERENCES ----

COMPANY: ALEACIONES DE METALES SINTERIZADOS SA

REGION:  (Maryland (1MA47); USA (1US73); Americas (1AM92); North America (1NO39))

Language:  EN

OTHER INDEXING:  (Hatfill, Steven J (Dr))  (AMES; ARMY; FBI; FEDERAL BUREAU OF
INVESTIGATION; LOUISIANA STATE UNIVERSITY)  (F.B.I. Searches; Hatfill; Steven
Hatfill)  (Anthrax; Biographical Information; Terrorism; Biological and Chemical
Warfare)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

COMPANY TERMS: FEDERAL BUREAU OF INVESTIGATION

EDITION: Late Edition - Final

Word Count: 182
**9/12/02 NYT A16**
END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**EXHIBIT 7**

1648



U.S. Department of Justice

**Subject to
Protective Order**

United States Attorney

*District of Columbia*

*Judiciary Center
555 Fourth St. N.W.
Washington, D.C. 20001*

October 16, 2003

BY HAND DELIVERY

A.J. Kramer
Federal Public Defender for the District of Columbia
625 Indiana Avenue, NW, Suite 550
Washington, DC 20004

Re: Status of Property Seized From Steven Jay Hatfill

Dear Mr. Kramer:

In a letter dated September 10, 2003, you requested my assistance in helping you determine the status of each item of property taken from Steven Hatfill during the searches conducted on June 25, 2002 and August 1, 2002.

In response to your letter, I have compiled the enclosed chart, which lists every item taken from Dr. Hatfill, and the current status of each item. The chart shows that the FBI has seized a total of 223 items ████████████████ and that 86 of these items have previously been returned to your client. Another 16 items on the list are now ready to be released to Dr. Hatfill, at a time and place convenient for him. The remaining 121 items on the list are considered evidence, and are still under review by analysts at the FBI (and other outside laboratories) and cannot be released at this time.

I have enclosed each of the FBI FD-597 property return forms documenting the items returned to Dr. Hatfill on July 2, 2002, July 12, 2002 and March 28, 2003. These forms indicate that the FBI has been periodically releasing property to your client as the forensic analysis of those items has been completed. I have asked the FBI to expedite its analysis of the remaining 121 items of property so that as many of those items can be returned to your client as soon as possible.

Sincerely yours,

ROSCOE C. HOWARD, JR.
United States Attorney

By:  _Ken Kohl_

KENNETH C. KOHL
Assistant United States Attorney
United States Attorney's Office
(202) 616-2139



**NYT28SJH00030**

JA01686

Subject to
Protective Order

## Status of Items Seized From Dr. Steven Hatfill

| | STATUS |
|---|---|
| (1) master lock | RETURNED 7/2/02 |
| (21) mini monitor | RETURNED 7/2/02 |
| (31) black ledger book | RETURNED 7/2/02 |
| (32) black ledger book | RETURNED 7/2/02 |
| (33) black ledger book | RETURNED 7/2/02 |
| (34) Barrendale green notebook | RETURNED 7/2/02 |
| (35) typewritten letter | RETURNED 7/2/02 |
| (36) notes | RETURNED 7/2/02 |
| (37) typewritten paper | RETURNED 7/2/02 |
| (38) black ledger book | RETURNED 7/2/02 |
| (39) cellophane wrapped diplomas         [#B516] | EVIDENCE |
| (40) black ledger book | RETURNED 7/2/02 |

| | STATUS |
|---|---|
| (1) plastic bag of white flakes | EVIDENCE |
| (2) floor mat | RETURNED 7/12/02 |
| (3) film cannister containing two small test tubes | EVIDENCE |
| (4) spinner flask labeled "B Thuringensis simulant" | EVIDENCE |
| (5) test tube marked "Rogers 30 Nov" | RETURNED 7/12/02 |
| (6) 1 floppy disk labeled "Mike Provost resume" and "decon line", one zip disk w/ post-it note from Ryan | RETURNED 7/12/02 |
| (7) notebook w/ handwritten notes re: anthrak, milling & munitions | EVIDENCE |
| (8) zip disk labeled "bio agents" | RETURNED 7/12/02 |
| (9) notes on spore dispersal | RETURNED 7/12/02 |
| (10) Motorola beeper, serial number 042-1176922 | RETURNED 7/02/02 |
| (11) Samsung cellular phone. Sprint - silver in color | RETURNED 7/02/02 |

NYT28SJH00031

Subject to
Protective Order

| | EVIDENCE |
|---|---|
| (12) notebook w/ handwritten notes re: dissemination and Pentagon, WTC, White House and Congress | RETURNED 7/12/02 |
| (13) Palm Pilot, Palm VII, 60FEICM91279 | RETURNED 7/12/02 |
| (14) slides and photos (scientific equipment, diseases, etc) | RETURNED 7/12/02 |
| (15) 11 CD's, 3 floppy disks, 24 zip disks | RETURNED 7/12/02 |
| (16) 3.5" floppy disk, green unmarked | RETURNED 7/12/02 |
| (17) notes (processes, operations, sites/areas) | EVIDENCE |
| (18) microscope slides, vials, pottery | RETURNED 6/27/02 |
| (19) Quantum HDD s/n ADA5100 from Compaq Contura Laptop 410C, s/n 7515HPM72062 | RETURNED 7/12/02 |
| (20) floppy disks | RETURNED 7/12/02 |
| (21) slides of lab apparatus, map of Florida | RETURNED 7/12/02 |
| (22) IBM WDS-3160 SCSA Hard drive from IBM PS/28580, s/n B1XE2008430, CPU serial 23WK5328580 | RETURNED 7/2/02 |
| (23) 6 vials of sodium Heparin | RETURNED 6/27/02 |
| (24) IBM Travelstar Palm Pack Armada, s/n 3J19JMXDVAC7 hard drive | RETURNED 7/12/02 |
| (25) 6 zip disks, 32 floppy disks, 3 CD's | RETURNED 7/12/02 |
| (26) Level A suit and mask, blue and gray in color | RETURNED 7/12/02 |
| (27) virtis blender-like lab apparatus | RETURNED 7/12/02 |
| (28) metal lab apparatus | EVIDENCE |
| (30) Petri dish found in bookshelf near door | EVIDENCE |
| (31) tube labelled "pen strep" | RETURNED 7/12/02 |
| (32) stuffed animal gerbils | |

NYT28SJH00032

JA01688

1651



U.S. Department of Justice

United States Attorney

*District of Columbia*

---

*Judiciary Center*
*555 Fourth St. N.W.*
*Washington, D.C. 20001*

October 16, 2003

BY HAND DELIVERY

A.J. Kramer
Federal Public Defender for the District of Columbia
625 Indiana Avenue, NW, Suite 550
Washington, DC 20004

Re: Status of Property Seized From Steven Jay Hatfill

Dear Mr. Kramer:

In a letter dated September 10, 2003, you requested my assistance in helping you determine the status of each item of property taken from Steven Hatfill during the searches conducted on June 25, 2002 and August 1, 2002.

In response to your letter, I have compiled the enclosed chart, which lists every item taken from Dr. Hatfill, and the current status of each item. The chart shows that the FBI has seized a total of 223 items from Dr. Hatfill and Miss Chegne, and that 86 of these items have previously been returned to your client. Another 16 items on the list are now ready to be released to Dr. Hatfill, at a time and place convenient for him. The remaining 121 items on the list are considered evidence, and are still under review by analysts at the FBI (and other outside laboratories) and cannot be released at this time.

I have enclosed each of the FBI FD-597 property return forms documenting the items returned to Dr. Hatfill on July 2, 2002, July 12, 2002 and March 28, 2003. These forms indicate that the FBI has been periodically releasing property to your client as the forensic analysis of those items has been completed. I have asked the FBI to expedite its analysis of the remaining 121 items of property so that as many of those items can be returned to your client as soon as possible.

Sincerely yours,

ROSCOE C. HOWARD, JR.
United States Attorney

By: _____
KENNETH C. KOHL
Assistant United States Attorney
United States Attorney's Office
(202) 616-2139



JA01689

1652

## Status of Items Seized From Dr. Steven Hatfill

| ITEM | STATUS |
|------|--------|
| (1) master lock | RETURNED 7/2/02 |
| (21) mini monitor | RETURNED 7/2/02 |
| (31) black ledger book | RETURNED 7/2/02 |
| (32) black ledger book | RETURNED 7/2/02 |
| (33) black ledger book | RETURNED 7/2/02 |
| (34) Barrendale green notebook | RETURNED 7/2/02 |
| (35) typewritten letter | RETURNED 7/2/02 |
| (36) notes | RETURNED 7/2/02 |
| (37) typewritten paper | RETURNED 7/2/02 |
| (38) black ledger book | RETURNED 7/2/02 |
| (39) cellophane wrapped diplomas          [#IB510] | EVIDENCE |
| (40) black ledger book | RETURNED 7/2/02 |

| ITEM | STATUS |
|------|--------|
| (1) plastic bag of white flakes | EVIDENCE |
| (2) floor mat | RETURNED 7/12/02 |
| (3) film cannister containing two small test tubes | EVIDENCE |
| (4) spinner flask labeled "B Thuringensis stimulant" | EVIDENCE |
| (5) test tube marked "Rogers 30 Nov" | RETURNED 7/12/02 |
| (6) 1 floppy disk labeled "Mike Provost resume" and "decon line", one zip disk w/ post-it note from Ryan | RETURNED 7/12/02 |
| (7) notebook w/ handwritten notes re: anthrax, milling & munitions | EVIDENCE |
| (8) zip disk labeled "bio agents" | RETURNED 7/12/02 |
| (9) notes on spore dispersal | RETURNED 7/12/02 |
| (10) Motorola beeper, serial number 042-1176922 | RETURNED 7/02/02 |
| (11) Samsung cellular phone, Sprint - silver in color | RETURNED 7/02/02 |

JA01690

| Item Number and Description | Status |
| --- | --- |
| (12) notebook w/ handwritten notes re: dissemination and Pentagon, WTC, White House and Congress | EVIDENCE |
| (13) Palm Pilot, Palm VII, 60FEICM91279 | RETURNED 7/12/02 |
| (14) slides and photos (scientific equipment, diseases, etc) | RETURNED 7/12/02 |
| (15) 11 CD's, 3 floppy disks, 24 zip disks | RETURNED 7/12/02 |
| (16) 3.5" floppy disk, green unmarked | RETURNED 7/12/02 |
| (17) notes (processes, operations, sites/areas) | RETURNED 7/12/02 |
| (18) microscope slides, vials, pottery | EVIDENCE |
| (19) Quantum HDD s/n ADA5100 from Compaq Contura Laptop 410C, s/n 7516HPM72062 | RETURNED 6/27/02 |
| (20) floppy disks | RETURNED 7/12/02 |
| (21) slides of lab apparatus, map of Florida | RETURNED 7/12/02 |
| (22) IBM WDS-3160 SCSA Hard drive from IBM PS/28560, s/n B1XE2008430, CPU serial 23WK5328580 | RETURNED 7/12/02 |
| (23) 6 vials of sodium Heparin | RETURNED 7/2/02 |
| (24) IBM Travelstar Palm Pack Armada, s/n 3J16JMXDVAC7 hard drive | RETURNED 6/27/02 |
| (25) 6 zip disks, 32 floppy disks, 3 CD's | RETURNED 7/12/02 |
| (26) Level A suit and mask, blue and gray in color | RETURNED 7/12/02 |
| (27) virus blender-like lab apparatus | RETURNED 7/12/02 |
| (28) metal lab apparatus | RETURNED 7/12/02 |
| (30) Petri dish found in bookshelf near door | EVIDENCE |
| (31) tube labelled "pen strep" | EVIDENCE |
| (32) stuffed animal gerbals | RETURNED 7/12/02 |

JA01691

1654

| | |
|---|---|
| (1) US Air ticket stub | RETURNED 7/12/02 |
| (2) ATM bank receipt | RETURNED 7/12/02 |
| (3) access keys w/ numbers on them | RETURNED 7/12/02 |
| (4) expired NIH badge and Cairo embassy badge | RETURNED 7/12/02 |
| (5) map of Florida | RETURNED 7/12/02 |
| (6) SAIC business cards | RETURNED 7/02/02 |
| (7) documents from car | RETURNED 7/12/02 |
| (8) misc. receipt | RETURNED 7/12/02 |
| (9) Biohazard magazine receipt | RETURNED 7/12/02 |
| (10) misc. receipts | RETURNED 7/12/02 |
| (11) black box w/ red button and wires | RETURNED 7/12/02 |
| (12) regulator for fermentation | RETURNED 7/12/02 |
| (13) white cap | RETURNED 7/12/02 |
| (14) expired SAIC tag | RETURNED 7/12/02 |
| (15) sheet of paper w/ instructions for fermentation | RETURNED 7/12/02 |
| (16) freeze dry system notebook | RETURNED 7/12/02 |
| (17) 3 notebooks LSU bioterrorism | RETURNED 7/12/02 |
| (18) oustanding bill | RETURNED 7/12/02 |
| (19) red notebook "current finances" | RETURNED 7/12/02 |
| (20) diagram on sheet of paper | RETURNED 7/12/02 |
| (21) DOD window decal | RETURNED 7/12/02 |
| (22) misc. meeting documents | RETURNED 7/12/02 |
| (23) towing receipt, Panama City, FL | RETURNED 7/12/02 |
| (24) instruction manual for rotary pump | RETURNED 7/12/02 |
| (25) misc. financial info w/ Illinois address | RETURNED 7/12/02 |
| (26) business card CDC Karen Cleveland | RETURNED 7/12/02 |

JA01692

1655

| | |
|---|---|
| (1) cut master lock                                    [#IB835] | READY FOR RETURN |
| (5) photo negative                                    [#IB835] | EVIDENCE |
| (8) misc. documents including personal notes about background    CONTAINER #1    [#IB835] | EVIDENCE |
| (9) misc. documents including soldier of fortune magazine re: zip gun article   CONTAINER #2    [#IB836] | EVIDENCE |
| (10) metal cylinder with firing pin spring CONTAINER #28                              [#IB836] | READY FOR RETURN |
| (11) misc. documents / books CONTAINER #28                              [#IB836] | EVIDENCE |
| (12) misc. documents, beret, x-ray film CONTAINER #28                              [#IB836] | BERET IS READY FOR RETURN |
| (13) two shoe boxes w/ misc. documents and photos CONTAINER #28                              [#IB836] | EVIDENCE |
| (14) misc. documents including confidentially marked "presentation exercise, urban guartlia warfare" CONTAINER #5                               [#IB836] | EVIDENCE |
| (15) book of infectious diseases, misc. documents, CONTAINER #28                              [#IB836] | EVIDENCE |
| (15) 14 photocopied documents                     [#IB836] | EVIDENCE |
| (16) misc. documents CONTAINER #6                               [#IB836] | EVIDENCE |
| (17) infantry training manual CONTAINER #7                               [#IB837] | EVIDENCE |
| (18) flight computer / books CONTAINER #21 misc. documents / book CONTAINER #23·                             [#IB837] | EVIDENCE |
| (19) misc. documents / book CONTAINER #23                              [#IB837] | EVIDENCE |
| (20) military manuals and patches CONTAINER #8                               [#IB837] | EVIDENCE |
| (21) misc. documents including Zimbabwe phone book CONTAINER #21                              [#IB837] | EVIDENCE |
| (22) misc. documents including military manuals CONTAINER #9                               [#IB837] | EVIDENCE |

JA01693

| | |
|---|---|
| (23) misc. documents, notebooks CONTAINER #25                    [#IB837] | EVIDENCE |
| (24) misc. documents, notebooks, books CONTAINER #17.                   [#IB838] | EVIDENCE |
| (25) documents and patches CONTAINER #11                    [#IB838] | EVIDENCE |
| (26) political science book CONTAINER #22                    [#IB838] | READY FOR RETURN |
| (27) misc. documents CONTAINER #10                    [#IB838] | EVIDENCE |
| (28) misc. documents including blank diplomas CONTAINER #13                    [#IB838] | EVIDENCE |
| (29) misc. documents, helicopter man CONTAINER #20                    [#IB839] | EVIDENCE |
| (30) misc. documents CONTAINER #14                    [#IB839] | EVIDENCE |
| (31) misc. documents including document labeled "Proposals for the Use of Biological Weapons and Unconventional Warfare Operations" CONTAINER #15                    [#IB839] | EVIDENCE |
| (32) Univ. of Zimbabwe letter CONTAINER #18                    [#IB839] | EVIDENCE |
| (33) lab coat and flight suit CONTAINER #27                    [#IB839] | READY FOR RETURN |
| (34) misc. documents including magazines, stamp and negatives CONTAINER #24                    [#IB840] | EVIDENCE |
| (35) misc. items including subversive warfare manual CONTAINER #16                    [#IB840] | EVIDENCE |
| (36) notebook labeled respiration med & pharm (loose in storage unit)                   [#IB840] | EVIDENCE |
| (37) misc. documents including Univ. of Cape Town photo (loose in storage unit)                   [#IB840] | EVIDENCE |
| (39) misc. plaques and one beret CONTAINER #19                    [#IB841] | EVIDENCE |
| (40) two military manuals, biochemical pathways index, jacket bearing Ames research center and 1 plaque CONTAINER #29                    [#IB841] | EVIDENCE |

JA01694

| | READY FOR RETURN |
|---|---|
| (41) two 5 1/4" floppy disks [#IB841] | EVIDENCE |
| (42) misc. documents, photos, patches, fab coat, and beret [#IB841] CONTAINER #30 | EVIDENCE |
| (43) ziploc bag containing 4" long metal cylinder tube w/ sealed end cap containing unknown substance [#IB782] | EVIDENCE |
| (44) ziploc bag containing 3" long blue metal object [#IB783] | EVIDENCE |
| (45) ziploc bag containing 3 glass microscope slides [#IB785] | EVIDENCE |

JA01695

| | |
|---|---|
| (1) one large plastic container w/ assorted clothing   [#IB646] | READY FOR RETURN |
| (2) one blue suitcase containing misc. clothing   [#IB648] | READY FOR RETURN |
| (3) one plastic bag containing a paraffin block w/ tissue sample   [#IB656] | EVIDENCE |
| (4) one plastic bag containing plastic tube w/ bandaid inside   [#IB655] | EVIDENCE |
| (5) one plastic bag containing numerous glass slides   [#IB657] | EVIDENCE |
| (6) one paper bag w/ classified document and cover sheet   [#IB645] | EVIDENCE |
| (7) one box of misc. clothing   [#IB585] | EVIDENCE |
| (8) one box w/ biohazard bag w/ swab, filters, catheter tubes   [#IB618] | EVIDENCE |
| (9) one bag containing misc clothing and tape samples   [#IB593] | EVIDENCE |
| (10) one biohazard bag containing pharmaceuticals and misc. biology equipment   [#IB658] | EVIDENCE |
| (11) one plastic bag w/ assorted floppy discs   [#IB653] | READY FOR RETURN |
| (12) 23 boxes containing misc. documents, financial records, VHS tapes, books, etc. | EVIDENCE |
| (13) 5 paper bags containing misc. documents | EVIDENCE |
| (14) silencer   [#IB584] | EVIDENCE |
| (15) one sharps box container   [#IB600] | EVIDENCE |

JA01696

| | | |
|---|---|---|
| (Q1) HP Laser Jet Printer | [#IB572] | EVIDENCE |
| (Q2) misc financial paper | [#IB572] | EVIDENCE |
| (Q3) check book registers | [#IB572] | EVIDENCE |
| (Q4) zip computer disks | [#IB572] | EVIDENCE |
| (Q5) misc pieces of paper | [#IB572] | EVIDENCE |
| (Q6) three page email | [#IB572] | EVIDENCE |
| (Q7) agar agar noodles | [#IB572] | EVIDENCE |
| (Q8) toner cartridge and paper | [#IB572] | EVIDENCE |
| (Q9) first aid kit | [#IB572] | EVIDENCE |
| (A1) Microsoft book w/ Andrew Gaston name on it | [#IB576] | RETURNED 3/28/03 |
| (A2) misc. pens | [#IB576] | EVIDENCE |
| (A3) guest book and tape recorder | [#IB576] | RETURNED 3/28/03 |
| (A4) Oracle box | [#IB576] | RETURNED 3/28/03 |
| (A5) note books and papers | [#IB576] | RETURNED 3/28/03 |
| (A6) misc documents | [#IB577] | RETURNED 3/28/03 |
| (J1) lint tape roller | [#IB582] | READY FOR RETURN |
| (J2) plastic container of files | [#IB571] | RETURNED 3/28/03 |
| (H1) brush comb bobby pin | [#IB582] | RETURNED 3/28/03 |
| (E1) pieces of envelopes | [#IB582] | RETURNED 3/28/03 |
| (B1) two pens | [#IB582] | EVIDENCE |
| (B2) box of cancelled checks | [#IB582] | RETURNED 3/28/03 |
| (B3) plastic containers | [#IB582] | RETURNED 3/28/03 |
| (G1) misc key (safe deposit box) | [#IB582] | RETURNED 3/28/03 |
| (G2) passport, address book, and SS card | [#IB582] | RETURNED 3/28/03 |
| (G3) misc papers and check register | [#IB582 & 583] | EVIDENCE |
| (G4) misc financial documents | [#IB576] | RETURNED 3/28/03 |
| (G5) misc documents | [#IB575] | RETURNED 3/28/03 |
| (R1) map | [#IB582] | RETURNED 3/28/03 |

JA01697

1660

| | | |
|---|---|---|
| (R2) map | [#IB582] | RETURNED 3/28/03 |
| (R3) misc. documents | [#IB582] | RETURNED 3/28/03 |
| (R4) misc. documents | [#IB582] | RETURNED 3/28/03 |
| (O1) keys and misc. papers | [#IB582] | RETURNED 3/28/03 |
| (N1) computer discs | [#IB573] | READY FOR RETURN |
| (N2) computer discs | [#IB573] | READY FOR RETURN |
| (N3) misc. papers | [#IB573] | EVIDENCE |
| (N4) video tapes | [#IB573] | EVIDENCE |
| (N5) misc. documents | [#IB573] | EVIDENCE |
| (N6) computer discs | [#IB573] | READY FOR RETURN |
| (N7) misc. pens | [#IB573] | EVIDENCE |
| (N8) airline boarding pass | [#IB573] | EVIDENCE |
| (N9) notebooks | [#IB573] | EVIDENCE |
| (N10) one roll of film | [#IB573] | EVIDENCE |
| (N11) misc paper (dated 9/18) | [#IB573] | EVIDENCE |
| (N12) Palm IIIX | [#IB573] | READY FOR RETURN |
| (N13) misc. photos | [#IB573] | EVIDENCE |
| (N14) business cards | [#IB573] | EVIDENCE |
| (N15) MRE meal | [#IB573] | EVIDENCE |
| (N16) notebook | [#IB573] | EVIDENCE |
| (N17) nerve agent detector | [#IB573] | EVIDENCE |
| (N18) photocopies of passport | [#IB573] | EVIDENCE |
| (N19) misc. docs | [#IB573] | EVIDENCE |
| (N20) birthday card | [#IB573] | EVIDENCE |
| (N21) address book | [#IB573] | EVIDENCE |
| (N22) medications<br>    Cipro<br>    two inhalers<br>    Prednisone | [#IB566]<br>[#IB567]<br>[#IB568] | EVIDENCE |
| (N23) optical eyepiece, pen and film | [#IB573] | EVIDENCE |

JA01698

1661

| | | |
|---|---|---|
| (N24) computer disc in envelope | [#IB573] | EVIDENCE |
| (N25) computer disc | [#IB573] | EVIDENCE |
| (N26) maps and misc. papers | [#IB573] | EVIDENCE |
| (N27) Sony mini recorder and four cassette tapes | [#IB573] | EVIDENCE |
| (N28) hammer | [#IB573] | EVIDENCE |
| (N29) misc. papers | [#IB573] | EVIDENCE |
| (N30) misc. keys | [#IB573] | EVIDENCE |
| (N31) container of Cipro for Peck Chegne | [#IB568] | EVIDENCE |
| (N32) misc. papers and book with hidden area | [#IB569] | EVIDENCE |
| (N33) misc. documents | [#IB574] | RETURNED 3/28/03 |
| (N34) misc. papers | [#IB573] | EVIDENCE |
| (N35) Mason jar w/ coffee in which N31 was found | [#IB573] | EVIDENCE |
| (N36) misc. paperwork | [#IB573] | EVIDENCE |
| (N37) zip disc from desk | [#IB573] | EVIDENCE |
| (N38) misc. blank papers | [#IB573] | EVIDENCE |
| (N39) misc blank paper | [#IB573] | EVIDENCE |
| (N40) blank paper | [#IB573] | EVIDENCE |
| (N41) blank paper | [#IB573] | EVIDENCE |
| (N42) laptop computer, and computer discs | [#IB579] | READY FOR RETURN |
| (N43) misc. papers | [#IB580] | EVIDENCE |
| (N44) two tape dispenser w/ tape | [#IB573] | EVIDENCE |
| (N45) tape | [#IB573] | EVIDENCE |
| (Q10) tape | [#IB582] | RETURNED 3/28/03 |
| (O2) misc. men clothes | [#IB570] | READY FOR RETURN |
| (N46) address book | [#IB581] | RETURNED 3/28/03 |
| (N47) misc. papers | [#IB573] | EVIDENCE |

JA01699

1662

| | | |
|---|---|---|
| (2) visitors pass to "Rotunda" [#IB627] | | EVIDENCE |
| (3) books, papers, receipts, pictures, cassette, map from the trunk [#IB622] | | EVIDENCE |
| (4) Diazepam, cell phone, SAIC business cards, auto receipts from the glove box [#IB630] | | EVIDENCE |
| (5) mail, SAIC business cards, Texaco receipt, pass for Tysons Dulles Plaza and pass for Indian Head Div. Naval Surface Warfare [#IB634] | | EVIDENCE |
| (6) bag with postmark portion of envelope from trunk [#IB636] | | EVIDENCE |
| (7) torn paper with "SunTrust" dated 6/28/02 [#IB638] | | EVIDENCE |
| (8) bag containing binder and transparencies from trunk [#IB624] | | EVIDENCE |
| (9) cassette tape [#IB642] | | EVIDENCE |
| (10) cassette tapes [#IB647] | | EVIDENCE |
| (11) cassettes [#IB649] | | EVIDENCE |
| (12) business card, Copenhagen can with pills, receipts and ad papers [#IB651] | | EVIDENCE |
| (13) key [#IB652] | | EVIDENCE |
| (14) bottles of Triethyl Phosphate and Methyl Salicylate [#IB620] | | EVIDENCE |
| (15) gas cylinder [#IB654] | | EVIDENCE |

| | | |
|---|---|---|
| (1) cassette tape & notebook [#IB607] | | RETURNED 3/28/03 |
| (2) Post it note [#IB611] | | RETURNED 3/28/03 |
| (3) map and notes [#IB609] | | RETURNED 3/28/03 |
| (4) maps, directions, notes [#IB608] | | RETURNED 3/28/03 |

JA01700