# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **IN THE MATTER OF THE APPLICATION** | : | |
| **OF THE NEW YORK TIMES COMPANY** | : | **Misc. Action No. 08-mc-576 (RCL)** |
| **FOR ACCESS TO CERTAIN SEALED** | : | |
| **COURT RECORDS** | : | |

### GOVERNMENT'S OPPOSITION TO THE MOTION OF THE NEW YORK TIMES FOR PUBLIC ACCESS TO CERTAIN SEALED COURT RECORDS

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes the motion of the New York Times Company (the "NY Times")[1] to unseal certain search warrant materials in the criminal investigation into the anthrax mailings of 2001 (the "Amerithrax investigation"). As grounds for this opposition, we rely on the following points and authorities, and any others that may be raised at a hearing on this motion.

### Factual and Procedural Background

### I. The Anthrax Investigation

In September and October, 2001, at least five envelopes containing significant quantities of *Bacillus anthracis* were mailed to persons in the District of Columbia, New York City, and Boca Raton, Florida, in violation of Title 18, United States Code, Section 2332a, which prohibits the use of a Weapon of Mass Destruction. The letters were addressed to members of the national media in New York City and Boca Raton, and to the Capitol Hill offices of two United States Senators located in the District of Columbia. Each of the envelopes contained a photocopy of a handwritten note, as follows:

---

[1] In the days following the filing of this motion, the Los Angeles Times filed an unopposed motion to intervene, which the Court promptly granted. References to the NY Times in this pleading encompass both the NY Times and the LA Times.

Dockets.Justia.com

<u>Letters to Tom Brokaw at NBC and the New York Post (postmarked September 18, 2001)</u>

THIS IS NEXT
TAKE PENACILIN NOW

DEATH TO AMERICA
DEATH TO ISRAEL
ALLAH IS GREAT

<u>Letters to Senators Pat Leahy and Tom Daschle (postmarked October 9, 2001)</u>

YOU CAN NOT STOP US.
WE HAVE THIS ANTHRAX.
YOU DIE NOW.
ARE YOU AFRAID?

DEATH TO AMERICA.
DEATH TO ISRAEL.
ALLAH IS GREAT.

The two letters addressed to Senators Leahy and Daschle had the same fictitious return address, 4th GRADE, GREENDALE SCHOOL, FRANKLIN PARK NJ 08852. Finally, it appears that at least one more envelope was sent to the American Media, Inc. ("AMI") building in Boca Raton, Florida, given the contemporaneous anthrax outbreak in that facility, but no such envelope was recovered from AMI.

At least 22 victims contracted anthrax as a result of the mailings. Eleven individuals contracted inhalational anthrax (developed from inhaling *Bacillus anthracis* spores) and another eleven suffered cutaneous anthrax (contracted through the skin). Five of the inhalational victims eventually died from their infections: (1) Robert Stevens, 63, photo editor, AMI, Boca Raton, Florida, died on 10/5/2001; (2) Thomas L. Morris, Jr., 55, postal worker, Brentwood Post Office, Washington, D.C., died on 10/21/2001; (3) Joseph P. Curseen, Jr., 47, postal worker, Brentwood Post Office, Washington, D.C., died on 10/22/2001; (4) Kathy T. Nguyen, 61, hospital employee,

New York City, died on 10/31/2001; and (5) Ottilie Lundgren, 94, Oxford, Connecticut, died on 11/21/2001. Another 31 persons tested positive for exposure to anthrax spores. All of the exposures and cases of infection are attributed to the anthrax mailings, based on their timing, their location, the place of employment of each individual infected, and the identity of the Ames strain of anthrax found in each letter and in the bodies of the five deceased victims.

Given the broad-ranging nature of an investigation into the release of a deadly pathogen from an unknown source through the U.S. mail system – a seven-year endeavor that relied upon hundreds of thousands of agent-hours and spanned six continents – countless individuals have been investigated in the case. Among the many individuals identified by a joint FBI/United States Postal Inspection Service (USPIS) Task Force as warranting further investigation were Dr. Steven J. Hatfill and Dr. Bruce E. Ivins, both researchers at the United States Army Military Research Institute of Infectious Diseases ("USAMRIID"), in Fort Detrick, Maryland. Numerous investigative techniques were employed throughout the seven-year investigation, including search warrants of property associated with both Dr. Hatfill and Dr. Ivins.[2] The New York Times has moved to unseal all search warrants and related paperwork pertaining to these searches.[3]

---

[2] Although the government normally does not disclose even the existence of sealed search warrant materials, because the NY Times appears to know the dates and locations of the Hatfill searches – indeed, the searches received much media attention as they were underway – we acknowledge here only these bare facts. The numerous Ivins searches escaped public and media attention, but as they are unsealed, see n.3 *infra*, we acknowledge them as well.

[3] However, as of September 24, 2008, all search warrants pertaining to Dr. Ivins have been unsealed by this Court, and the Times has withdrawn its motion with respect to the Ivins warrants, leaving the Hatfill warrants the only filings at issue. The government has supplied to the Court, *ex parte*, the magistrate numbers associated with the Hatfill warrants, and provides the Court complete copies of those motions papers, under seal, along with this filing. "The Hatfill warrants" includes all warrant papers pertaining to Hatfill and Peck Chegne.

3

## II.    Dr. Steven J. Hatfill

One of the individuals investigated in the Amerithrax case was Dr. Hatfill, a virologist who was employed at USAMRIID from September, 1997 through September, 1999.  In 2002, a number of search warrants were executed at various locations linked to Dr. Hatfill, who had by that time become the focus of significant media attention, including from the New York Times. Indeed, the August 1, 2002, search warrant of Dr. Hatfill's residence in Frederick, Maryland was covered as a live media event, complete with helicopter footage of the search in progress.  In the months that followed the search, several publications did "exposes" of the anthrax investigation, each highlighting some of the "evidence" they had uncovered that in their estimation implicated Dr. Hatfill in the anthrax mailings.[4]

In the years that followed, the Task Force continued to investigate whether Dr. Hatfill had any involvement in the anthrax mailings.  However, as one might imagine in a case of this magnitude and complexity, agents investigated numerous other individuals, both nationally and internationally, during that time frame as well.  In the course of this broad-ranging inquiry, investigators and scientists – both from the FBI and numerous outside laboratories – achieved a substantial breakthrough in their ability to pinpoint a singular flask of anthrax spores, housed at USAMRIID, as the parent material of the spores used in the anthrax attacks.  At that point, as the scientific methodology was being validated in late 2006, the focus narrowed to USAMRIID and

---

[4]     During these same early years of the investigation, as information about him trickled out in the media, Dr. Hatfill filed a lawsuit against the United States Department of Justice ("DOJ"), the FBI, and numerous individuals alleging tort claims and violations of the Privacy Act.  After several years of litigation, the parties settled this lawsuit, without admission of liability, in June, 2008.

those laboratories that had received material from that flask. Ultimately, through a combination of laboratory access records, witness accounts, and other information, investigators were able to definitively rule out Dr. Hatfill as the anthrax mailer based on his lack of access to that flask, among other factors. The Department of Justice communicated this to Dr. Hatfill's attorney in an August 8, 2008 letter. See NYT Mot., Attachment C.

## III.    Dr. Bruce E. Ivins

The identification of the flask at USAMRIID as the source of the parent material led investigators to focus on Dr. Bruce E. Ivins – a PhD microbiologist who created and maintained the flask of parent material, known as RMR-1029 – along with a number of other researchers who had access to the particular suite of labs at USAMRIID, where that flask was created and maintained since its creation. The investigation of Dr. Ivins accelerated in the summer and fall of 2007, as the final genetic test proved definitively that RMR-1029 was the parent material. In the course of this intensified focus on Dr. Ivins, the Task Force executed a number of search warrants of his residence, office, and cars on November 1, 2007.[5]

In the wake of those searches, investigators interviewed Dr. Ivins on a number of occasions in the presence of his attorneys, in which they confronted him with, among other things, his conflicting statements regarding key aspects of the anthrax evidence, and his unusual late-night lab hours in the days before each of the anthrax mailings. In addition, they conducted physical surveillance of Dr. Ivins, interviewed numerous additional witnesses, searched Dr. Ivins's trash several times, and executed a number of additional search warrants, including on

---

[5]     Case numbers 07-524-m - 07-529-m, unsealed by order of this Court, August 6, 2008.

several of his email accounts in February, 2008,[6] and for his residence, office, cars, and hospital room on July 12, 2008.[7]   Ultimately, based on all of this evidence, in July, 2008, prosecutors were preparing to charge Dr. Ivins with the anthrax attacks.  However, before those charges were finalized, Dr. Ivins took his own life, ingesting a fatal dose of Tylenol on July 26, 2008, and dying shortly thereafter, on July 29, 2008.[8]

As the NY Times has noted in its motion to unseal these search warrant materials, and as United States Attorney Jeffrey A. Taylor made clear in a press conference on August 6, 2008, in the wake of Dr. Ivins's death, there was enormous media and public interest in the details of the anthrax investigation in general and with respect to Dr. Ivins in particular.  See NY Times Motion ("NYT Mot.") at 2 and NY Times Attachment B.  For this reason, even though the case had not yet been officially closed, in light of Dr. Ivins's suicide, the government made available to the public many details of the anthrax investigation through the release of unsealed search warrant materials and public statements by U.S. Attorney Taylor, and various officials of the F.B.I. and the U.S. Postal Service.  We expect that once the final investigative measures have run their course, most of which were in progress at the time that Dr. Ivins committed suicide, and we

---

[6]     Case numbers 08-082-m - 08-084-m, 08-124-m, 08-125-m, 08-160-m, unsealed by order of this Court on August 6 and September 24, 2008.

[7]     Case numbers 08-429-m - 08-433-m, 08-443-m, similarly unsealed by order of this Court on August 6 and September 24, 2008.

[8]     The Task Force executed a number of additional search warrants of Dr. Ivins's email accounts in the wake of his death, in an effort to obtain additional information relevant to the anthrax mailings – including additional emails he may have sent during the last few weeks of his life when he was hospitalized in a mental health facility, and in the two days between his release from that facility and his fatal overdose.  These warrants were unsealed on September 24, 2008, by order of this Court (08-489-m - 08-495-m).

formally close the case, most of the remaining details of the compelling evidence against Dr.

Ivins will be released.  However, for the reasons that follow, we strongly object to the release of

information concerning Dr. Hatfill – an innocent third-party – from the currently-sealed search

warrants.

## Argument

Citing the extraordinary public interest in the anthrax investigation, the NY Times asks

this Court to unseal all the search warrant materials pertaining to Dr. Hatfill and his girlfriend,

Peck Chegne.  According to the NY Times, the public is entitled to have its questions answered

regarding "how the investigation became misdirected in focusing on Dr. Hatfill (at huge expense

to the American taxpayer), why it took seven years to complete the investigation, and whether the

government's conclusion that Dr. Ivins was solely responsible for the anthrax mailings is sound."

NY Times Memorandum of Points and Authorities ("NYT Mem") at 2.  Further, it claims, "no

proper basis exists for continuing to impose secrecy over the requested court records."  Id.

Because both (1) the interest of Dr. Hatfill – an innocent third party – in protecting his reputation

far outweighs the public's interest in knowing what precise facts the government alleged in

obtaining the search warrants for his property; and (2) even the release of this information would

not answer the questions that – according to the NY Times – burn in the minds of the American

public, the Times's arguments fail.[9]

---

[9]     Because the government has released all search warrant materials pertaining to Dr.
Ivins – and thus all sealed materials which may purport to answer questions regarding the
soundness of our conclusion of Ivins's guilt are in the public domain – this Opposition confines
its reponse to the first two questions proffered by the NY Times on behalf of the American
public: (1) how the investigation became "misdirected" at Dr. Hatfill, and (2) what took so long.

**I.    The public's right of access to court documents is not absolute.**

The NY Times is correct – it is a fundamental tenet of our system of jurisprudence that the public generally has the right to inspect court documents.  NYT Mem. at 6, *citing, inter alia*, Nixon v. Warner Communications, Inc., 435 U.S. 589, 597 (1978).  However, this right is not absolute.  It must thus be balanced against other factors, such as the privacy rights of innocent third parties and confidential informants, and the need to protect ongoing investigations.  See generally Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 510 (1984) (Press-Enterprise I); Press-Enterprise Co. v. Superior Court, 478 U.S. 1 (1986) (Press-Enterprise II); In re Search Warrant No. 00-138-01 (JMF), 2000 WL 1196327 at * 1-2 (D.D.C., July 24, 2000) ("federal courts . . . have balanced the right of public access against the interests in continued secrecy, which interests include the protection of privacy of others and the profound governmental necessity to shield confidential sources of information and to conduct and complete fair and efficient investigations into criminal behavior") (collecting cases).

In order to choose the correct standard for this balancing test, the Court must first determine whether the right of access to the particular documents at issue, in this case sealed search warrant materials, is protected by the first amendment or the common law.  For

> [t]he distinction between the rights afforded by the first amendment and those afforded by the common law is significant. A first amendment right of access can be denied only by proof of a "compelling government interest."  (Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 606 (1982)).  In contrast, under the common law, the decision to grant or deny access is "left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case."

Baltimore Sun Co. v. Goetz, 886 F.2d 60, 64 (4th Cir. 1989), *quoting* Nixon, 435 U.S. at 599, and

In re Washington Post Co., 807 F.2d 383, 390 (4th Cir. 1986) (no first amendment right of access to search warrant papers, only qualified common law right of access). Although this is an issue of first impression in the District of Columbia, for the reasons that follow, the government respectfully urges the Court to adopt the view of the majority of circuits that have examined the issue, and hold that there is a common law right of access, but no constitutional right of access, to sealed search warrant materials. *Compare* Baltimore Sun Co., 886 F.2d at 62; (no first amendment right of access); Times Mirror Co. v. Copley Press, Inc., 873 F.2d 1210, 1213-1219, *amended on reh'g*, (9th Cir. 1989) (same), *with* In re Search Warrant for Secretarial Area Outside the Office of Thomas Gunn, 855 F.2d 569, 572-575 (8th Cir. 1988) (first amendment right of access); *cf.* In the Matter of Eyecare Physicians of America, 100 F.3d 514, 517 (7th Cir. 1996) (no fourth amendment right of access, only common law right).[10]

A.    **The first amendment**

Beginning with Nixon v. Warner Communications, Inc., 435 U.S. 597, which held that the public has a general right "to inspect and copy public records and documents, including judicial records and documents," the Supreme Court and a number of Circuit Courts of Appeals have had occasion to address whether there is a first amendment right of access, beyond the common law right, to a particular phase of a criminal proceeding, or court document. See, e.g.,

_____

[10]    Notably, while this Circuit has not reached this precise issue – whether there is a first amendment right of access to sealed search warrant materials – when confronted for the first time in Washington Post v. Robinson, 935 F.2d 282, 288 (D.C. Cir. 1991) with the issue of whether there is a first amendment right of access to sealed plea agreements and related documents, it held "in accord with the rulings of [its] sister Second, Fourth, and Ninth Circuits," that such a right existed. This Court should follow the lead of the Fourth and Ninth Circuits again here and hold that, while there is a first amendment right of access to plea agreements, there is no such right of access to search warrant materials.

Richmond Newspapers Inc. v. Virginia, 448 U.S. 555 (1980) (qualified first amendment right of access to a criminal trial generally); Press-Enterprise I, 464 U.S at 510 (qualified first amendment right of access to *voir dire* proceedings); Press-Enterprise II, 478 U.S. 1 (qualified first amendment right of access to preliminary hearing transcript); Waller v. Georgia, 467 U.S. 39, 46 (1984) (qualified first and sixth amendment rights of access to suppression hearing); In re the Matter of the New York Times Co., 828 F.2d 110, 114 (2d Cir. 1987) (qualified first amendment right of access to documents filed in conjunction with suppression hearing).  For their analysis, courts have relied upon a two-prong test to determine whether there is a first amendment right of access to the particular document or proceeding:  (1) "whether the place and process have historically been open to the press and general public," and (2) "whether public access plays a significant positive role in the functioning of the particular process in question."  Press-Enterprise II,  478 U.S. at 8-10.

The NY Times baldly asserts, without citation, that "both the common law and the First Amendment extend a qualified public right of access" to search warrant materials (NYT Mem. at 2); and further, again without citation, that "[t]he First Amendment right of access to judicial records also encompasses access to search warrant materials filed with the court, once the warrant has been executed and an investigation completed," (id. at 9).  However, just because the NY Times says it does not make it so.  Quite to the contrary, the NY Times's request for the search warrant materials fails the first prong of this "experience and logic" test, as the search warrant process generally has not been "historically open to the press and general public."  As the Fourth Circuit in Baltimore Sun Co. emphasized in determining that there was no first amendment right of access to search warrant materials, "[t]wice the Supreme Court has

10

recognized that proceedings for the issuance of search warrants are not open." 886 F. 2d at 64,

*quoting* <u>Franks v. Delaware</u>, 438 U.S. 154, 169 (the process for issuing a search warrant is

"necessarily *ex parte*, since the subject of the search cannot be tipped off to the application for a

warrant lest he destroy or remove the evidence"), and *quoting* <u>United States v. United States</u>

<u>District Court</u>, 407 U.S. 297, 321 (1972) ("warrant application involves no public or adversary

proceeding").

The Ninth Circuit in <u>Times Mirror Co.</u> came to the same conclusion, flatly declaring that

there is "no historical tradition of public access to warrant proceedings." 873 F.2d at 1214. In so

doing, the court expressly rejected one of the very claims of openness that the NY Times makes

here – that "Rule 41(i) of the Federal Rules of Criminal Procedure requires that all papers

prepared in connection with a search warrant shall be filed with the clerk of the district court in

the district in which the subject property was seized. These records typically are then available

for public inspection" (NYT Mem. at 7, internal citation omitted; <u>id</u>. at 9-10) – stating:

> [a]ppellants' sole argument of a history of openness of warrant
> proceedings is based upon Fed. R. Crim. P. 41(g) [now 41(i)],
> which requires the magistrate to file the search warrant return,
> inventory, and all "other papers in connection therewith" with the
> clerk of the district court at some point after the warrant is
> returned. . . . Rule 41(g)'s requirement that returned warrant
> materials be filed with the district court **does not establish a**
> **tradition of open warrant proceedings and materials** because
> Rule 41(g) does not require that the warrant materials when filed
> be open to public inspection.

<u>Times Mirror Co.</u>, 873 F.2d at 1214, n. 5 (emphasis added).

Similarly, the NY Times fails as well the second prong of Press-Enterprise II's "experience and logic" test – whether public access "would play a significant positive role in the functioning of the particular process in question." Press Enterprise II, 478 U.S. at 9. It is not enough to answer "[p]lainly it does" to the question of "whether public access to search warrant affidavits contributes to the functioning of the judicial process of which they are a part." NYT Mem. at 10. Rather, a balancing of interests is required:

> Were we to accept this argument, few, if any, judicial proceedings would remain closed. Every judicial proceeding, indeed every governmental process, arguably benefits from public scrutiny to some degree, in that openness leads to a better-informed citizenry and tends to deter government officials from abusing the powers of government. . . . But because the integrity and independence of these proceedings [grand jury proceedings and jury deliberations] are threatened by public disclosures, claims of "improved self-governance" and "the promotion of fairness" cannot be used as an incantation to open these proceedings to the public. Nor will the mere recitation of these interests open a particular proceeding merely because it is in some way integral to our criminal justice system.

Times Mirror Co., 873 F.2d at 1213, internal citations omitted. Considering the very factors advanced by the NY Times in the instant motion, the Times Mirror Co. court found that, although legitimate, they were "more than outweighed" by the damage the criminal investigatory process would sustain as a result of open warrant proceedings, which are "indistinguishable" from grand jury proceedings. Some of the policy underpinnings the court relied on in that case are identical here – "to assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule." Id. at 1216, *quoting* Douglas Oil Co. of Calif. v. Petrol Stops Northwest, 441 U.S. 211, 219 (1979).

Finally, the NY Times's attempt to distinguish these cases on the grounds that their failure to recognize a constitutional right of access to search warrant materials came "at the pre-indictment stage of on-going investigations" (NYT Mem. at 12, n. 7), relies on an unduly and inappropriately narrow reading of these cases. The NY Times claims that "practical and policy concerns" have changed now that there is no longer a concern that release of pre-indictment warrant materials will interfere in the ongoing criminal investigation. Id. Although that may be true, as noted *supra*, the Times Mirror Co. court made clear that this was but one factor contributing to its holding that there is no first amendment right of access to sealed search warrant materials: "[o]ur position is reinforced by still another factor, namely the privacy interests of the individuals named in the warrants and supporting affidavits." Times Mirror Co., 873 F. 2d at1216.[11]

Because neither prong of the "experience and logic" test is satisfied, much less both, this Court should follow the lead of the Fourth and Ninth Circuits – as the D.C. Circuit did in the seminal public access case of Washington Post v. Robinson, 935 F. 2d 282, 288 (D.C. Cir. 1991) – and find that there is no first amendment right of access to the sealed search warrant materials pertaining to Dr. Hatfill.

---

[11] The Ninth Circuit did not reach the question of whether there is a first amendment right of access after an indictment has been returned, as that was not the situation before the court. Times Mirror Co., 873 F.2d at 1218. However, the logical extension of their reasoning – placing heavy emphasis on the privacy rights of individuals named in the warrants – suggests that its ruling would be the same in this context.

### B.     The common law

As set forth in <u>Nixon</u>, under the common law, the decision whether to grant the NY Times access to the Hatfill search warrant materials rests in the discretion of the Court, "a discretion to be exercised in light of the relevant facts and circumstances of the particular case." 435 U.S. at 599. In light of the particular facts and circumstances of this case – where (1) Dr. Hatfill has been investigated and cleared of any involvement in the anthrax letter attacks of 2001, (2) the information contained in the sealed warrants would not provide the answers sought, and (3) and the public has been provided unprecedented access to more than 20 search warrant affidavits with respect to the true perpetrator, with substantially more information to come as the case is formally closed – the Court should preclude access to the Hatfill search warrant materials. Indeed, even under the more stringent first amendment standard, the government's interest in protecting the privacy of the innocent Dr. Hatfill, and the confidential witnesses, is indeed a "compelling government interest" requiring that the Hatfill search warrants remain sealed.

## II.     Dr. Hatfill's privacy interests, and those of confidential witnesses, trump the public's right to know.

According to the NY Times, "no proper basis exists for continuing to keep the Warrant Materials under seal." NYT Mot. at 3. Indeed, even while citing the six-factor test identified by the D.C. Circuit for determining whether there is a "proper basis" for a particular court document to remain under seal, the NY Times then fails to apply that test to the particular facts and circumstances of this case. <u>Id.</u> at 14, <i>citing</i> <u>Johnson v. Greater Southeast Community Hospital Corp.</u>, 951 F.2d 1268, 1277, n.14, <i>citing</i> <u>United States v. Hubbard</u>, 650 F.2d 293, 317-322 (D.C. Cir. 1981). Rather, the NY Times devotes fully one sentence of a 15-page Memorandum of Law

to dismissing the very real and substantial privacy interests of Dr. Hatfill – factor 4 of the test – because, essentially, the public already knows that Dr. Hatfill had been investigated for this crime.  NYT Mem. at 15.  While addressing the propriety of sealing in a slightly different context, the Hubbard court's analysis – balancing of the common law right of access against other factors – provides a useful tool for this Court's evaluation of the current matter.  Hubbard counsels a far more in-depth analysis than the naked assertions of the NY Times, one which comes out squarely on the side of protecting the privacy interest of Dr. Hatfill.

Similarly, under circumstances more directly analogous to the present, numerous circuit courts of appeals have denied access to search warrant materials at least in part on the very grounds we advance today – that the privacy rights of Dr. Hatfill, and of the confidential informants, outweigh the right of the public to know the precise bases for the searches of his property.  See generally Times Mirror, 873 F. 2d at 1216; In re the Matter of the New York Times Co., 828 F.2d at 116; In the Matter of Eyecare Physicians of America, 100 F.3d at 518-519.  Still other courts have redacted references to innocent third parties, thereby acknowledging that such privacy interests can, on balance, outweigh the public's right of access to the information they have provided.  In re Application of Newsday, *supra*, 895 F.2d at 79-80.

Under any articulation of the test, whether the factors set forth in Hubbard or the more generalized "balancing" suggested by Nixon and its progeny, Dr. Hatfill's right to get on with his life after years of intense media speculation that he was a mass-murderer far outweighs the right of the public to know what precise facts the government alleged when it obtained search warrants for his property in the very early days of the extraordinarily complex anthrax investigation.  Similarly, the rights of those witnesses who may have volunteered information to investigators in

that early stage have the right to remain out of the public eye.

## A.    The Hubbard Analysis

In Hubbard, the Church of Scientology and individuals employed by the church appealed a trial court's order to unseal all documents seized during searches of two of their churches, which were the subject of a motion to suppress at the criminal trial of the individuals.  The Church of Scientology was not a defendant in the criminal case.  The Court of Appeals remanded to the trial court for "a more particularized rationale" for its unsealing order, finding the trial court's tripartite reasoning  – (1) "there is a right in the public to know what occurs before the courts"; (2) "there is a public interest in access to court records"; and (3) "sunshine is the best disinfectant" – insufficient.  Hubbard, 650 F. 2d at 295.  It set forth six factors to aid the trial court in its particularized rationale:  (1) the need for public access to the documents at issue; (2) the public use of the documents; (3) the fact of objection and the identity of those objecting to disclosure; (4) the strength of the generalized property and privacy interests asserted; (5) the possibility of prejudice; and (6) the purposes for which the documents were introduced.  Id. at 317-322.  We take the factors relevant to this particular case in turn.[12]

---

[12]    The fifth factor – the possibility of prejudice – is not implicated by the instant motion.  In Hubbard, the Court considered the potential prejudice to two remaining defendants of the original eleven who had yet to be tried.  It considered, without deciding, the impact the full disclosure sought by the government would have on future trial rights, finding that "prejudice to the defendants by sensational disclosure is a factor which may weigh in favor of denying immediate public access."  Hubbard, 650 F. 2d at 321.  Similarly, the sixth factor – the purposes for which the defendants in that case had sought to use the sealed documents, to challenge the validity of the search warrant used to seize those documents – is irrelevant here.

### 1. The public's right to know

As noted throughout this Opposition, the public's right to know what is alleged in a court document is not absolute. In order to determine the strength of this factor, it is important to look to the specific reasons the public – or here the media on its behalf – have advanced for **why** they want to know. For if, as here, the sealed material would not answer the questions in any event, the weight of this factor in the balancing becomes negligible. Here, the NY Times has asserted that "[t]he public has a vital, ongoing interest in understanding how the government carried out its now-completed Amerithrax investigation. Questions continue to be raised about how the investigation became misdirected in focusing on Dr. Hatfill (at huge expense to the American taxpayer), why it took seven years to complete the investigation, and whether the government's conclusion that Dr. Ivins was solely responsible for the anthrax mailings is sound." NYT Mem. at 2.

As the Court and the NY Times know, the searches of property related to Dr. Hatfill took place on August 1, 2002. At that point, just under ten months had elapsed since the time that the anthrax attacks became known to law enforcement. The investigators had determined that the strain used in the attacks was the Ames strain, but further genetic identification of the parent material – much less the identification of a particular flask – would not be available for several years hence. The Amerithrax investigation was, by all accounts, at a very early stage – a time in which teams of several dozen agents were pursuing leads both throughout the United States and many foreign countries.

One of the persons who was at the forefront of this early investigation was Dr. Steven J. Hatfill, who as described above was a virologist at USAMRIID from 1997 through 1999. In the course of the investigation of Dr. Hatfill, Task Force agents sought and obtained court authorization to search property associated with him. The investigation of Hatfill continued for several years, based on various investigative tools and leads. Ultimately, Dr. Hatfill was absolved of any involvement in the crime.

The NY Times claims that information contained within the affidavit in support of search warrants for Dr. Hatfill's property would shed light on "how the investigation became misdirected" at Hatfill, and on "why it took seven years to complete the investigation." Leaving aside the unsupported assertion that the focus on Hatfill was "misdirected," it is simply incomprehensible how the state of the information in the summer of 2002 would shed any light on why it took seven years to complete the investigation and come to the conclusion that Dr. Bruce Ivins was instead the culprit. Thus, to the extent that the public needs answers to the questions posed by the NY Times on its behalf, those answers won't be found in the materials sought, and thus this first factor is moot.[13]

### 2. The public use of the documents

In <u>Hubbard</u>, the trial court authorized the unsealing of the documents. Before the parties could file an appeal of the trial court's order, the documents were made public. The second factor the Court analyzed was whether the information was already in the public domain in some

---

[13] As noted at the outset of this Opposition, because all of the Ivins search warrants have been unsealed, there can be no colorable argument that the August 2002 search warrant affidavits will shed any light whatsoever on the final query, whether the government's July 2008 conclusion that Dr. Ivins was the mailer is sound.

fashion.  Concluding that prior to the trial court's unsealing, the information had in fact been

private, "[t]here is thus no previous access to weigh in favor of the access granted through the

district court's unsealing order."  Hubbard, 650 F.2d at 319-320.  Here, the NY Times is correct

in its assertion that some limited information regarding the specific "incriminating" evidence

against Dr. Hatfill was available in the public domain, at least by the spring and summer of 2002.

Indeed, the NY Times was among a number of media outlets disseminating this information.[14]

However, this is but one factor for this Court to consider, one the government submits is more

than outweighed by Dr. Hatfill's interest, as an officially-exonerated third party, in being left

alone.

### 3.    The fact of objection and the identity of those objecting to disclosure

It seems that the Hubbard Court would agree that the privacy interests of Dr. Hatfill

should weigh heavily:

> An important element in this case is the fact that the party from
> whom the documents were seized was not made a defendant in the
> proceedings and now objects to public access to the fruits of the
> seizure.  **We think that where a third party's property and
> privacy rights are at issue, the need for minimizing intrusion is
> especially great and the public interest in access to materials
> which have never been judicially determined to be relevant to
> the crimes charged is especially small. . . . . [W]e think the fact
> that objection to access is made by a third party weighs in
> favor of non-disclosure.**

650 F.2d at 319-320 (emphasis added).  Here, Dr. Hatfill, through his attorney, has made clear

that he objects to the public disclosure of the search warrant materials, although he obviously

---

[14]    It would be unsettling indeed if the fact that the media had published allegations
about a particular person would mean that they could then gain access to sealed warrant materials
under an "it's already out there anyway" theory.

does not know the details of the information contained therein. He is, as noted throughout, an innocent third party, about whom disclosure of criminal allegations, later disproven, would do continuing harm.

### 4.     Strength of generalized property and privacy interests asserted

In a similar vein, the Hubbard Court looked to the strength of the Church's privacy interests, and determined that they were "unquestionably strong," (650 F.2d at 320), "substantial enough, given the other factors to be considered in weighing the generalized interests in public access against the generalized interest in nondisclosure here asserted, to require retention of the documents under seal." Id. The Court did not make the ultimate determination of whether the documents at issue should remain sealed, rather it remanded to the trial court for a more fulsome analysis based on the factors set forth in its opinion. It is notable, however, that in a separate section discussing the pros and cons of disclosure in more detail, the Court noted with favor the trial court's willingness, "[i]n order to make certain that such material, which would violate the rights of innocent third-parties, is not released, [to] examine the documents at issue and . . . keep under seal those documents or portions of documents which would result in an unwarranted invasion of privacy." Id. at 323-324.[15]

All these factors, taken together, weigh strongly in favor of keeping the Hatfill warrant materials under seal.

---

[15]     Indeed, the Court of Appeals made clear that privacy interests should be considered for anyone who asserts them, "whether or not they concern 'innocent third parties.'" Hubbard, 650 F. 2d at 324.

## B. The Search Warrant Analysis

Even without undertaking the detailed analysis articulated in Hubbard, sister Circuits have held that the privacy rights of innocent third parties are factors to consider in weighing whether the public should have access to sealed search warrant materials. See In re Application of Newsday, 895 F.2d at 79 ("[w]e hold that the common law right of access is qualified by recognition of the privacy rights of the persons whose intimate relations may thereby be disclosed"); see also In re the Matter of the New York Times Co., 828 F.2d at 116; Times Mirror Co., 873 F.2d at 1216. Perhaps the Second Circuit in In re the Matter of the New York Times Co. put it best, in assessing the privacy interests of individuals intercepted on a Title III wiretap:

> Certainly the privacy interests of innocent third parties as well as those of defendants that may be harmed by the disclosure of the Title III material **should weigh heavily in a court's balancing equation in determining what portions of motion papers in question should remain sealed or should be redacted**. In this regard, we note the commendable concern Judge Weinstein displayed in attempting to protect the Title III privacy interests at stake in this case. The job of protecting such interests rests heavily upon the shoulders of the trial judge, since all parties who may be harmed by disclosure are typically not before the court.

In re the Matter of the New York Times Co., 828 F. 2d at 116 (emphasis added).

Further, he right of confidentiality promised to witnesses who have come forward to provide information should similarly be protected. As the Seventh Circuit articulated in In re the Matter of Eyecare Physicians of America, *supra*, 100 F.3d at 518, n. 5, "the informer's privilege" is an independent basis for maintaining the search warrant materials under seal. Indeed, the privilege is actually that of law enforcement, "the Government's privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged

with enforcement of that law.  The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement.  The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation."  100 F. 3d at 518, n. 5, *quoting* <u>Roviaro v. United States</u>, 353 U.S. 53, 59 (1957).  This privilege is another factor that weighs heavily in support of keeping the Hatfill search warrant materials under seal.

The <u>Hubbard</u> factors inform the straight balancing test advanced by these other Circuits – and each test counsels for the same conclusion:  because the questions the NY Times posits on behalf of the American people are not capable of being answered by the information contained in the Hatfill search warrant materials, the public's espoused "need" for the information is a weak factor for the Court to consider, if at all.  Conversely, the privacy rights of Dr. Hatfill – who, while appropriately investigated by the FBI, was the subject of a great deal of media scrutiny[16] – are powerful, as are the rights of informants, and together these vastly outweigh any right of the public to know the particular facts the government thought were incriminating in the earliest stages one of the most complex criminal investigations in United States history.

---

[16]     <u>See</u>, <u>e.g.</u> Thompson, Marilyn W., "A Person of Interest," <u>Washington Post Magazine</u>, September 14, 2003, 7-11, 19-22, 33-35; Foster, Don, "The Message in the Anthrax," <u>Vanity Fair</u>, October 2003, 180-190, 195-200; Kristof, N., "Media's Balancing Act," <u>New York Times</u>, August 28, 2008, appended hereto as Attachment A ("So, first, I owe an apology to Dr. Hatfill.  In retrospect, I was right to prod the F.B.I. and to urge tighter scrutiny of Fort Detrick, but the job of the news media is supposed to be to afflict the comfortable and comfort the afflicted.  Instead, I managed to afflict the afflicted.")

WHEREFORE, we respectfully request that the NY Times Motion for Public Access to Certain Sealed Court Records be denied.

Respectfully submitted,

JEFFREY A. TAYLOR
D.C. BAR NUMBER 451-058
UNITED STATES ATTORNEY

BY: _____

RACHEL CARLSON LIEBER
Assistant United States Attorney
DC Bar No. 456-491
555 Fourth Street, NW, Room 11-909
National Security Section
Washington, DC  20530
(202) 353-8055