## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN THE MATTER OF THE APPLICATION
OF THE NEW YORK TIMES COMPANY
FOR ACCESS TO CERTAIN SEALED
COURT RECORDS

Misc. Action No. 1:08-mc-00576-RCL

### REPLY MEMORANDUM IN FURTHER SUPPPORT OF
### MOTION FOR PUBLIC ACCESS TO CERTAIN SEALED COURT RECORDS

The New York Times Company (the "Times") and Los Angeles Communications LLC
(the "LA Times") (together, "Movants") respectfully submit this reply memorandum in further
support of their joint motion for public access to Search Warrant Materials relating to the now-
completed Amerithrax investigation.  The government's opposition (hereinafter, the
"Opposition" or "Opp.") underscores the extraordinary public interest in understanding the
government's actions in conducting this significant seven-year investigation—an intense interest
that should heighten, rather than diminish, the government's burden to justify ongoing secrecy
for such traditionally available court records.

The Opposition concedes the existence of a common law right of access to search warrant
records, but then misapplies the controlling Supreme Court standard and cites readily
distinguishable authority in a misguided attempt to deny the existence of any constitutional
access right.  Proceeding under the "less stringent" common law standard, the Opposition urges
permanent secrecy for the Search Warrant Materials for two basic reasons, each advanced
without the benefit of evidentiary support: (1) that Dr. Hatfill's asserted desire "to get on with his
life" outweighs the public's right to the information in the Court's records about how and why

Dockets.Justia.com

the government targeted him specifically and how it carried out the anthrax investigation generally; and (2) that the Search Warrant Materials will supposedly not answer *all* the questions raised about the government's actions means there is no reason to provide answers to *any* of them. Neither theory satisfies the government's burden on this motion.

First, the Opposition fundamentally misconstrues the nature of a privacy interest that might be sufficient to overcome the access right—the need to maintain confidentiality over sensitive, personal information the public does not already know. The privacy concern typically protected at the pre-indictment stage is the identity of specific individuals actually under investigation who may be innocent and would have no opportunity to exonerate themselves if they are never indicted. This concern is completely absent here. Dr. Hatfill was publicly identified by the Attorney General in August 2002 as a "person of interest" to the investigation and has since been publicly absolved of any guilt by the Department of Justice. The government should not be allowed to invoke Dr. Hatfill's desire to "get on with his life" as an excuse for blocking public disclosure of information concerning how its investigation was conducted, why it took seven years, where it went wrong, and how Dr. Ivins was finally identified as the anthrax mailer.

Second, that access to the Search Warrant Materials may not provide definitive answers to all such questions about the Amerithrax investigation does not mean that access to them will not illuminate public understanding of the government's actions. Plainly, it will. Disclosure of the Search Warrant Materials will inform public debate about the Amerithrax investigation and permit public oversight of the role of prosecutors and the courts in protecting Fourth Amendment rights in this case. Moreover, the government's insistence that Movants demonstrate why the records *should* be made public reverses the legal burden—the rights of access exist precisely so

that government must make a special showing to deny information to the public. The public's right to know is not limited to what the government wants it to know.

In short, the Opposition fails to establish any proper basis for the continued wholesale sealing of the Search Warrant Materials. At a minimum, the government should be required to demonstrate on a record by record basis what truly private and previously undisclosed information warrants sealing, and why a redacted version of the record should not be disclosed.

## ARGUMENT

### I. THE PUBLIC HAS AN AFFIRMATIVE RIGHT OF ACCESS TO THE SEARCH WARRANT MATERIALS

Movants have demonstrated that the public has both a common law and a constitutional right to inspect search warrant materials filed with the court. Mem. at 6-12. The Opposition concedes the existence of a common law right, but denies that any access right exists under the First Amendment and misleadingly accuses Movants of making up the right "without citation." Opp. at 10. Actually, Movants' memorandum (at 9-13) clearly explains the precedential basis for the right, applying the controlling standard articulated by *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) and its progeny, and noting that the Eighth Circuit Court of Appeals has held that the public has a First Amendment right of access to search warrant materials. *See In re Search Warrant for Secretarial Area*, 855 F.2d 569, 573 (8th Cir. 1988) ("*Gunn*").[1] No other Circuit has held to the contrary, nor has any appellate court ruled "that search warrant applications may be sealed indefinitely after the investigation comes to a close,"

---

[1] The government incorrectly asserts that in *In re Washington Post Co.*, 807 F.2d 383, 390 (4th Cir. 1986), the Fourth Circuit found "a qualified common law right of access," but "no first amendment right of access" to search warrant papers. Opp. at 9. The Fourth Circuit in that case held that "the First Amendment right of access applies to documents filed in connection with plea hearings and sentencing hearings in criminal cases, as well as to the hearings themselves." 807 F.2d at 390.

as the government seeks in this case. *In re Sealing and Non-Disclosure of Pen/Tap/2703(d) Orders*, Mag. Nos. H-08-218M, H-08-219M, 2008 WL 2315862, at *12 (S.D. Tex. May 30, 2008).

The Opposition has no answer to the precedent recognizing a constitutional access right in this context, but relies instead on inapposite authority that expressly distinguishes, and does not purport to speak to, the situation presented here. *See* Opp. at 10-13. Neither the Fourth Circuit decision in *Baltimore Sun Co. v. Goetz*, 886 F.2d 60, 62 (4th Cir. 1989), nor the Ninth Circuit decision in *Times Mirror Co. v. United States*, 873 F.2d 1210 (9th Cir. 1989), addresses the First Amendment right of access to search warrants where the criminal investigation is completed and the crime solved. *See Times Mirror*, 873 F.2d at 1211 (expressly declining to decide "whether the public has a First Amendment right of access to warrant materials *after an investigation is concluded or after indictments have been returned*") (emphasis added); *Baltimore Sun*, 886 F.2d at 62 (addressing right of access "*in the interval between execution of the warrants and indictment*") (emphasis added). As other courts have recognized, these holdings rest on policy concerns that are no longer present once an investigation is concluded and do not address the constitutional issue before this Court. *In re Application of Newsday, Inc.*, 895 F.2d 74, 78 (2d Cir. 1990) (noting that *Times Mirror* addresses rights of access "'*during the pre-indictment stage of an ongoing criminal investigation*'") (emphasis added) (citation omitted); *United States v. Kott*, 380 F. Supp. 2d 1122, 1124 (C.D. Cal. 2004) (*Times Mirror* "specifically left open the question whether the public has a First Amendment right of access to warrant materials after an investigation is concluded or after indictments have been returned") (internal quotations and citation omitted), *aff'd*, 135 F. App'x 69 (9th Cir. 2005).

Nor does the Opposition properly apply the "experience and logic" test the Supreme Court articulated for determining where the First Amendment access right exists. As previously demonstrated, the existence of a common law right to inspect search warrant affidavits – conceded by the government – generally satisfies the "experience" prong of the First Amendment analysis, Mem. at 9, and the absence of historical evidence of access to search warrant affidavits would not in any event defeat the right of access where the "'importance of the . . . proceeding [is] clear,'" *id.* at 10 n.6. (citation omitted). The Opposition concedes these points by its silence.

Instead, the Opposition points to situations where search warrant materials are historically sealed, but again in vastly different circumstances. The authority cited in the Opposition acknowledges only that aspects of search warrant proceedings historically are confidential due to the government's need to avoid tipping off the subject of a search warrant "'lest he destroy or remove the evidence.'" Opp. at 11 (quoting *Franks v. Delaware*, 438 U.S. 154, 169 (1978)); *see also Times Mirror*, 873 F.2d at 1218 (noting the government's interest in secrecy *at the pre-indictment stage* of an investigation). But, as the Eighth Circuit has recognized, where this concern does not exist, search warrant affidavits "are routinely filed with the clerk without seal." *Gunn*, 855 F.2d at 573. In short, the common law right of access indicates a tradition of openness sufficient to satisfy the "experience" prong of the constitutional test, and the Opposition demonstrates nothing to the contrary.

The Opposition equally misapplies the policy prong of the analysis. In its "policy" discussion the government relies principally upon considerations of Dr. Hatfill's privacy, Opp. at 12-13, but its particularized concern with the disclosure of specific facts is properly relevant to the issue of whether the qualified First Amendment right of access must yield under the

circumstances of this case, rather than to the existence of the right itself.[2]  The threshold issue is whether access to search warrant materials generally contributes to the functioning of the process, and plainly it does.  Mem. at 10-12.

The Opposition asserts that the Ninth Circuit in *Times Mirror* found the policy factors cited by Movants to be "'more than outweighed'" by the potential damage to the criminal investigatory process, Opp. at 12 (quoting *Times Mirror*, 873 F.2d at 1216), but again disregards the context of that decision and the actual reasoning of the Ninth Circuit.  Because disclosure of the Search Warrant Materials will not jeopardize an ongoing criminal investigation, as the government concedes, Opp. at 13, its reliance on the policy considerations in *Times Mirror* is wholly misplaced.  The Opposition asserts that the pre-indictment status was just "one factor contributing to [the court's] holding that there is no first amendment right of access to sealed search warrant materials," *id*., but ignores that the Ninth Circuit's holding was expressly limited to the question of whether public access should be granted *at that stage* and that the court's concern focused on privacy interests arising "before indictments are returned," *Times Mirror*, 873 F.2d at 1218.

Simply put, both prongs of the experience and logic test are satisfied here.  A First Amendment right of access attaches to search warrant materials after an investigation is concluded.

---

[2] Notably, the government relies on *Times Mirror* for its proposition about Dr. Hatfill's privacy, *see* Opp. at 12 (quoting *Times Mirror Co. v. United States*, 873 F.2d 1210, 1213 (9th Cir. 1989)), but the passage to which the government cites says nothing about "a balancing of interests."

## II.  THE GOVERNMENT FAILS TO MEET ITS BURDEN TO OVERCOME THE PUBLIC'S RIGHTS OF ACCESS

The Opposition concedes a common law right of access to search warrant materials, but fails to demonstrate how that right is overcome, let alone how the "more stringent" First Amendment standard is satisfied.  *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006) (discussing relation of common law and First Amendment access standards).  As noted, the Opposition argues primarily that Dr. Hatfill has been cleared of any involvement in the anthrax attacks so that disclosure of information in the sealed warrants would infringe his privacy and "would not provide the answers sought" by Movants.  Opp. at 14.  Neither rationale satisfies the government's burden to justify the limitation it seeks to impose on the public's rights of access.

The Opposition's principal concern is with Dr. Hatfill's privacy, but it misperceives the privacy considerations relevant to the issue of public access.  The "privacy" asserted by the government is Dr. Hatfill's desire to "get on with his life," Opp. at 15, which is not a type of privacy interest that customarily weights against the public's right of access.[3]  The Opposition makes no showing of specific non-public facts about Dr. Hatfill that need properly to be sheltered from disclosure, but instead asserts a generalized claim that facts already known should be sealed from further review.  This is a sweeping and novel notion of "privacy" that would allow court records routinely to be sealed.

---

[3] *See, e.g.*, *Hubbard*, 650 F.2d 293, 324 (D.C. Cir. 1980) (stating that one could validly assert a valid privacy interest in not disclosing privileged information or documents "which reveal the intimate details of individual lives, sexual or otherwise"); *In re Application of Newsday, Inc.*, 895 F.2d 74, 79 (2d Cir. 1990) ("[T]he common law right of access is qualified by recognition of the privacy rights of the *persons whose intimate relations may thereby be disclosed . . . .*") (emphasis added); *United States v. Kott*, No. 04-50551, 2005 WL 1400288, at *2 (9th Cir. June 15, 2005) (right of access to judicial materials cannot be overcome by reputational concerns of accused or third parties).

The Opposition also fails to acknowledge the significance to the access calculation of the government's past identification of Dr. Hatfill as someone who was closely scrutinized and absolved of guilt. This is not a situation, as in *Times Mirror*, where court records need be sealed to keep confidential incriminating information about individuals who might not be indicted and would have no forum "to exonerate themselves." 873 F.2d at 1216. Dr. Hatfill was identified by the Attorney General as a person under investigation, one search of his apartment was shown live on national television, the itemized return revealing what was taken as evidence during the searches of his property is public, and the government has officially exonerated him of guilt.

As a result of past disclosures the public already knows a great deal about Dr. Hatfill and the government's investigation of him—including disclosures made by Dr. Hatfill in his now-settled lawsuit against the Attorney General.[4] In this situation, the privacy concerns that typically might support some limitation on public access rights are severely diminished. *See, e.g.*, *In re Search Warrants Issued on May 21, 1987*, Misc. No. 87-186, 1990 WL 113874, at *6 (D.D.C. July 26, 1990) (concluding that privacy interests of named unindicted co-conspirators do not outweigh public's common law right of access). Moreover, the court records that the government seeks to keep secret are not so likely to reveal private facts about Dr. Hatfill as to inform the public about why the government targeted him and the nature of the government's investigation—facts the public has a legitimate interest in knowing.

---

[4] *See* Bead Decl. ¶ 8 (listing information concerning searches identified in Amended Complaint in *Hatfill v. Mukasey*, No. 1:03-cv-01793 (D.D.C.) (RBW)). The government says it would be "unsettling" if the media were able to report confidential allegations about an individual and then gain access to sealed warrant materials because the information is already public, Opp. at 19 n.14, but this suggestion ignores the government's alleged role in the disclosures about Dr. Hatfill—including by the Attorney general—and Dr. Hatfill's subsequent actions to place the disclosures on the public record in his own lawsuit against the Government.

Nor does the government's self-serving assurance that the Search Warrant Materials will not "provide the answers sought," satisfy its burden to defeat the rights of access. Opp. at 14.[5] As the Opposition acknowledges, the Search Warrant Materials relating to Dr. Hatfill are part of a complex investigation that spanned more than seven years. The public and the press have the right to review those materials because they are likely to be relevant to a number of issues, even if they will not answer all of the questions. Indeed, the transcript of the press conference at which the United States Attorney for the District of Columbia asserted Dr. Ivins' guilt as the lone anthrax mailer shows how release of materials about Dr. Hatfill will likely assist the public assessment of the manner in which the investigation was conducted:

> **Question**: So there was at least a two-year delay between the forensic evidence leading to Fort Dietrich[sic], and really focusing on Dr. Ivins. How big a factor was Dr. Hatfield[sic] in that, and how did the FBI get so off-track in focusing on him, apparently as the sole and primary suspect?
>
> **Mr. Taylor**: Let me refer back to what I said: It was an extensive investigation. In an investigation of this scope and complexity, the task is to follow the evidence where it leads . . . .
>
> **Question**: Was Dr. Hatfield[sic] under investigation at this time?
>
> **Mr. Taylor**: Again, the evidence – the followed[sic] where it lead. That's all I'm prepared to say at this point.
>
> **Question**: Dr. Hatfield was never established to have access in the Detrick division or possession, obviously, of anthrax. Yet his residence was searched in June of 2002. Further searches of his property were conducted throughout that year and beyond. Yet it took until, if I'm reading your documents correctly, late 2007 before you ever sought to search Bruce Ivins' vehicles or his residence. Can you just speak to that gap?

Shane Decl. Ex. B.

---

[5] It bears noting that the Government does not venture a response to a number of the questions about the investigation raised in the Declaration of Scott Shane, such as the legitimacy of the investigative techniques and the basis for targeting Dr. Hatfill. *See* Shane Decl. ¶¶ 5-6.

As this exchange suggests, many questions remain concerning the information available to the government in 2002 and the manner in which it pursued this investigation. The government's claim that it already has provided access to many materials relating to its investigation of Dr. Ivins does not diminish the right of access to the sealed materials concerning Dr. Hatfill. The public's right to know is more than a right to know what the government *wants* it to know. The right of access exists so that the public need not take the government's word on these issues, but rather can independently exercise proper oversight.

The Opposition's effort to address the *Hubbard* factors is no more persuasive. Its analysis once again completely misses the mark:

      1.     <u>The need for public access to the documents at issue</u>

The Opposition repeats the claim that the court records sought will "not answer the questions" posed by Movants, but again misses the point. This step of the *Hubbard* analysis examines the nature of the proceeding or record at issue, and the importance of public access to this *type* of proceeding or document. In *Hubbard*, for example, the court noted that the motion for access did not involve courtroom conduct, documents introduced as evidence or even documents "relied upon by the trial judge." *See United States v. Hubbard*, 650 F.2d 293, 317 (D.C. Cir. 1980). Here, the affidavits supporting the search warrant applications were used by the court in adjudicating an important constitutional right—the Fourth Amendment right to be free from government intrusion. The documents played a significant role in the exercise of judicial power, which is why such search warrant materials traditionally are available for public inspection once an investigation is concluded. Mem. at 6-7, 9-10. Access is particularly important in this case, because it involves significant issues of national security. The information will be useful to inform the public about what the government has done in the

anthrax investigation and how governmental power was exercised in the particular situation of Dr. Hatfill. This factor strongly supports access.

2.      The extent of public access prior to sealing

The Opposition concedes that information "regarding the specific 'incriminating' evidence against Dr. Hatfill was available in the public domain" by 2002, Opp. at 19, and this factor also favors disclosure.

3.      The fact of objection and the identity of those objecting to disclosure

In this case it is the government objecting to disclosure. Its obvious interest in avoiding public scrutiny of government conduct weighs against a limitation on access, and this factor therefore favors disclosure.

The Opposition asserts that "Dr. Hatfill, through his attorney, has made clear that he objects to the public disclosure of the search warrant materials, although he obviously does not know the details of the information contained therein." Opp. at 19-20. The claim is made without benefit of evidentiary support and may thus be discounted. In any event, the type of privacy that might be advanced by the government on Dr. Hatfill's behalf is not an interest that supports a restriction on public access, as discussed in factor four.

4.      The strength of the property and privacy interests involved

The Opposition again asserts that Dr. Hatfill has an "interest . . . in being left alone." Opp. at 19. This case does not involve the type of intrusion into sensitive, private facts that concerned the *Hubbard* court. *See supra* at 7-8. Rather, it is an effort to prevent public analysis of facts already widely known. The fact that Dr. Hatfill was identified as a person of interest during the investigation, was publicly identified as having been exonerated by the Department of Justice, brought a lawsuit against the Attorney General in which he laid bare information

concerning the searches, and received a multi-million dollar settlement from the government, all further minimize any privacy interest in the Warrant Materials at issue.

5. <u>The possibility of prejudice to those opposing disclosure</u>

The Opposition argues that "the fifth factor – the possibility of prejudice – is not implicated by the instant motion," Opp. at 16 n.12, but the fact that there is no possibility of prejudice weighs in *favor* of disclosure. *See Johnson v. Greater Se. Cmty. Hosp. Corp.*, 951 F.2d 1268, 1277-78 (D.C. Cir. 1991) (directing trial court to consider need for sealing in light of *Hubbard* principles).

6. <u>The purposes for which the documents were introduced</u>

The Opposition asserts that this factor "is irrelevant here," Opp. at 16 n.12, but overlooks that the materials were introduced to obtain a court order allowing the search of private property, and were relied upon to adjudicate a Fourth Amendment right. The materials were submitted to gain permission to exercise government power in the most sensitive of circumstances. This factor, too, favors disclosure.

In sum, none of the *Hubbard* factors, properly applied, support the government's request to limit public access to the Search Warrant Materials. The government has plainly failed to meet its burden of demonstrating that Dr. Hatfill's privacy interests outweigh the public's right of access to the materials at issue.

## III.  AT A MINIMUM, REDACTED COPIES OF THE SEARCH WARRANT MATERIALS SHOULD BE DISCLOSED

Even if some privacy interest could be established that might justify some limitation on the public's right to inspect the Search Warrant Materials, the government has failed to demonstrate why public access to them may properly be denied altogether. Because a restriction on access must be "no broader than is necessary to protect *those specific interests identified as in*

12

*need of protection*," *Johnson*, 951 F.2d at 1278 (emphasis added), the government is required to identify the precise privacy interests of Dr. Hatfill that are at stake and describe the manner in which disclosure of the Search Warrant Materials will impinge upon those interests, or, conversely, the manner in which the continued sealing of the Search Warrant Materials will protect those interests. *See, e.g.*, *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 14 (1986) (party seeking secrecy must demonstrate "that closure would prevent" harm sought to be avoided); *In re the Matter of the New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987) (When considering whether right of access may be overcome by privacy interests, court "should consider 'whose privacy interests might be infringed, how they would be infringed, [and] what portions of the [records] might infringe them . . . .'") (citation omitted).

Before the Court orders that any material may continue to be withheld, the government should be required to explain, document by document, why less restrictive alternatives to a complete denial of access is insufficient. *Johnson*, 951 F.2d at 1278 (court should require party seeking closure "to come forward with specific reasons why the record, or any part thereof, should remain under seal"); *In re the Matter of the New York Times Co.*, 828 F.2d at 116 (directing trial court to consider whether privacy interests may be protected by redacting records "as opposed to the wholesale sealing of the papers" and noting that redactions are appropriate where "material contained in the papers has already been publicized"). Because the record is devoid of both a proper analysis of the privacy interests involved and an explanation of why wholesale redaction is necessary to protect those interests, if any continued sealing is to be

permitted, the government at a minimum should be compelled to provide a reasoned explanation for the denial of access to each record that it seeks to be sealed, in whole or in part.[6]

## CONCLUSION

For each and all of these reasons, and for the reasons set forth in the initial papers submitted in support of the motion for public access to certain sealed court records, the Times and the LA Times respectfully request the Court to enter an Order granting the motion and unsealing the Search Warrant Materials in their entirety. Alternatively, Movants request the Court to compel the government to articulate the precise privacy interests it seeks to protect and to justify the sealing of each judicial record, and to enter such further relief as the Court deems proper.

Dated: October 15, 2008                    Respectfully submitted,


                                           LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

                                           By:_____/s/ Jeanette M. Bead_____
                                                 David A. Schulz, DC Bar No. 459197
                                                 Jeanette M. Bead, DC Bar No. 480539

                                           1050 Seventeenth Street, NW
                                           Suite 800
                                           Washington, DC 20036-5514
                                           Phone (202) 508-1100
                                           Fax (202) 861-9888

---

[6] The government argues that "'the informer's privilege' is an independent basis for maintaining the search warrant materials under seal." Opp. at 21 (citing *In re the Matter of Eyecare Physicians of America*, 100 F.3d 514, 518 n.5 (7th Cir. 1996)). As the case on which the government relies observes, however, the privilege is limited to the informant's identity and the contents of communications tending to reveal the informant's identity. *In the Matter of Eyecare Physicians*, 100 F.3d at 518 n.5. Thus, as Movants observed in their initial memorandum, while some information may need to remain sealed, the government has not justified the denial of access to the Search Warrant Materials altogether.

*Of Counsel:*

David E. McCraw
The New York Times Company
620 Eighth Avenue
18th Floor
New York, NY 10018

Karlene W. Goller
Los Angeles Times Communications LLC
202 West First Street
Third Floor
Los Angeles, California 90012